## EXHIBITS 1 through 4

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| MUSIC DEALERS, LLC, | ) | 2011L013409 |
| | ) | CALENDAR/ROOM W |
| Plaintiff, | ) | TIME 00:00 |
| | ) | Breach of Contract |
| v. | ) | Case No. _____ |
| | ) | |
| SIERRA BRAVO CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT AT LAW

Plaintiff, Music Dealers, LLC, by and through its attorneys, Elvis Gonzalez, Ltd., for its

Complaint against Defendant, Sierra Bravo Corporation, alleges as follows:

### PARTIES, JURISDCTION, AND VENUE

1.     Plaintiff, Music Dealers, LLC ("Music Dealers"), is a limited liability company

organized under the laws of the State of Illinois.  It is a music licensing company, which operates

the website, www.musicdealers.com.

2.     Defendant, Sierra Bravo Corporation ("The Nerdery"), is a corporation organized

under the laws of the State of Minnesota.  It is a software consulting company that conducts

business under the trade name The Nerdery.

3.     Jurisdiction over this case is proper in Illinois because the conduct complained of

occurred in this State, and the parties have consented to the jurisdiction of Illinois courts.

4.     Venue is proper in Cook County because the conduct complained of occurred

here, and the parties have consented to this venue.

### FACTUAL BACKGROUND

*A.*     *Music Dealers's business, and the Discovery Tool Upgrade*

5.     Central to Music Dealers's business is a technological application, which allows


EXHIBIT

users to to search and license music from pre-licensed, unsigned artists working with it ("the Discovery Tool"). The Discovery Tool is accessed through www.musicdealers.com.

6.  In or about July of 2011, The Nerdery offered to provide certain services to Music Dealers by which it would design and develop an upgrade to the Discovery Tool ("the Discovery Tool Upgrade"). Music Dealers accepted The Nerdery's offer, and the parties further exchanged certain promises and executed certain writings that included a Master Services Agreement, and a Scope of Work. The parties thus formed a valid and enforceable contract ("the Contract"). True and accurate copies of the Master Services Agreement and the Scope of Work are attached hereto as Exhibits A and B, respectively.

7.  Under the Contract, the Nerdery was required to provide services for Music Dealers "as described in one or more Estimates, Proposals, Project Plans, or Statements of Work." (Ex. A, ¶1). Although not referenced in the Master Services Agreement, a Scope of Work describes the services to be performed by The Nerdery as follows:

- Design integration;

- Search functionality,

- Song rating functionality;

- Song play count functionality;

- Song note functionality;

- Genre functionality;

- Song genre functionality;

- Song functionality;

- Playlist functionality; and

- Playlist song functionality;

- 2 -

(Ex. B, p. 2). Under the Scope of Work, the detailed contractual requirements of various components was to be set forth in separate "wireframe" documents, which are schematics that serve as visual guides representing the skeletal framework of a website. In addition, various annotations to the wire frames described key functionality requirements; and in numerous conferences and planning sessions, The Nerdery stated in words or substance to Music Dealers that the Scope of Work was only intended to serve as a general outline of the services to be provided.

8. Music Dealers has been actively promoting the introduction of the redesigned Discovery Tool to the marketplace at various events and conferences, and its existing and prospective customers have based further commercial dealings with Music Dealers on its availability. Because of the importance of the Discovery Tool to the business of Music Dealers, The Nerdery was required to complete the Discovery Tool Upgrade by September 8, 2011.

**B.**    *The Nerdery's Misrepresentations and Breaches of Contract.*

9. In order to induce Music Dealers to enter into the Contract, the Nerdery repeatedly made material misrepresentations about its expertise in Drupal, a website content management system necessary for completion of the Discovery Tool Upgrade. Specifically, on Friday, April 8, 2001 at a meeting in Chicago, The Nerdery, through its agents, Matthew Yonan, Rose Lannin, and Melanie Griffin Pugh, stated in words or substance that The Nerdery had an expert grasp of Drupal, and would have no difficulty meeting Music Dealers's needs.

10. Notwithstanding Music Dealers's payments to the Nerdery in excess of $115,000, The Nerdery failed to perform its obligations under the Contract. Specifically, basic and core elements of the Discovery Tool's functionality have not been implemented, and are not present

in The Nerdery's work product. In addition, the following constitute further material breaches of the Contract:

- the third column of the Discovery Tool's filter options is missing entirely;

- the Discovery Tool's shared playlists do not function;

- the Discovery Tool's playlist page share option does not function;

- the Discovery Tool's song rating functionality is missing;

- the Discovery Tool's song play count is missing;

- the Discovery Tool's genre functionality, song genre functionality, and song functionality do not work properly;

- Filter tags are not grouped properly; and

- the Discovery Tool Upgrade was not completed by the agreed upon deadline

11.     Following the deadline for the Nerdery's completion of the Discovery Tool Upgrade, it even acknowledged and admitted its breaches of the Contract. Specifically, on September 15, 2011, The Nerdery, through Simon Banks, stated to Music Dealers, through Joshua Burke, that upon completion of the project "we will have a post morten to review why this project failed in such a manner." The Nerdery, through Simon Banks, further apologized, and stated that it did not "normally work in such a manner."

COUNT I
(BREACH OF CONTRACT)

12.     Music Dealers incorporates by reference the allegations contained in Paragraphs 1 through 11 of its Complaint as if fully set forth herein.

13.     Music Dealers has performed all obligations required of it under the Contract; specifically, it has paid the Nerdery in excess of $115,000.

14.    The Nerdery's conduct alleged herein constituted material breaches of the Contract, which proximately caused Music Dealers harm.  Specifically, it has paid for services not performed, has been unable to pursue economic opportunities because of the delay in completion of the Discovery Tool Upgrade, and has had existing business relationships jeopardized.

WHEREFORE, Plaintiff, Music Dealers, LLC, prays that judgment be entered in its favor and against Defendant, Sierra Bravo Corporation, in an amount to be determined at trial, but in no event less than $50,000.00, and for such other and further relief as the Court deems just and equitable.

COUNT II
(FRAUD)

15.    Music Dealers incorporates by reference the allegations contained in Paragraphs 1 through 14 of its Complaint as if fully set forth herein.

16.    The Nerdery's statement to Music Dealers that it had an expert grasp of Drupal was a misrepresentations of fact as the Discovery Tool Upgrade delivered to Music Dealers by the Nerdery did not adhere to Drupal coding standards.

17.    Music Dealers would not have entered into the Contract had The Nerdery not possessed the claimed Drupal expertise because such expertise, which Music Dealers lacked, was required in order to design and develop the Discovery Tool Upgrade.

18.    The Nerdery knew that it did not have the Drupal expertise it claimed, which statement it thus knew to be false.

19.    Music Dealers relied on The Nerdery's aforementioned statements to its detriment by entering into the Contract.

- 5 -

20.     As a direct and proximate result of the Nerdery's statements, Music Dealers was harmed when it entered into the Contract. In addition, the Nerdery billed an excessive amount of hours developing the Discovery Tool Upgrade, which would not have been necessary if it had the level of expertise it represented to Music Dealers.

WHEREFORE, Plaintiff, Music Dealers, LLC, prays that judgment be entered in its favor and against Defendant, Sierra Bravo Corporation, in an amount to be determined at trial, but in no event less than $50,000.00, and for such other and further relief as the Court deems just and equitable.

Respectfully Submitted,

MUSIC DEALERS, LLC

By: Its Attorney

Elvis D. Gonzalez
ELVIS GONZALEZ, LTD.
Three First National Plaza
70 West Madison Street, Suite 5050
Chicago, Illinois 60602
312-558-9779
Firm No. 43658
404519.5-11270.00100

# MASTER SERVICES AGREEMENT

## SUMMARY

This Master Services Agreement ("Agreement") is made this ___ day of _____, 2011 (the "Effective Date") by and between Sierra Bravo Corporation, a Minnesota corporation, doing business as The Nerdery, with its principal place of business at 9555 James Ave. S., Suite 345, Bloomington MN, 55431 (hereinafter, "The Nerdery") and _____, a _____ having offices at _____ ("Client"). The Nerdery and Client may be referred to hereinafter individually as a "Party" and collectively as the "Parties." _____

## RECITALS

WHEREAS, The Nerdery is in the business of computer software consulting and development services ("Services") as further described in one or more Statements of Work, the form of which is attached hereto as Exhibit A.

WHEREAS, Client desires to engage The Nerdery to provide software consulting and development services as further described hereunder, and The Nerdery agrees to perform such services, subject to the terms and conditions set forth herein.

## AGREEMENT

THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Services. Subject to the payment of the fees set forth in Section 4 hereunder, The Nerdery agrees to provide Services for Client as described in one or more Estimates, Proposals, Project Plans, or Statements of Work (hereinafter, a "Statement of Work"). Client may request changes to a Statement of Work by providing written notice or other communication to The Nerdery, email requests are permissible hereunder (a "Change Request"). The Nerdery shall provide Client with a quote indicating the costs and fees associated with any Change Request prior to performing any requested work. Upon approval of such quote by Client, Client shall be responsible for any additional time and expenses for any changes to the Services arising out of a Change Request. In the event there is any inconsistency or conflict between the provisions of this Agreement and any executed Statement of Work, the executed Statement of Work under which the Services are to be performed shall govern. The Nerdery retains the right in its discretion and without liability to Client, to change the methods, processes and/or the suppliers by which The Nerdery provides Services and from time to time the right to change, add to or delete Services provided that The Nerdery notifies Client of such change prior to making such change.

2. Cooperation. Client shall assist The Nerdery in the performance of its obligations under this Agreement and shall undertake its responsibilities specified in this Agreement and the applicable Statement of Work. Client shall make available to The Nerdery a designated representative (_____, "Client's Representative") who shall be authorized to make binding decisions for Client regarding the obligations which are the subject of this Agreement, and shall perform or have performed other duties and requirements of Client as set forth in this Agreement or in an applicable Statement of Work. Client understands that The Nerdery shall rely upon Client's Representative as having the authority specified in Section 2 herein and that all official communications from The Nerdery to Client shall be addressed to Client's Representative.

3. Ownership of Software. Subject to payment in full of all amounts owed to The Nerdery hereunder, and except for any Third Party Software, as discussed hereunder, Client shall own all right, title and interest in and to software developed by The Nerdery after the Effective Date pursuant to a Statement of Work as a "work made for hire" under the United States Copyright Act. To the extent that the Software ("Software") is not deemed a work for hire, and to the extent that Client is not deemed to be the author thereof in any territory, The Nerdery hereby agrees to assign the Software to Client (including all copyrights thereon) and grant

PAGE 1 of 1

EXHIBIT A

herein is granted, and that the Licensee is non-exclusive and not perpetual. Client, as the author of the Software, shall have the right to use, modify, reproduce, display, distribute, make use of and/or other exploitation of the Software as well as the right to make changes thereto with such customizations or derivative works. Client acknowledges and agrees that certain software developed by The Nerdery may contain software libraries developed by third parties ("Third Party Software") and, notwithstanding anything to the contrary in this Agreement, the use and disclosure of Third Party Software is at all times subject to the terms and conditions set forth in their respective licenses. The Nerdery makes no representations or warranties of any kind with respect to the Third Party Software. The Nerdery is and shall remain the owner and/or licensor of all right, title and interest in and to any software development tools that may be used to develop any software for Client hereunder or any applicable Statement of Work. Client acknowledges and agrees that this Agreement and the Statement of Work does not transfer or grant Client any rights, title, or interest in and to such software development tools.

4. Fees And Payment Terms. Client agrees to pay all fees for Services either as a Fixed-Price Project, Time & Materials Project, or as an Hourly Service Project basis (collectively, "Service Fees") subject to the terms described on Exhibit B and the applicable Statement of Work. The Nerdery expressly reserves the right to change the Service Fees for Services from time to time upon prior thirty (30) day written notice to Client. The Nerdery also reserves the right to change its billing practices, including, but not limited to the date on which such billing will occur and the types of charges that will be included in such bills.

5. Invoices. Client will be invoiced weekly for all Time & Materials Projects and/or Hourly Service Projects for the prior week's services and as appropriate for all other Services provided under this Agreement and applicable Statement of Work. Client shall pay the invoices for Time & Materials Projects and/or Hourly Service Projects within fifteen (15) days after the date of the invoice at a rate of $_____ per hour. Client shall pay all other invoices within thirty (30) days after the date of the invoice. All past-due invoices are reviewed by The Nerdery on a weekly basis and The Nerdery reserves the right to take any or all of the following actions in the event an invoice is not paid within the specified time period:

1. Notify Client of the delinquent payment by phone, fax, or email and ask that the situation be remedied.
2. Services performed by The Nerdery may be immediately discontinued, delayed or placed on hold at The Nerdery's sole discretion without regard for any project deadlines or other provisions of this Agreement or applicable Statement(s) of Work.
3. Client's hourly rate for Time & Materials and/or Hourly Services may be adjusted. The Nerdery will notify Client in writing of any rate change; however, hourly rate changes under this section 5 will not require any advance notice by The Nerdery and will be applied to all future Services performed for Client.

6. Late Payments. Any payment not received within the specified time period set forth hereunder, or on the Invoice, will accrue interest at a rate of one and one-half percent (1-1/2%) per month, or the highest rate allowed by applicable law, whichever is greater. Client shall also pay to The Nerdery all costs and expenses incurred by The Nerdery in exercising any of its rights under this Agreement or applicable law with respect to recovering any amount owed to The Nerdery hereunder or other breach by Client, including, but not limited to, reasonable attorneys' fees and costs incurred by any collection agency retained by The Nerdery.

7. Limited Warranty. Provided that the Software was developed under a fixed-bid arrangement, The Nerdery agrees to correct any defects in Software caused by source code or data developed or modified by The Nerdery at no charge for a period of thirty (30) days following the installation of such Software onto a live server. Client acknowledges and agrees that the determination of the cause of a defect may require additional time to troubleshoot the source of the defect. The time spent to troubleshoot or correct Software flaws which are determined to not have been caused by source code or data developed or modified by The Nerdery will be billed on a time and materials basis.

8. Warranty Disclaimer. EXCEPT AS EXPRESSLY PROVIDED HEREIN, THE NERDERY AND IT'S AGENTS, OFFICERS, DIRECTORS, EMPLOYEES, SUCCESSORS, ASSIGNS, AND AFFILIATES PROVIDE THE SERVICES "AS IS, WITH ALL FAULTS," AND MAKE NO REPRESENTATIONS OR WARRANTIES OF KIND, EXPRESS OR IMPLIED, AND EXPRESSLY DISCLAIMS ALL WARRANTIES OF TITLE, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

9. Limitation Of Liability. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW AND REGARDLESS OF WHETHER ANY REMEDY FAILS OF ITS ESSENTIAL PURPOSE, IN NO EVENT SHALL THE NERDERY OR ITS AGENTS, OFFICERS, DIRECTORS, EMPLOYEES, SUCCESSORS, ASSIGNS, OR AFFILIATES BE LIABLE TO CLIENT OR ANY OTHER PERSON FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR OTHER SPECIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, LOSS OF DATA, LOST TIME, LOST SAVINGS, LOST CONFIDENTIAL OR OTHER INFORMATION, BUSINESS INTERRUPTION, OR FOR ANY MATTER ARISING

FROM OR RELATING TO THIS AGREEMENT EVEN IF THE NERDERY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE. THE NERDERY'S AGGREGATE LIABILITY FOR ANY CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LIMITED TO THE AMOUNT PAID BY CLIENT TO THE NERDERY UNDER THIS AGREEMENT FOR THE THREE (3) MONTHS IMMEDIATELY PRECEDING THE EVENTS GIVING RISE TO SUCH CLAIM.

10. Indemnification. The Parties agree to defend, indemnify, and hold harmless the other Party, its respective agents, officers, directors, employees, successors, assigns, and affiliates from and against all claims, costs, expenses, damages, loss, fine, penalty, liability or judgment (including attorneys' fees and costs) arising out of or relating to an actual or alleged violation of any of the covenants contained in this Agreement by the other Party or any of its officers, employees, agents.

11. Term. The term of this Agreement shall commence upon the Effective Date and continue until the completion of the applicable Statements of Work unless earlier terminated as set forth herein.

12. Termination. This Agreement may be terminated by either Party at any time for any or no reason upon either Party giving to the other no less than thirty (30) days' prior written notice of termination. Upon such termination, all work completed, including but not limited to the Software, shall be delivered to Client, in its then current condition and all amounts due as of the date of the written notice of termination under the then applicable Statement of Work shall be delivered by Client to The Nerdery.

In addition to any other rights The Nerdery may have under this Agreement or applicable law, The Nerdery may immediately terminate this Agreement or suspend service, effective without notice, in the event of: (i) Client's failure to timely pay any amount owed under this Agreement or applicable Statement of Work; or (ii) Client's breach or failure to comply with any other term, condition, or obligation of Client under this Agreement. Upon the termination of this Agreement by The Nerdery for a breach by Client, all amounts due prior to such termination for work completed by The Nerdery, shall be immediately due and owing. Upon receipt of a payment from Client on any amounts due at termination, The Nerdery shall immediately deliver the Software and all other work completed under the applicable Statement of Work. Client may immediately terminate this Agreement if The Nerdery breaches any material term or condition of this Agreement and fails to cure such breach within fifteen (15) days after receipt of written notice of same. Upon the termination of this Agreement by Client for a breach by The Nerdery, all Software and other work completed by The Nerdery shall be immediately turned over to Client. All Software and other work completed by The Nerdery shall be developed prior to termination.

13. Non-Solicitation. The Parties acknowledge and agree that any attempt on the part of either Party to induce employees or independent contractors to leave a Party's employ, or any effort by a Party to interfere with a Party's relationship with its employees or other service providers would be harmful and damaging to a Party. The Parties agree that during the term of this Agreement and for a period of two (2) years after the end of the Initial or Renewal Term, they will not in any way, directly or indirectly:

· induce or attempt to induce any employee or other service provider of the other Party to quit employment or providing services for or on behalf of such Party;
· otherwise interfere with or disrupt such Party's relationship with its employees, independent contractors, or service providers, discuss employment opportunities or provide information about competitive employment to any of a Party's employees, independent contractors, or service providers; or
· solicit, entice, or hire away any employee, independent contractor, or other service provider of a Party

14. Notices. Any notice permitted or required by this Agreement must be in writing, and shall be deemed given when delivered to the applicable address set forth below by (a) registered or certified mail, return receipt requested; (b) overnight delivery with a nationally recognized courier; or (c) hand delivery.

If to Client:

If to The Nerdery:

The Nerdery
Attn: Mike Derheim, CEO
9555 James Ave. S, Suite 240
Bloomington, Minnesota 55431

15. Force Majeure. The Nerdery shall not be liable for any delay or failure in performing any obligation under this Agreement where cause for such failure or delay is beyond The Nerdery's reasonable control.

16. Non-Waiver. The Nerdery's failure at any time to enforce any of the provisions of this Agreement or any right or remedy available hereunder or at law or in equity, or to exercise any option herein provided, shall not constitute a waiver of such provision, right, remedy or option or in any way affect the validity of this Agreement. The Nerdery's waiver of any default shall not be deemed a continuing waiver, but shall apply solely to the instance to which such waiver is directed.

17. Severability. Every provision of this Agreement shall be construed, to the extent possible, so as to be valid and enforceable. If any provision of this Agreement so construed is held by a court of competent jurisdiction to be invalid, illegal or otherwise unenforceable, such provision shall be deemed severed from this Agreement, and all other provisions shall remain in full force and effect.

18. Choice Of Law And Venue. This Agreement shall in all respects be governed by and interpreted, construed and enforced in accordance with the laws of the State of Illinois, without regard to conflict of law principles. Client expressly agrees that the exclusive jurisdiction for any dispute or action or any nature of or relating to this Agreement, shall be in the state or federal courts located within the state of Illinois. Client agrees that it will not maintain any breach of contract or negligence claim arising out of or relating to this Agreement within one (1) year after the claim or cause of action arose.

19. Attorneys' Fees. If any action at law or in equity is necessary to enforce the terms of this Agreement, the prevailing Party in such dispute shall be entitled to reasonable attorneys' fees, costs and expenses in addition to any other relief to which it may be entitled.

20. Assignment. Client may not assign, delegate or otherwise transfer this Agreement or any of its rights or obligations hereunder without the prior written consent of The Nerdery.

21. Relationship of the Parties. The Nerdery is an independent contractor. Nothing in this Agreement shall be construed as creating any joint venture, partnership, employment or agency relationship between the Parties.

22. Entire Agreement. This Agreement, Exhibits, and Statements of Work set forth the entire agreement and understanding between The Nerdery and Client regarding the subject matter hereof and supersedes any prior representations, advertisements, statements, proposals, negotiations, discussions, understandings, or agreements regarding the same subject matter. Except as otherwise set forth in this Agreement, this Agreement and any Statement of Work entered into by the Parties pursuant to this Agreement may only be amended by the written agreement of the Parties. In the event any term of any of the above mentioned documents conflict with the terms of this agreement, or a relevant statement of work, shall prevail.

23. Use of Client's Name. Client agrees that during the term of this Agreement The Nerdery may publicly refer to Client, orally and in writing, as a Client of The Nerdery in resumes, client lists and in other promotional materials and communications, including, but not limited to, press releases, brochures, reports, letters and electronic media such as e-mail or Web pages.

24. Headings. Headings contained in this Agreement are for convenience of reference only and do not form part of this Agreement. A word importing the singular includes the plural and vice versa.

25. No Third Party Beneficiary. This Agreement is solely for the benefit of the parties hereto and does not confer any rights to any other person or business entity as a third party beneficiary or otherwise.

26. Counterparts. This Agreement may be executed in any number of counterparts each of which, when executed and delivered, shall be deemed to be an original, and all such counterparts together shall constitute one and the same agreement. This Agreement to the extent signed and delivered by means of a facsimile machine, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

## AUTHORIZATION

The Parties hereby agree to all of the above terms and have executed this Agreement by a duly authorized officer or officer representative.

| THE NERDERY | CLIENT |
|---|---|
| | MUSIC DEALERS |
| | *Name* |
| | *(signature)* |
| | 7/19/11 |
| | *(date)* |
| | JOSHUA BURKE |
| | *Print* |
| | DIR. OF PRODUCTION |
| | *Title* |



## SCOPE OF WORK

PHONE (877) 664.0379
FAX (952) 948.1611
EMAIL info@nerdery.com
WEB http://nerdery.com

JULY 18, 2011

# DISCOVERY TOOL UPGRADE
PROJECT #13915
MUSIC DEALERS

## DOCUMENT OBJECTIVE

The purpose of this document is to provide detailed documentation that clearly defines the work The Nerdery will perform and the deliverables you will receive within the scope of this project. If you have questions or need clarification of any part of this document, please contact The Nerdery at your earliest convenience to review. By accepting this document you acknowledge your understanding and agreement to this scope of work. Any requirement, which falls outside the specifications in this document, will be considered "Out of Scope" and may require significant changes to the budget or timeline established for this project.

This document takes precedent over the proposal and any other documentation provided regarding scope of work.

## PROJECT COST

Given the details and assumptions included in this scope of work, this project's cost is shown below:

## $115,768*

If accepted by 7/20/11, development could be completed by 9/8/11. Given the details and assumptions included in this scope of work, this project's cost is shown above. This project requires a 50% payment to begin development. See payment terms below.

## SCOPE OF WORK ACCEPTANCE

To proceed with the project as described in this scope of work, complete the form below and fax this entire document to (952) 948-1611. By accepting, you agree to our terms and conditions visible online at http://nerdery.com/terms

JOSHUA BURKE
ACCEPTED BY

_[signature]_ 7/19/11
SIGNATURE, DATE

ASHLEY SHEERAN
BILLING CONTACT
328. S JEFFERSON, CHICAGO
IL, 60661
BILLING ADDRESS

888.584.0005
BILLING CONTACT PHONE

13915
PURCHASE ORDER OR JOB NUMBER

JULY 18, 2011

DISCOVERY TOOL UPGRADE / PROJECT #13915
MUSIC DEALERS

**EXHIBIT
B**

## PROJECT FEATURES

A summary and itemized estimate of this project's features and development tasks are provided below:

| Component |
|---|
| Project Plan |
| UX/IA |
| Design Integration |
| Search Functionality (flow detailed in wireframes) |
| Song Rating Functionality (flow detailed in wireframes) |
| Song Play Count Functionality (flow detailed in wireframes) |
| Song Note Functionality (flow detailed in wireframes) |
| Genre Functionality (flow detailed in wireframes) |
| Song Genre Functionality (flow detailed in wireframes) |
| Song Functionality (flow detailed in wireframes) |
| Playlist Functionality (flow detailed in wireframes) |
| Playlist Song Functionality (detailed in wireframes) |
| Additional Functionality (detailed below) |
| QA |
| Project Management (10 hours completed) |

The current set of estimates includes the core functionality for working with the main data structures. Backend and frontend functions are called out separately.

The current estimates do not include the following:

- Styling the html5 music player, audio tag. Assuming basic audio tag.
- Music player waveform functionality.
- Drag and drop functionality

## SLICE AND DICE

The slice and dice task includes slicing PSD files, creating html/css. It also includes basic jquery functionality for accordion, sliding functionality.

Search : Provide functionality for the application to search and create a listing based on preset data and associate with a userId. These results can then be sorted, edited, stored, or removed. Allows for multiple searches and interaction using AJAX

Backend:
module : contain backend methods
content type : create with fields for storing userId, search data
View : listing

create() : encapsulates genre's , moods, etc into json and stores

NERDERY

update() : similar to create, but updates instead of save
remove() : simple remove
list() : retrieve and order
broadSearch() : retrieve saved playlists, saved searches, videos based on search term

Frontend:
json object(s) : stores search data, multiple searches?
create() : gathers json data and sends via ajax
update() : gathers json data and sends via ajax, along with search_id
addItem() : adds term to the list of terms in upper-left
removeItem() : removes term from the list of terms in upper-left
broadSearch() : call backend function, update listing display

**Song Rating** : Provide functionality for the application to attached ratings to individual songs. These ratings can then be added, retrieved, updated, or removed.

backend:
module : contain backend methods
content type : create with fields
View : retrieve values

create() : inserts row for user and song
update() : updates row for user and song
remove() : removes row for user and song
getSongRating() : retrieves averaged value for song

frontend:
clear() : clears current search, updates content
create() : sends rating with userId, songId
update() : sends rating with userId, songId, ratingId. Updates display.
remove() : removes rating with ratingId
getSongRating() : retrieves averaged value for song from backend

**Song Play Count** : Show a summary of number of songs in results.
backend :
module : contain backend methods
content type : create with fields for songId, rating
View : retrieve values

incrementPlayCount() : increments play count for song, does not store userId with count

frontend :
incrementPlayCount() : sends songId via ajax

**Song Note** : Provide functionality for the application to attached notes to individual songs. These notes can then be added, retrieved, updated, or removed

backend :
module : contain backend methods
content type : create fields for songId, note content

save() : inserts or updates. limit of a single note per song

frontend :
saveNote() : sends note info via ajax
hasNote() : checks if song has a note via ajax

NERDERY

DISCOVERY TOOL UPGRADE / PROJECT #13915
MUSIC DEALERS

JULY 18, 2011

getNote() : get note for song via ajax

**Genre** : Provide functionality for the application to establish genres. These genres can then be added, retrieved, updated, or removed.

backend :
  module : contain backend methods

  create() : insert genre name
  update() : update genre name

frontend :
  create() : send genre name via ajax
  update() : send genre name, id via ajax

**Song Genre** : Provide functionality for the application to attached genres to individual songs. These genres can then be added, retrieved, updated, or removed.

backend :
  module : contain backend methods
  content type : create fields for songId, genreId

  create() : insert row for songId, genreId
  remove() : remove row for songId, genreId by songGenreId

frontend :
  addSongGenre() : send songId, genreId via ajax
  removeSongGenre() : send songGenreId via ajax

**Song** : Provide functionality for the application to attach additional fields to individual songs. These fields can then be added, retrieved, updated, or removed

backend :
  content type : already there, but will add fields for: playCount, vocal type
  View : some listing functions already there
  module : add functions for custom search, similar song finder

  search() : gather filters and return songs based on criteria
  getSimilar() : gather song info and search for similar songs
  getSongInfo() : retrieve data for a song via ajax, with json response
  getArtistSongs() : get all songs for an artist
  getAlbumSongs() : get all songs for an album

frontend :
  currentSong : object for storing current song in player

  getSongInfo() : retrieve data for a song via ajax/json
  getArtistSongs() : retrieve songs by artist via ajax/json
  getAlbumSongs() : retrieve songs by album via ajax/json
  playSong() : loads song into main music player
  pauseSong() : pauses song in main music player
  getSimilar() : display lightbox and checkboxes for similarity criteria

NERDERY

JULY 18, 2011

DISCOVERY TOOL UPGRADE / PROJECT #13915
MUSIC DEALERS

**Playlist** : Provide functionality for the application to generate Playlists with unique URL's. These playlists can then be added, retrieved, updated, edited or removed

backend :
  content type : already there, may add a field for marking as featured
  View : some listing functions already there, but will add some
  module : add functions for recommending playlists, creating via ajax

  recommendPlaylists() : recommend playlists based on genre's and moods
  searchPlaylist() : return playlists based on name, search term
  featuredPlaylists() : return 'featured' playlists
  create() : insert row, with ajax/json response
  update() : rename playlist, with ajax/json response
  remove() : remove playlist, with ajax/json response

frontend:
  currentPlaylist : object for storing current playlists songs in display

  getRecommendedPlaylists() : call backend via ajax
  searchPlaylists() : call backend via ajax
  getFeaturedPlaylists() : call backend via ajax
  loadPlaylist() : load songs into display area
  copyPlaylist() : copy playlist and songs to new playlist. Update listing.

  createPlaylist() : create playlist via ajax. Update listing
  duplicatePlaylist() : make a copy of the playlist. Update listing.
  renamePlaylist() : rename playlist via ajax. update listing
  removePlaylist() : remove playlist via ajax. update listing


**Playlist_Song** : Provide functionality for the application to attached songs to individual playlists. These songs in the playlist can then be added, retrieved, updated, or removed

backend :
  content type: already there
  View : some listing functions already there
  module : add functions for interacting with frontend via ajax/json

  addSongs() : inserts multiple rows of songs based on array
  addSong() : inserts row for songId, playlistId
  addSongToPlaylists() : inserts multiple rows based on array
  addSongToNewPlaylist() : creates a new playlist and adds song to it
  removeSong() : remove song from playlist

frontend :
  addSongs() : send array of songId's with playlistId
  addSong() : send songId, playlistId via ajax . add song to playlist/song listing
  removeSong() : send songId, playlistId via ajax . remove song from playlist/song listing
  addSongToPlaylists() : send array of playlistId's with songId
  addSongToNewPlaylist() : send songId, playlist name via ajax. from within lightbox.


Additional Functionality:

1a. Song player 'like' button
  frontend :
    css, image creation
    likeSong() : calls backend, disables button after click

DISCOVERY TOOL UPGRADE / PROJECT #13915
MUSIC DEALERS

JULY 19, 2011

NERDERY

backend :
    likeSong() : receives song and user Id. updates database. returns json.

1b. removing most played songs :

1c. adding inline editing functionality for playlist creation
    frontend :
      startNewPlaylist() : adds a DOM element with a text input
      newPlaylistOnEnter() : attaches to text input and listens for enter key.
                    sends ajax request, and disables text input onSuccess

2. scroll bar for playlists :
    frontend :
      two options :
        use default css scrolling
        use custom javascript/css scroll bar

3. switch image with musicdealers image : same amount of time for styling

4a. adjust functionality of tag box so 'parent' categories are grouped with 'child categories,
    and remove display of number of search results :
    frontend :
      need a naming scheme between parent and child filters to recognize div element id's
      addParentFilter() : create div container in filter box.
      addChildFilter() : adds child to corresponding parent div.
      removeChildFilter() : removes child filter.
      removeParentFilter() : removes parent filter and all child filters.
      modify saveSearch() to save hierarchical structure :

4b. switch placement of buttons : 'Advanced Options', 'Show Songs' :
    frontend :
      styling :

5a. remove download column, add link next to song title : no change

6. song details styling :
    frontend :
      styling :

7. no video features : no change since video was removed from scope

8a1. 'Open Playlist' in gear menu loads playlist in main content : already in scope
8a2. 'Share Playlist' in gear menu opens modal for sending email : (not previously in scope) :
    frontend :
      creating modal
      styling modal
    backend :
      sharePlaylist() : receives form data. sends email. displays confirmation
8a3. 'Add to Playlist' in gear menu saves playlist to My Playlists
    frontend :
      use copyPlaylist(), already in scope
    backend :
      use copyPlaylist(), already in scope

9a. Playlist details page , Left panel , switch edit text with pencil image
    swapping text with image
    where do the edit links go? Inline editing was not previously scoped
    Inline editing : add frontend/backend functions for this
    frontend :

SHPDERMARK

DISCOVERY TOOL UPGRADE / PROJECT #13915
MUSIC DEALERS

JULY 18, 2011

NERDERY

javascript functions to switch fields to editable text input
javascript functions to submit via ajax and listen for confirmation
backend :
generic function to handle updating info

9a1. similar to 9a, to use same functionality for 3 new fields.
9b1. addition of modal with edit form
frontend :
use previously scoped functionality for modal
styling
backend :
use previously scoped song note functions

10 . add options to playlist gear menu :
frontend :
styling
use previously scoped playlist functions
backend :
use previously scoped playlist functions

11. same as 9b1
12. add fields to form,modal :
frontend :
add inputs and style
backend :
add logic to form handler and email function

13. My Profile page (not previously scoped)
frontend :
page creation, form creation, styling
backend : form handler, validation

DISCOVERY TOOL UPGRADE / PROJECT #13915
MUSIC DEALERS

JULY 18, 2011

NERDERY

# PROJECT MILESTONES

If this Scope of Work is signed and delivered on or before July 20, 2011 Music Dealers and The Nerdery will agree to meet the following deadlines. This schedule is subject to change. Changes, if necessary, will be reported by the SPM by via email to Joshua Burke

| NAME | OWNERS | DATE |
| --- | --- | --- |
| Scope of Work Approved | Music Dealers | 7/20/2011 |
| Approved PSDs delivered | Music Dealers | 7/20/2011 |
| Design Integration | The Nerdery | 8/10/2011 |
| Playlist Functionality | The Nerdery | 8/24/2011 |
| Search Functionality | The Nerdery | 9/2/2011 |
| QA Review Begins | Music Dealers & Nerdery | 9/5/2011 |
| QA Review Complete | Music Dealers & Nerdery | 9/6/2011 |
| QA Issues Resolved | Music Dealers & Nerdery | 9/7/2011 |
| QA Issues Verified as Resolved | Music Dealers & Nerdery | 9/7/2011 |
| Deployment | The Nerdery | 9/8/2011 |

## QA TESTING

The Nerdery will perform QA testing on the documented features and functions of the project prior to its deployment. Our QA process starts with determining which inputs/actions cause deviation from desired behavior by starting with good/expected values and actions, progressing through reasonable but invalid inputs, and ending with extreme and invalid values. The overall aesthetic and large-scale attributes of a project are also scrutinized, including general usability, performance, and security.

## QA CORRECTIONS

Errors and omissions found during QA testing are documented and assigned to developers for repair. Once a defect has been fixed, it is retested, marked as resolved, and are closed in the tracking system. When all known defects have been closed, the project is ready for deployment.

## SUBMITTING TRAC REPORTS

The feedback cycle will allow client to provide feedback for the application. To create a centralized system for tracking feedback, we will implement Trac, a development wiki and issue tracking system for software development projects. Upon review of the application, per the above timeline, we will ask that all enhancements, defects, and issues be entered into Trac that will then create a "ticket" for the defect, enhancement, or issue. Since we're under the assumption that assets provided are to be deemed final, any design changes reported will be deemed out of scope.

## DEFINITIONS

- Defect can be classified as anything that causes the application to not function per the scope of work.
- Enhancement can be classified as anything that is not within the scope of work.

- Issues can be classified as anything that causes the application to not behave in the manner expected but is not clearly addressed in the scope of work. Issues are not actionable items until they have been discussed with the client and are converted into a defect or enhancement.

## DUE TO THE TIMELINE AND COMPLEXITY OF THE APPLICATION, WE ASK THAT THE BELOW ITEMS BE FOLLOWED:

- Only key contacts at Music Dealers will be allowed to create tickets.
- Only key contacts at the Nerdery will assign tickets.
- Matthew Yonan and Jesse Hansоßn are the Nerdery contacts.
- Joshua Burke is the main contact for Music Dealers.
- All tickets must be entered into the Trac system no later than midnight of the due date.
- Enhancements, defects, or issues provided to Nerdery contacts via email will not be addressed, same as telephone calls.
- All entries entered after midnight will not be addressed within the feedback cycle assigned to the next review cycle.
- Music Dealers will provide supporting content for anything entered into Trac, such as screen shots that highlight reported Trac item.
- If we feel that we require further information, we will make notes for that particular ticket and place it into client wait.
- All tickets will be reviewed before assigning to appropriate development team member.
- We reserve the right to place feature requests into client wait and will not address until further discussion between main Trac contacts.
- Upon development completion of assigned tickets, we will assign back to Music Dealers contacts for approval.
- Music Dealers contacts are to verify that the reported item has been completed.
- It is the responsibility of Music Dealers to assign the Trac tickets to the appropriate parties for review.
- Music Dealers will be responsible for closing all Trac tickets they have submitted upon their change to "In_QA".

## SUPPORTED BROWSERS & DEVICES

**Full support** – Application will fully support these browsers/devices and QA will test in these browsers.

**None** – Application may or may not work in these browsers/devices. No QA testing will be done in these browsers/devices. No development effort is included in this scope of work.

### BROWSERS

| BROWSER NAME | VERSION | TYPE | SUPPORT |
|---|---|---|---|
| Safari* | 3.0.x | Legacy | None |
| Safari | 4.0.x | Legacy | None |
| Safari | 5.0.x | Current Stable | Full |
| Firefox* | 2.0.0.x | Legacy | None |
| Firefox* | 3.0.x | Legacy | None |
| Firefox | 3.5.x | Legacy | Full |
| Firefox | 3.6.x | Current Stable | Full |
| Firefox** | 4.0.x | Current Stable | Full |
| Internet Explorer* | 6.0 SV3 ('6 SP3') | Legacy | None |
| Internet Explorer | 7.0 | Current Stable | Full |

DISCOVERY TOOL UPGRADE / PROJECT #13915
MUSIC DEALERS
JULY 16, 2011

NERDERY

| Internet Explorer | 8.0.x.x | Current Stable | Full |
|---|---|---|---|
| Internet Explorer | 9.0.x.x | Current Stable | Full |
| Opera | 10.x or earlier | Legacy | None |
| Opera | 11.00 | Current Stable | None |
| Google Chrome | 10.x or earlier | Legacy | None |
| Google Chrome | 11.x | Current Stable | None |
| Google Chrome | 12.x or later | Beta | None |

* Design exceptions may be necessary for complete compatibility with these browsers.

** On Mac OS 10.6, Firefox requires at least Flash 10.1 for Flash to work. http://support.mozilla.com/en-US/kb/Managing the Flash plugin -
w_flash-does-not-work-in-firefox-4

# DEVICES

| MANUFACTURER | DEVICE NAME | OS VERSION | CARRIER | SUPPORTED |
|---|---|---|---|---|
| iOS | | | | |
| Apple | iPod Touch (2nd gen) | 4.2.1 | N/A | YES |
| Apple | iPhone 3GS | 4.3.1 | AT&T | YES |
| Apple | iPhone 4 | 4.3.1 | AT&T | YES |
| Apple | iPhone 4 | 4.2.6 | Verizon | YES |
| Apple | iPad (orginal) | 3.2.2 | N/A | NO |
| Apple | iPad (orginal) | 4.3.3 | N/A | YES |
| Apple | iPad 2 | 4.3.3 | N/A | YES |
| BLACKBERRY | | | | |
| RIM | Storm | 5.0.0.328 | Verizon | YES |
| RIM | Torch | 6.0 | AT&T | YES |
| ANDROID | | | | |
| HTC | G1 | 1.6 | T-Mobile | NO |
| HTC | G2 | 2.2 | T-Mobile | YES |
| HTC | Evo 4G | 2.2 | Sprint | YES |
| HTC | Nexus One | 2.3 | T-Mobile | YES |

NERDERY

| Samsung | Nexus S | 2.3 | T-Mobile | YES |
| Motorola | Droid X | 2.2 | Verizon | YES |
| Motorola | Droid 2 | 2.2 | Verizon | YES |
| Motorola | XOOM | 3.0 | N/A | YES |

## ASSUMPTIONS

In the process of developing this scope document, the following assumptions were made:

- Music Dealers will provide all creative assets. The Nerdery reserves the right to re-estimate our effort if these assets exceed our expectations.
- It is assumed that Music Dealers will provide comprehensive JPGs or a PDF to demonstrate every unique design that may be implemented.
- The final high quality artwork will be provided as a layered Adobe Photoshop PSD file with its Color Mode set to RGB. This file must use layer comps instead of multiple Adobe Photoshop PSD files to manage the various final layered designs.
- All art must be delivered using Photoshop's default "North American Web/Internet" Color Settings. The RGB Working Space must be "sRGB IEC61966-2.1". The RGB Color Management Policy must be set to Convert to Working RGB. Failure to deliver PSDs without these color settings will result in inaccurate colors. The effort to resolve inaccurate color settings or rework implemented colors is outside the scope of work and will be billed on a time and materials basis.
- Potential iterations or changes to workflows and designs during the development process are not included in the project cost. Iterations or modifications to the design will result in additional costs and will exceed the project timeline.
- Music Dealers agrees that the project will not launch two days before a weekend or holiday.
- All Flash development will target the current stable release of Flash or later.
    - Flash must be installed by users of the application.
    - Flash Player version 10.3.181.14 is the current stable version of Flash.
    - All QA testing will be done against the current stable version of Flash only.
    - On Mac OS 10.6, Firefox requires at least Flash 10.1 for Flash to work. http://support.mozilla.com/en-US/kb/Managing the Flash plugin - w_flash-does-not-work-in-firefox-4
- The Nerdery will develop the fixed width web interface for a target screen resolution of 1024 x 768 unless otherwise directed.
- The Nerdery will develop the web site to be compatible only with the browsers listed in the table above. Compatibility with other legacy or beta web browsers is not included as part of this project.
- The website will not be optimized specifically for mobile phones, mobile browsers or mobile devices of any kind such as iPhones, iPad, Blackberry and Android operating systems.
- Interactions with third party APIs assume that the API will not change during development and that the Terms of Service for the API allow the intended interaction.
- The development timeline assumes all APIs are available and working during the development period. If APIs are unavailable the project timeline and effort will increase.
- The production server will use Apache 2.2, PHP 5.2, and MySQL 5.0.
- The Nerdery will not create or implement content for the website.
- Any software license costs are the responsibility of Music Dealers.
- The Nerdery assumes no responsibility for the success, failure or profitability of the workflows, methods, or business strategies created by Music Dealers.

## SOURCE CODE

All source code produced by The Nerdery for this project will be provided to the client. The client is free to work with other service providers on future modifications to the project utilizing the provided source code unless otherwise stipulated.

NERDERY

# THIRD-PARTY MATERIALS

If this project includes the use of client-provided or third-party materials, The Nerdery has made our best estimate of effort required to utilize these assets based on previous experience. Because we have not yet reviewed these materials, we may need to adjust scope or estimate to accommodate the actual materials received.

# LIMITED WARRANTY

This project includes a 30 day warranty against software defects. Any issues that are identified within this period must be submitted to The Nerdery in the format defined in the Submitting Trac Reports section. The Nerdery will review issue reports to determine whether a defect can be covered under warranty, or are a request for an additional feature. Issues that are confirmed to be defects will be addressed at no charge.

Music Dealers acknowledges and agrees that the determination of the cause of a defect may require additional time to troubleshoot the source of the defect. The time spent to troubleshoot or correct software flaws – which are determined to not have been caused by source code, or, data developed or modified by The Nerdery – will be billed on a time-and-materials (T&M) basis.

The Nerdery will use the following method to determine if reported issues are defects or feature requests.

The following will be considered warrantable defects:

1.  If the issue exists within a part of the site (or application) that is specifically called-out in the project's Scope of Work document, and, there is a deviation between the actual functionality and what is described in the document
2.  If a website visitor is unable to access a page, or complete a workflow that is described in the Scope of Work

All other issues will be considered requests for additional features, such as:

3.  Copy or design changes
4.  New pages, user workflows or interactions
5.  New forms, or modifications to existing forms
6.  Modifications to how a component functions, assuming it works as originally scoped
7.  Modifications required due to changes by third-party software or services integrated into the project but not developed by The Nerdery
8.  Functionality that was not expressly defined in the scope, and would require the modification of a component of the site that is currently in good working order

## THIRD-PARTY SOFTWARE AND SERVICES

The Nerdery makes no representations or warranties of any kind with respect to third-party software or services.

## WHAT MAY VOID THE WARRANTY

This Limited Warranty shall be null and void in the following circumstances:

1.  Modification of any source code by the end user or any third party
2.  Improper use or installation, failure to conduct regular maintenance or backups by the end user or any third party
3.  Warranty is void when damage is caused by computer viruses or occurs when trying to remove the virus

DISCOVERY TOOL UPGRADE / PROJECT #13915
MUSIC DEALERS

JULY 18, 2011

NERDERY

# PROJECT COST

## $115,768*

If accepted by 7/20/11, development could be completed by 9/8/11. Given the details and assumptions included in this scope of work, this project's cost is shown above. This project requires a 50% payment to begin development. See payment terms below.

## PAYMENT TERMS FOR THIS PROJECT ARE AS FOLLOWS:

| INVOICE BASIS | HOURS |
|---|---|
| 50% of total project fees due immediately | $57,884.00 |
| 35% of total project fees due upon Net 30. | $40,518.80 |
| 15% of total project fees due upon source code delivery. | $17,365.20 |
| TOTAL OF INVOICES | $115,768.00 |

DISCOVERY TOOL UPGRADE / PROJECT #13915
MUSIC DEALERS

JULY 18, 2011

NERDERY



Mariano Torrespico, Plaintiff, v. Columbia College, Jean H. Lightfoot, Rose Gordon, Susan Naese, and Don Gold, Defendants.

No. 97 C 8881

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*1998 U.S. Dist. LEXIS 15714*

September 29, 1998, Decided
September 30, 1998, Docketed

**DISPOSITION:** [*1] Barreto's motion to dismiss counts against her pursuant to *Fed. R. Civ. P. 12(b)(5)* and *12(b)(6)* granted and Columbia's motion to dismiss counts against it and its employees pursuant to *Fed. R. Civ. P. 12(b)(2), 12(b)(5) and 12(b)(6)* granted in part and denied in part.

**COUNSEL:** For MARIANO TORRESPICO, plaintiff: Denise M. Mercherson, Attorney at Law, Chicago, IL.

For COLUMBIA COLLEGE, JEAN H LIGHTFOOT, ROSE L GORDON, defendants: Richard Peter Carey, Uve R. Jerzy, Mandel, Lipton & Stevenson, Ltd., Chicago, IL.

For SUSAN NAESE, defendant: Michael John Leech, Hinshaw & Culbertson, Chicago, IL.

**JUDGES:** JOAN B. GOTTSCHALL, United States District Judge.

**OPINION BY:** JOAN B. GOTTSCHALL

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff Mariano Torrespico brings this action against Susan Barreto (formerly Susan Naese), Columbia College, and three Columbia employees, Jean Lightfoot, Rose Gordon, and Don Gold, seeking compensatory and punitive damages for allegations ranging from malicious prosecution and false imprisonment to violations of *Section 1981*, Title VI, and Title IX. Columbia moves to dismiss the counts against it and its employees pursuant to *Fed. R. Civ. P. 12(b)(2), 12(b)(5), and 12(b)(6)*. [1] Barreto also moves to dismiss the counts against her pursuant to *Fed. R. Civ. P. 12(b)(5) and 12(b)(6)*. For the following reasons, Barreto's motion is granted and Columbia's motion is granted in part and denied in part.

1  Defendants Columbia College, Lightfoot, Gordon, and Gold share the same counsel, and arguments for each have been made in the same pleadings. This Opinion thus will refer to their motion to dismiss as Columbia's Motion to Dismiss.

[*2] **I. BACKGROUND** [2]

2  The following facts are taken from Torrespico's Second Amended Complaint and are assumed to be true. *Fredrick v. Simmons Airlines, Inc., 144 F.3d 500, 502 (7th Cir. 1998)*.

**A. Factual background regarding Plaintiff's substantive claims**

Plaintiff Mariano Torrespico, an Hispanic male, enrolled at Columbia College in early 1994. That fall, he became Managing Editor of the *Chronicle of Columbia College*. In the spring of 1995, Torrespico was hired to serve as Managing Editor of Columbia's *Chicago Arts and Communication Magazine* (hereinafter "CACM"), a federally funded work-study position. As Editor in Chief of CACM, Barreto was Torrespico's supervisor. Torrespico alleges that he "opposed racially segregated literary publications," "was vocal about the lack of Hispanic and African Americans [sic] presence on the staff of the



EXHIBIT
2

college's literary publications," and that Barreto did not share this concern. Second Amended Complaint (hereinafter "SAC") PP 7, 10.

[*3] Torrespico and Barreto began dating in the fall of 1995. On December 6, 1995, their relationship ended. That evening, Torrespico and Barreto went out on a dinner date, after which Torrespico accompanied Barreto home to her dormitory residence. Torrespico claims that he then ended their dating relationship due to numerous on-the-job conflicts. SAC P 13. According to Torrespico, Barreto threatened to have him fired from CACM. Id. Barreto filed a criminal complaint for sexual assault against Torrespico later that night.

The next day, December 7, Barreto told Lightfoot, Columbia's Dean of Students, that Torrespico had raped her the night before in her dormitory room. On December 8, Torrespico received a notice stating that he would be subject to a disciplinary hearing on December 11 for sexual assault, a violation of the Student Code. Torrespico attended that hearing, where he was questioned by Lightfoot about Barreto's date rape allegations. At the conclusion of the hearing, Lightfoot prohibited Torrespico from attending class or participating in any school organizations or activities pending the outcome of the hearing. SAC P 21. According to Torrespico, Lightfoot also told him [*4] she had "arranged" for him to meet with Detective Thomas Skol of the Chicago Police Department on December 13 "to answer" the rape charges. Id. P 20.

Torrespico claims Lightfoot and Gordon conducted the hearing. SAC P 17. According to the complaint, Lightfoot was responsible for administering Columbia's Student Disciplinary procedures as well as its Sexual Harassment Policy and procedures. Id. P 3. Torrespico alleges that Gordon held herself out to be Columbia's staff psychologist and was responsible both for administering disciplinary procedures and for investigating reports under the Disciplinary and Sexual Harassment Policy and Procedures when so directed by Lightfoot. Id. P 4.

Torrespico finds several defects in the December 11 hearing. First, he claims that Lightfoot and Gordon "singled out" some controversial comments he had previously made at a Student Organization Committee meeting on November 21, 1995, where he opposed a proposal to use student monies to fund a date rape panel, and treated these comments as pertinent to the alleged Student Code violation. SAC PP 12, 18. Second, he claims that Gordon stated that his "too macho Latin attitude" was proof of his [*5] guilt. Id. P 19. Third, Torrespico claims that the composition of his hearing committee-two females, Lightfoot and Gordon-violated Columbia's Sexual Harassment Policy, which he alleges mandates inclusion of an administrative person of his gender, that is, a male. Id. PP 31-32.

On December 13, 1995, Torrespico voluntarily presented himself for questioning by the Chicago Police Department, which also questioned Barreto and (apparently) her roommates. Torrespico alleges that Lightfoot first "coached" both Barreto and her roommates "as to how they should respond to police questioning." SAC P 23. Torrespico was subsequently arrested, charged with criminal sexual assault, and incarcerated that same day.

On January 9, 1996, a court dismissed the charge of criminal assault for "lack of probable cause." SAC P 26. On February 22, 1996, Barreto unsuccessfully sought an order of protection against Torrespico in Cook County Circuit Court's Domestic Relations Division. According to the complaint, the court denied the request "following a determination that the facts did not justify an order of protection." Id. P 28.

In between these two events, on February 5, 1996, Lightfoot found [*6] that Torrespico had committed a sexual battery on Barreto in violation of the Student Code and Sexual Harassment Policy. SAC P 29. Torrespico was consequently expelled from Columbia. He was also fired from his job with CACM by Gold, who, according to Torrespico, stated that he could not have a man like Torrespico "on the staff because there are too many women." Id. P 30.

On November 12, 1997, Torrespico filed a complaint in Cook County court. On December 23, 1997, Columbia removed this case to federal court. Plaintiff alleges five counts against one or more of the five defendants named in this case. Counts I and II are state law claims alleging malicious prosecution and false imprisonment, respectively, against both Barreto and Lightfoot. Counts III-V are federal law claims. Count III alleges that Columbia and Gold discriminated against Torrespico on the basis of his national origin in contravention of 42 U.S.C. § 1981. Count IV alleges that Columbia, Lightfoot, and Gordon discriminated against him on the basis of his national origin in contravention of Title VI. Finally, Count V alleges that Columbia discriminated against Torrespico on the basis of his sex in contravention of [*7] Title IX.

**B. Service of process** [3]

3   This factual background includes facts taken from several affidavits submitted on behalf of Defendants Lightfoot, Gordon, and Barreto. In considering the sufficiency of service of process, a defendant may introduce affidavits to support its contention that service was improper. See, e.g., Jones v. Jones, 217 F.2d 239, 242 (7th Cir. 1954) (considering affidavits submitted by both

1998 U.S. Dist. LEXIS 15714, *

parties in deciding whether service was proper); *Grantham v. Challenge-Cook Bros., Inc., 420 F.2d 1182, 1186 (7th Cir. 1969)* (considering affidavit submitted to support defendant's motion to quash service). Where the content of such affidavits is uncontroverted except by the process server's return, such content will be deemed admitted for purposes of the *Rule 12(b)(5)* motion. *See id.* (granting defendant's motion to quash service on the basis of an uncontroverted affidavit that the individual on whom service was made was not an agent of the defendant).

Because the sufficiency [*8] of service of process raises several disputed issues, this Court will outline the facts regarding Torrespico's various attempts at service. This case was initially filed in state court on November 12, 1997. On November 24, 1997, Torrespico effected service on the College and also attempted to serve Lightfoot and Gordon. On November 28, 1998, he attempted to serve Barreto. On December 23, 1997, Columbia removed this case to federal court. It is undisputed that Torrespico properly served Columbia, but the parties dispute the sufficiency of the November attempts at service on Lightfoot, Gordon, and Barreto. [4]

4    No issue is raised as to the propriety of service on Don Gold.

**1. Facts regarding attempts at service on Lightfoot and Gordon**

Plaintiff initially attempted to serve Lightfoot and Gordon by leaving the process for each at Columbia with one Darryll Jones, identified as an "authorized person" of each defendant on the return of service from the Cook County Sheriff's Office. *See* Plaintiff's Response [*9] to Defendants' Reply to Plaintiff's Response to Defendants' Motion to Dismiss the Second Amended Complaint (hereinafter "Plaintiff's Second Response") Exs. 2 (Lightfoot) and 3 (Gordon). In a letter dated January 8, 1998, [5] Uve Jerzy, attorney for Columbia and its employees, Lightfoot, Gordon, and Gold, informed Plaintiff that his attempted service on both Lightfoot and Gordon was defective. *See* Columbia College's Reply to Plaintiff's Response to the *Rule 4(m)* Service Issue (hereinafter "Columbia's Second Reply") Ex. A at 2. Columbia, which noted that Jones was its general counsel, asserted that neither Lightfoot nor Gordon had been properly served because Jones was not an authorized agent for either defendant. *See id.* Columbia raised the issue of defective service once again in its February 20, 1998 motion to dismiss. *See* Columbia's Motion to Dismiss at 3-4. Attached to the motion were affidavits from Lightfoot and Gordon, dated February 19, 1998, denying that they had ever been served with process in this lawsuit and stating that they had not authorized or appointed any

agent to accept process on their behalf. *See* Lightfoot Aff., *id.* Ex. A and Gordon Aff., [*10] *id.* Ex. B.

5    The letter was received by facsimile that same day. *See* Columbia's Second Reply at 2.

Torrespico apparently agreed with Mr. Jerzy's assessment, at least initially, conceding that he had not obtained "personal service" on either Lightfoot or Gordon in a letter dated March 1, 1998, from his attorney, Denise Mercherson, to Mr. Jerzy. *See* Plaintiff's Second Response Ex. 5. In that letter, Ms. Mercherson notified Mr. Jerzy that she was mailing a Notice of Lawsuit and Request for Waiver of Service of Summons, along with the amended complaint, to Lightfoot and Gordon. *See id.* Copies of these unsigned documents, dated March 2, 1998, are attached to Plaintiff's Second Response. *See id.* Exs. 6 (Lightfoot) and 7 (Gordon). Ms. Mercherson also asked whether Mr. Jerzy's law firm would accept service on Lightfoot's and Gordon's behalf and stated that she would arrange to have them personally served if they were not amenable to either the waiver or agency alternatives. *See id.* Torrespico [*11] claims that Mr. Jerzy did not respond to the March 1 letter, *see id.* at 2, P 7, and neither Lightfoot nor Gordon signed the requests for waiver. *See id.* Exs. 6 (Lightfoot) and 7 (Gordon).

Service was not thereafter made on either Lightfoot or Gordon until April 27, 1998, when they were personally served at Columbia. *See* Plaintiff's Second Response Exs. 8 (Gordon) and 9 (Lightfoot). Torrespico now asserts, however, that service was effected through the Cook County Sheriff's Department on November 24, 1997, when the deputy served process on Jones. *See id.* at 1 P 2. Torrespico also apparently recognizes that if his November 24, 1997 service was defective, he has not timely served either Lightfoot or Gordon under *Rule 4. See id.* at 3 PP 14, 16. Torrespico thus alternatively argues that his attempts to serve Lightfoot and Gordon on November 24, 1997, March 2, 1998, and April 27, 1998 constitute diligent efforts meeting the good cause standard and thus meriting an extension of time for service. *See id.* at 3 P 17.

**2. Facts regarding attempted service on Barreto**

Torrespico has submitted an affidavit of service from the Jo Daviess County Sheriff's Office [*12] certifying that process was personally served on Susan Naese at 11619 East Chelsea Road, Stockton, IL, on November 28, 1997, at 8:39 p.m. *See* Plaintiff's Second Response Ex. 4. The return identifies the respondent as a 23-year old white female. *See id.*

Defendant Barreto disputes the accuracy of this return. Barreto first raised the sufficiency of process issue in open court on February 20, 1998, when her counsel advised the Court and Torrespico's counsel that she

would be filing a motion to dismiss on both 12(b)(5) and 12(b)(6) grounds. Barreto filed the motion on March 9, 1998, attaching an affidavit dated March 6, 1998 in which Barreto stated that she had at no time thereto been personally served. *See Aff. of Susan Barreto, Barreto's Motion to Dismiss Ex. 1 P 4.* Barreto, who married about two weeks before Torrespico filed this lawsuit, also stated in her March 6 affidavit that she had resided with her husband, Sergio Barreto, at 2614 West Leland Avenue, Chicago, IL, on and at all times after November 12, 1997, the date the complaint was filed, that no one else resided with her and her husband, and that she had not received process via her husband. *See id.* Finally, [*13] Barreto denied having appointed or authorized anyone to receive process on her behalf. *See id. P 5.* Sergio Barreto filed an affidavit stating that he had not received process at their home. *See Aff. of Sergio Barreto, Barreto's Motion to Dismiss Ex. 2 P 3.*

Two other affidavits support Barreto's claim. The Stockton address listed on the sheriff's return is the home of Barreto's parents. *See Aff. of Violet Naese, Susan (Naese) Barreto's Sur-Reply Memorandum in Support of Her Motion to Dismiss (hereinafter "Barreto's Second Reply") Ex. 1 P 3.* Mrs. Naese claims that the process served on November 28, 1997 was served upon her rather than her daughter. *See id. at PP 7-9.* Mrs. Naese further swears that she told the process server that she was Barreto's mother and that her daughter had not resided at her address for two years. *See id. at P 7.* Mrs. Naese claims that she told the process server that her daughter was staying with her for the Thanksgiving holiday but was then visiting a friend. *See id. at P 8.* That friend has submitted an affidavit swearing that Barreto was at her house from approximately 7:30 or 8:00 p.m. until midnight. *See Dascher Aff., Barreto's* [*14] *Second Reply Ex. 2 P 4.* Plaintiff has offered no further proof beyond the sheriff's return to dispute these affidavits.

No further efforts were made to serve Barreto until April 28, 1998, when a process server served a copy of the summons and complaint on Barreto's husband at their W. Leland home address. *See Ricker Aff., Plaintiff's Second Response Ex. 10; see also Aff. of Sergio Barreto, Susan (Naese) Barreto's Reply Memorandum in Support of Her Motion to Dismiss (hereinafter "Barreto's First Reply") Ex. 2.* The return of service states that "personal service" was made upon "Susan Naese Barreto? Serge Barreto 2614 W. Leland, Chicago, ILL." *See Plaintiff's Second Response Ex. 9.* Barreto disputes the sufficiency of the April 28 service on two grounds. First, Barreto notes that the return improperly states that the process server personally served her and that it failed to include information about the age, race, and sex of the person served as well as the time and day of service, information

"required under the cognate state statute governing service of process, *735 ILCS § 5/2-203(b).*" *See* Barreto's First Reply at 3. Second, she argues that the April 28 service was [*15] untimely and without good cause for the delay. *See id.*

## II. DISCUSSION

### A. Service of process issues

Both motions in this case raise affirmative defenses regarding the sufficiency of process for certain defendants, specifically, Lightfoot, Gordon, and Barreto, defenses that must be addressed before considering the merits of these defendants' *Rule 12(b)(6)* motions.

#### 1. Sufficiency of the November 1997 attempts at service

Torrespico's first attempt to serve the defendants occurred in late November, about two weeks after he filed his complaint in state court and about one month before Columbia removed this case to federal court. [6] In these circumstances, plaintiff had the obligation to serve Lightfoot, Gordon, and Barreto, each sued as individuals, in accordance with *Section 5/2-203* of Illinois's Code of Civil Procedure, which provides two relevant methods of serving an individual defendant:

> Except as otherwise provided, service of summons upon an individual defendant shall be made (1) by leaving a copy of the summons with the defendant personally, [or] (2) by leaving a copy at the defendant's usual place of abode, with some person of [*16] the family or a person residing there, of the age of 13 years or upwards, and informing that person of the contents of the summons, provided the officer or other person making service shall also send a copy of the summons in a sealed envelope with postage fully prepaid, addressed to the defendant at his or her usual place of abode. . . . The certificate of the officer or affidavit of the person that he or she has sent the copy in pursuance of this Section is evidence that he or she has done so.

*735 ILL. COMP. STAT. 5/2-203* (1998).

[6]  When confronted with motions to dismiss for insufficiency of service, Torrespico did not initially respond by citing his November 1997 attempts at service. He instead argued that he had effected service under Federal *Rule 4(e)(2)* by

personally serving Lightfoot and Gordon on April 27, 1998 and by using abode service for Susan Barreto on April 28, 1998. *See* Plaintiff's First Response at 3. It appears that Torrespico put the November 1997 attempts in issue only when he realized that the April service was untimely.

[*17] The Illinois Supreme Court has held that an affidavit of service constitutes prima facie evidence of proper service. *See In re Jafree*, 93 Ill. 2d 450, 444 N.E.2d 143, 146, 67 Ill. Dec. 104 (Ill. 1982). Service will not be set aside unless the affidavit is impeached by "clear and satisfactory evidence." *Id.* An uncorroborated defendant's affidavit denying the propriety of service is inadequate to overcome the presumption favoring an affidavit of service. *See Paul v. Ware*, 258 Ill. App. 3d 614, 630 N.E.2d 955, 958, 196 Ill. Dec. 790 (Ill. App. 1st Dist. 1994); *Aetna Casualty & Surety Co. v. Sanders*, 15 Ill. App. 3d 573, 305 N.E.2d 25, 27 (Ill. App. 1st Dist. 1973) (holding that defendant's uncorroborated statement that she was not served is insufficient to contradict a sheriff's return). Supporting documentation or other corroborating evidence is necessary to impeach proof of service. *See Paul*, 630 N.E.2d at 958.

### a. Attempted service on Lightfoot and Gordon

Plaintiff failed to effect either personal or "abode" service upon Lightfoot and Gordon. The sheriff's returns clearly indicate that the process served on November 24, 1997 was served on Darryll Jones [*18] rather than on either defendant. Although a sheriff's return constitutes prima facie evidence of proper service, *see In re Jafree*, 444 N.E.2d at 146, it may be impeached by clear and satisfactory evidence. In this case, the returns themselves indicate that service was made on a "business," *see* Plaintiff's Second Response at Exs. 2 (Lightfoot) and 3 (Gordon), not personally or via "abode" service, the two means specified by Illinois law for serving individuals. Second, Jones is not an agent of either defendant, as the uncontradicted affidavits of each indicates. *See* Columbia's Motion to Dismiss Exs. A (Lightfoot) and B (Gordon).

### b. Attempted service on Barreto

Plaintiff's November 1997 attempt to serve Barreto also failed under Illinois law. As required in Illinois, this Court treats the Jo Daviess County Sheriff's Office return of service as prima facie evidence that Susan Barreto was personally served on November 28, 1997. The sheriff's return states that service was made upon "Susan Naese," identified as a 23-year old white female, at 8:39 p.m. on November 28, 1997. *See* Plaintiff's Second Response Ex. 4. The Court finds, however, that Barreto has presented [*19] clear and satisfactory evidence sufficient to overcome the presumption that she was personally served.

Aside from her own affidavit denying that she was personally served, *see Barreto's Motion to Dismiss Ex. 1 P 4*, two other affidavits contradict the return and thus support Barreto's contention that no personal service was made on her while this case was in state court. Barreto's mother, Violet Naese, has sworn that she, not Barreto, was the person who received service on November 28. *See* Aff. of Violet Naese, Barreto's Second Reply Ex. 1 PP 7-9. Barreto's friend, Kimberley Dascher, further corroborates Barreto's assertion that she was not the person served on November 28 by placing Barreto at Dascher's home at the time the return indicates Barreto was served. *See Dascher Aff., Barreto's Second Reply at Ex. 2 P 4.*

Under Illinois law, the affidavits Barreto has presented suffice to rebut the presumption of service. Indeed, Illinois courts have accepted far less evidence as proof sufficient to rebut a sheriff's return. *See Robinwoods West, Inc. v. Kramer*, 128 Ill. App. 2d 49, 262 N.E.2d 332, 334 (Ill. App. 1st Dist. 1970) (holding that a paid out-of-state motel bill, [*20] even though apparently not authenticated, sufficed to corroborate defendant's claim that he could not have been the person named on the return of service as he was out of town at the relevant time). Although Barreto's affidavit would be insufficient, standing alone, to refute the return, the corroboration provided by the affidavits of two other people easily suffices to establish the clear and satisfactory evidence necessary to impeach the return, especially since Torrespico has presented no additional evidence.

The Court further notes that the November 28 service fails to meet the standard for abode service. Under Illinois law, abode service requires that the summons be left at the defendant's "usual place of abode." 735 ILL. COMP. STAT. 5/2-203(a)(2). As three affidavits establish, Violet Naese's Stockton address was not Barreto's "usual place of abode" on November 28 or at any time since the complaint was filed on November 12, 1997. *See Aff. of Violet Naese, Barreto's Second Reply Ex. 1 P 3; Aff. of Susan Barreto, Barreto's Motion to Dismiss Ex. 1 P 3; Aff. of Sergio Barreto, Barreto's Motion to Dismiss Ex. 2 P 2.* Mrs. Naese's affidavit, uncontradicted by any evidence other [*21] than the sheriff's return, further establishes that she informed the process server that Barreto was not then at Mrs. Naese's home and had not lived there for two years. *See* Aff. of Violet Naese, Barreto's Second Reply Ex. 1 P 7.

Once again, there is more than enough evidence to meet the "clear and satisfactory" evidence standard necessary to impeach the return of service. Mr. Barreto's affidavit itself suffices to establish that Mrs. Naese's Stockton address was not Barreto's usual place of abode. *See Four Lakes Management & Development Co. v. Brown*, 129 Ill. App. 3d 680, 472 N.E.2d 1199, 1203, 84

*Ill. Dec. 803 (Ill. App. 2d Dist. 1984)* (holding that wife's testimony that her husband did not live at location deputy sheriff described in return as husband's "usual place of abode" sufficed to quash service on husband). Indeed, where no counteraffidavit contradicts an affidavit denying that service was made at the defendant's "usual place of abode," the affidavit is taken as true. *Id., 472 N.E.2d at 1202.* Mrs. Naese's affidavit would also suffice since it, too, is uncontradicted. *See LaMotte v. Constantine, 92 Ill. App. 3d 216, 416 N.E.2d 23, 24, 48 Ill. Dec. 128 (Ill. [*22] App. 1st Dist. 1980)* (holding that service was improper where summons was left with defendant's father at the father's home and defendant and his father submitted uncontradicted affidavits denying that defendant resided with his father). Here Torrespico submits no affidavit countering Barreto's three affidavits to the contrary, so this Court accepts as true the allegation that Mrs. Naese's Stockton address was not Barreto's usual place of abode.

**2. Sufficiency and timeliness of the May 1998 attempts at service**

If service had been effected in state court on all defendants, there would be no need to consider the service provisions of the Federal Rules. Torrespico's efforts to effect service at the state court level, however, were improper as to Lightfoot, Gordon, and Barreto. When Columbia removed the case to federal court, Torrespico thus became obligated to serve Lightfoot, Gordon, and Barreto according to *Rule 4.* Unfortunately, Plaintiff failed to do so.

As explained below, this Court finds that service on all three defendants was untimely under *Rule 4(m),* which establishes the time limit for service and prescribes the steps to be taken should the plaintiff fail to effect [*23] service in a timely manner:

> If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.

*FED. R. CIV. P. 4(m)* (1998).

Although *Rule 4(m)* seems straightforward, directing plaintiffs to serve the summons and complaint upon defendants "within 120 days after the filing of the complaint," the parties dispute whether the 120-day period began to run on November 12, 1997, the date the complaint was filed in state court, or on Dec. 23, 1997, the date the case was removed to federal court. The Court declines to decide this issue. The Seventh Circuit has not yet squarely faced the issue, and the Court deems it unnecessary to decide it in light of its finding that service was untimely on all three defendants regardless of which date is chosen.

**a. Lightfoot and Gordon**

It is undisputed [*24] that a process server personally served Lightfoot and Gordon at their workplace on April 27, 1998. It is also undisputed that neither Lightfoot nor Gordon received personal service until that date. Abode service was never attempted, and no waiver of formal service was ever obtained. Torrespico did send both defendants a Notice of Lawsuit and Request for Waiver of Service of Summons on March 2, 1998, but the defendants declined to execute the waiver, as is their right. Torrespico's effort to contact the defendants' attorney to find out whether they were willing to accept service by waiver or agency is irrelevant to the question of whether and when the defendants were actually served. Since no service occurred until April 27, 1998, and since that service was accomplished more than 120 days as measured after either the filing or removal date, [7] this Court finds that neither Lightfoot nor Gordon was timely served.

> 7    As measured from the date of filing, the 120-day period expired on or before March 12, 1998; as measured from the date of removal, it expired on or before April 23, 1998.

**[*25] b. Barreto**

Abode service was effected on Barreto through her husband on April 28, 1998. *Rule 4(e)* permits service "by leaving copies [of the summons and complaint] at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein." *FED. R. CIV. P. 4(e)(2)* (1998). Although the return of service is less than a model of clarity, stating that "personal service" was made upon "Susan Naese Barreto? Serge Barreto 2614 W. Leland, Chicago, ILL," *see* Plaintiff's Second Response Ex. 9, the process server's affidavit, *see id.* Ex. 10, and the affidavit of Barreto's husband, *see* Aff. of Sergio Barreto, Barreto's First Reply Ex. 2, make clear that process was served under *Rule 4(e)'s* abode service provision. The process server left a copy of the summons and complaint at Barreto's home

address with her husband, clearly a person of "suitable age and discretion then residing therein."

No attempt was made to serve Barreto between November 1997 and April 28, 1998. The April 28 service, like that made on Lightfoot and Gordon, occurred over 120 days after both the filing and removal dates, so this Court finds that [*26] service on Barreto was likewise untimely.

### 3. Extension of time for service

*Panaras v. Liquid Carbonic Industries Corp., 94 F.3d 338 (7th Cir. 1996)* sets forth the framework for this Court's analysis of the impact of service of process defects under *Rule 4(m)*. Under the *Panaras* framework, this Court must first inquire whether Plaintiff has established good cause for failing to effect timely service. *Id. at 340*. Where good cause is shown, a district court *must* extend the time for service "for an appropriate period." *Id.* If good cause does not exist, then the Court has discretion either to dismiss the action without prejudice or to direct that service be effected within a specified time. *Id.*

#### a. Good cause inquiry

This Court finds that Torrespico has failed to establish good cause for his failure to serve the defendants within the 120-day period. Although no precise test exists for determining when good cause exists, a plaintiff's efforts to serve a defendant must "at the very least . . . [be] accompanied by some showing of reasonable diligence." *Bachenski v. Malnati, 11 F.3d 1371, 1377 (7th Cir. 1993)* (quoting *Tso v. Delaney, 969 [*27] F.2d 373, 377 (7th Cir. 1992))*. Several circumstances may constitute good cause, but Torrespico meets none of these. Defendants have not been evasive, *see Geiger v. Allen, 850 F.2d 330, 333 (7th Cir. 1988)* (holding that good cause is established when defendant evades service), nor have their addresses been unknown. *Cf. MCI Telecomm. Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1097-98 (3d Cir. 1995)* (stating that having an incorrect address and needing to locate the correct address warranted granting an extension of time). Plaintiff has long known addresses at which he could serve each of the defendants: Lightfoot and Gordon at their workplace, if nowhere else, and Barreto at her Chicago home, an address Plaintiff has been aware of at least since Barreto filed her motion to dismiss on March 9. Moreover, Plaintiff cannot request the indulgence commonly afforded to pro se defendants, for plaintiff has had counsel since the inception of this action. *See generally Robinson v. America's Best Contacts & Eyeglasses, 876 F.2d 596, 598 (7th Cir. 1989)*. Finally, this Court notes that neither inadvertent failure to timely serve nor half-hearted efforts to serve a defendant establish [*28] good cause, *see Geiger, 850 F.2d at 333*, nor does simple attorney

neglect or the running of the statute of limitations. *See Floyd v. U.S., 900 F.2d 1045, 1047-48 (7th Cir. 1990)*.

Moreover, Torrespico does not offer any meaningful explanation for his delay. He states that he made "three diligent efforts" to serve Lightfoot and Gordon. Although the Court acknowledges that Torrespico made some effort to serve both defendants, his efforts do not rise to the level of good cause. Columbia correctly asserts that Torrespico was twice put on notice of the defect in his attempted November service on Lightfoot and Gordon: via letter January 8, 1998 and via Columbia's February 20, 1998 motion to dismiss. Both defendants were readily servable at their workplace, as Torrespico knew, and he had plenty of time to remedy the defective service before the 120-day period expired or to ask this Court for more time. He did neither.

Torrespico offers even less explanation for the delay in serving Barreto. He merely asserts that he effected service of process on her on two dates, November 28, 1997 and April 28, 1998. *See* Plaintiff's Second Response at PP 3, 15. Torrespico was twice put on notice [*29] of the defects in his November 1997 service, however, when Barreto's counsel informed him in open court on February 20, 1998 of the defect and again via Barreto's March 9, 1998 motion to dismiss. As Torrespico both knew of the defect in his November 1997 attempt at service and knew Barreto's home address yet still failed to effect timely service even as measured by the removal date, the Court finds that Torrespico has failed to show good cause.

#### b. Discretionary extension of time

As *Panaras* directs, this Court must "clearly consider" whether a "permissive extension of time [is] warranted under the facts of this case" even absent good cause. *See Panaras, 94 F.3d at 341*. [8] Having carefully considered the facts and arguments made in this case, the Court declines to exercise its discretion to extend the time period for service and thus dismisses all counts against defendants Lightfoot, Gordon, and Barreto.

> 8    Under former *Rule 4(j)*, the Seventh Circuit had required plaintiffs who failed to meet the 120-day service deadline to show good cause for the failure or face dismissal. *See, e.g., Tso v. Delaney, 969 F.2d 373, 375 (7th Cir. 1992)*. When the Federal Rules were amended in 1993, *Rule 4(m)* replaced former *Rule 4(j)* and deleted the requirement that dismissal be granted absent a showing of good cause, requiring instead that courts grant an extension of time to plaintiffs who demonstrated good cause and giving courts the option to dismiss or grant an extension of time to those plaintiffs who failed to show good cause.

*See, e.g., Davis v. National Railroad Passenger Corp., 1997 U.S. Dist. LEXIS 12508, 1997 WL 527287* at *1-2 (N.D. Ill. 1997). Moreover, in *Panaras*, the Seventh Circuit clarified any confusion its earlier decision in *Tuke v. U.S., 76 F.3d 155 (7th Cir. 1996)*, might have caused regarding the necessity for showing good cause before obtaining an extension of time to accomplish service. *See Panaras, 94 F.3d at 340*; *Davis*, 1997 WL 527287 at *2 n.2.

[*30] Committee notes to *Rule 4(m)* give some examples of factors for district courts to consider in exercising their discretion:

> Relief may be justified, for example, if the applicable statute of limitations would bar the refiled action, or if the defendant is evading service or conceals a defect in attempted service.

*FED. R. CIV. P. 4(m)* advisory committee's note. The Court will consider each of these factors as well as whether defendants have been prejudiced by the improper service. *See Floyd, 900 F.2d at 1048-49* (lack of prejudice may mitigate a plaintiff's noncompliance with *Rule 4(m)*). As discussed above, no defendant has attempted to evade service. No defendant has concealed a defect in service. Lightfoot, Gordon, and Barreto each raised the service issue in their motions to dismiss. Moreover, Lightfoot and Gordon notified Plaintiff of the specific alleged defects as early as January 8, 1998, and Barreto as early as February 20, 1998.

This Court finds, however, that the prejudice to Lightfoot and Gordon would be minimal. Since Columbia was promptly and properly served, and since process for Lightfoot and Gordon was left with Jones, Columbia's General Counsel, [*31] it is hard to imagine either defendant was not promptly informed of the suit, nor has either so alleged. Moreover, Lightfoot and Gordon both still apparently work for Columbia and have its resources and institutional memory at their disposal. Barreto's situation is somewhat different. Although she has probably also been aware of Torrespico's suit since the date her mother was served, Barreto is an individual for whom this suit and its long delays pose greater personal and financial hardship.

Finally, this Court finds that the running of any statutes of limitations applicable to this case do not militate in favor of exercising its discretion to extend the time period for service. The Court has, as directed by *Panaras*, fully and carefully considered the fact that Plaintiff's claims against Lightfoot, Gordon, and Barreto would apparently be time-barred were this Court to dismiss for insufficiency of service of process. *See Panaras, 94 F.3d at 341* (holding that it was "incumbent" on the district court to "fully consider" this factor where dismissal for improper service would in practice bar a new suit). As *Panaras* itself recognized, however:

> The running of the statute [*32] of limitations does not require that a district court extend the time for service of process under the new rule. (citation omitted). Rather, absent a finding of good cause, a district court may in its discretion still dismiss a case even after considering that the statute of limitations has run.

*Id.* Indeed, *Panaras* provided useful guidance about how much weight to afford the statute-of-limitations factor. In *Panaras*, the Seventh Circuit urged the district court to give the factor "close attention" in view of the fact that the relevant statute of limitations at issue was an extremely short one: 90 days. *Id.* The court then directly compared the *Panaras* plaintiff's course of action to that undertaken by the plaintiff in *Tuke*:

> When, as here, a lawyer has not waited until the end of a more generous statute of limitations before getting a suit going--the situation in *Tuke*--the fact that the suit cannot be resolved on the merits is a factor that must be given close attention.

*Id.* Plaintiff's course of action resembles *Tuke* far more than it does *Panaras*. As in *Tuke*, Plaintiff waited until several two-year statutes of limitations [*33] [9] had nearly expired to bring his case. The unfortunate situation Plaintiff now finds himself in is not only one of his own making but has been compounded by Plaintiff's inaction in the face of clear and repeated notice of the defects in his November attempts at service-notice that was given well in advance of either 120-day deadline. Moreover, although Plaintiff could have requested an extension of time for service from this Court at any point, Plaintiff failed to do so. For all these reasons, the court finds no basis for excusing timely service in this case.

9 The statute of limitations for the state law claims of malicious prosecution and false imprisonment is two years. *See 735 ILL. COMP. STAT. 5/13-202.* Torrespico's false imprisonment claim accrued when he was incarcerated. *See generally Sneed v. Rybicki, 146 F.3d 478, 481 (7th Cir. 1998)* (holding that statute of limitations runs from the time when plaintiff can plead all elements of the claim, which for false arrest is the

day of arrest). His malicious prosecution action accrued just one month later, on January 9, 1996, when the criminal proceeding terminated in his favor. *See id.* Plaintiff thus brought his case just one month before the two-year limitations period on his false imprisonment claim would have expired and just two months before the malicious prosecution claim would have been time-barred.

Likewise, the limitations period for Torrespico's federal *§ 1981* and Title IX claims is also two years, as measured by Illinois's personal injury limitations statute. *See Smith v. City of Chicago Heights, 951 F.2d 834, 839 (7th Cir. 1992)* (applying Illinois's two-year statute of limitations for personal injury actions to a *§ 1981* claim in federal court in Illinois); *Cetin v. Purdue University, 94 F.3d 647, 1996 WL 453229 at *2 (7th Cir. 1996)* (applying state statute of limitations for personal injury claims to Title IX claims). Plaintiff's Title VI claim may be, unlike the other four, subject to a five-year statute of limitations. *See Beard v. Robinson, 563 F.2d 331, 338 (7th Cir. 1977)* (holding that Title VI claims are subject to a five-year statute of limitations); *but see Kalimara v. Illinois Department of Corrections, 879 F.2d 276, 276 (7th Cir. 1989)* (recognizing the partial overruling of *Beard* and applying a two-year statute of limitations to § 1983 suits); *Porter v. U.S. General Services Admin., F.3d , 1998 U.S. App. LEXIS 20496, 1998 WL 614752 at *1 (7th Cir. 1998)* (holding that the "proper statute of limitations for federal civil rights actions arising out of events in Illinois is two years" and applying that limitations period to *Bivens* actions).

[*34] **B. 12(b)(6) Motions to dismiss for failure to state a claim**

On a *Rule 12(b)(6)* motion to dismiss, a complaint will be dismissed only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See Ledford v. Sullivan, 105 F.3d 354, 357 (7th Cir. 1997)*. The issue is not whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence in support of his or her claims. *Pickrel v. City of Springfield, 45 F.3d 1115, 1118 (7th Cir. 1995)* (citing *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)*, overruled on other ground by *Davis v. Scherer, 468 U.S. 183, 191, 82 L. Ed. 2d 139, 104 S. Ct. 3012 (1984))*. The Court must treat all well-pleaded factual allegations in the complaint as true and must also draw all reasonable inferences from those allegations in the plaintiffs favor. *See MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc., 62 F.3d 967, 972 (7th Cir. 1995)*. The Court

need not, however, "strain to find inferences favorable to the plaintiffs which are not apparent on the face of the complaint." *Coates v. Illinois State* [*35] *Bd. of Ed., 559 F.2d 445, 447 (7th Cir. 1977)*. Nor is it required to ignore facts set forth in a complaint or exhibits that undermine the plaintiff's claim, *Hamilton v. O'Leary, 976 F.2d 341, 343 (7th Cir. 1992)*, much less to accept legal conclusions alleged or inferred from the pleaded facts. *Nelson v. Monroe Regional Medical Center, 925 F.2d 1555, 1559 (7th Cir. 1991)*.

**1. Count I: Malicious prosecution**

The Court dismisses Count I against both Lightfoot and Barreto for insufficiency of service. As a result, it is unnecessary to rule on defendants' 12(b)(6) motion.

**2. Count II: False imprisonment**

Likewise, the Court dismisses Count II against both Lightfoot and Barreto for insufficiency of service. As a result, it is unnecessary to rule on defendants' 12(b)(6) motion.

**3. Count III: *§ 1981* National origin discrimination**

Torrespico appears to state two grounds for relief under *§ 1981*: first, that Columbia discriminated against him in implementing its disciplinary hearing procedures; and second, that Columbia and Gold discriminated against him in terminating him from his position as CACM's Managing Editor. *See SAC PP 31-33.* Columbia [*36] moves to dismiss Count III on several grounds.

Columbia initially argues that Torrespico fails to state a claim because he only alleges national origin discrimination, which it contends is not covered by *§ 1981.* Torrespico counters that national origin is "construed more broadly in the Seventh Circuit," implying that the line between race and national origin is blurred for Hispanics. *See* Plaintiff's First Response at 6. Torrespico characterizes both Gordon's statement (at the hearing) and Gold's statement (regarding termination of his job) as references to his Hispanic ethnicity, race, or origin. *See id.*

Columbia alternatively argues that Torrespico has failed to state a claim against either Gold or Columbia even if his "national origin discrimination" allegations fall under *§ 1981's* umbrella. According to Columbia, Gold's comment that he could not have a man like Torrespico "on the staff because there are too many women" provides "no indication of racial animus." Columbia's Motion to Dismiss at 7. Torrespico counters that he "understood" Gold's comment to be "a reference to his Hispanic ethnicity and the Hispanic male stereotype." Plaintiff's First Response at 6. Columbia [*37] responds that

Torrespico never pled his subjective understanding and further argues that such an understanding is not a reasonable inference from the pleadings.

Finally, Columbia argues that Torrespico's expulsion from Columbia and termination as a CACM employee resulted from Barreto's allegations rather than either national origin or racial discrimination. In short, Columbia claims that Torrespico's allegations that he was outspoken on minority issues and a member of a protected class have nothing to do with why he was expelled or why he lost his job. Torrespico has not responded directly to this argument.

As a threshold matter, although the Court agrees with defendants that *§ 1981* does not cover a claim of discrimination based solely on national origin, it finds that Torrespico's multiple references to his "Hispanic" ethnicity do fall within *§ 1981's* purview. The Court will not allow Torrespico's claim to fail for mistaken labeling where he has alleged facts or conclusions from which the Court can reasonably infer a cause of action. *Section 1981* provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to [*38] make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

*42 U.S.C. § 1981(a).*

The Supreme Court has construed *§ 1981* to forbid all "racial" discrimination in the making of contracts, whether private or public. *Runyon v. McCrary, 427 U.S. 160, 168, 174-75, 49 L. Ed. 2d 415, 96 S. Ct. 2586 (1976).* Private colleges, such as Columbia, are therefore subject to the section's mandates. *See Saint Francis College v. Al-Khazraji, 481 U.S. 604, 609, 95 L. Ed. 2d 582, 107 S. Ct. 2022 (1987).*

In *Saint Francis College*, the Court included under the rubric of "racial discrimination" intentional discrimination based solely on a person's "ancestry or ethnic characteristics." *Id. at 613.* The Court explained that the understanding of "race" was different when *Section 1981* was passed than it is today, *id. at 610,* and concluded that Congress intended to protect not simply non-Caucasians but "identifiable classes [*39] of persons who are subjected to intentional discrimination solely because of

their ancestry or ethnic characteristics." *Id. at 613.* The Court thus permitted the plaintiff, a United States citizen born in Iraq who alleged that he was denied tenure because he was an Arab, to proceed under *Section 1981* on the theory that he was "subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin." *Id.*

Although Torrespico has mistakenly labeled his cause of action as one for "national origin discrimination," this Court construes his complaint liberally and finds that his self-identification as "Hispanic" falls within the rubric of "racial discrimination" as set forth by the Supreme Court in *Saint Francis College*. The Court can reasonably infer from Torrespico's allegations that the discrimination he alleges was based upon his ancestry or ethnicity rather than his country of origin even though he has erroneously used the phrase "national origin" to identify the type of discrimination that he alleges occurred. [10] *See also Quintana v. Byrd, 669 F. Supp. 849, 849-50 (N.D. Ill. 1987)* (holding that plaintiff [*40] who alleged that she was discriminated against because she was Hispanic and because she spoke out for the rights of Hispanic students rather than because her country of origin was Cuba stated an actionable claim under *§ 1981*).

> 10 Torrespico uses this phrase both in his complaint (in the caption for Count III and in paragraphs 31-33 to identify the type of discrimination alleged to have occurred in implementing the disciplinary hearing procedures and terminating his employment) and his First Response (in the caption and argument).

The Court's holding comports with both *St. Francis College* and the Seventh Circuit's holdings in *Anooya v. Hilton Hotels Corp., 733 F.2d 48 (7th Cir. 1984)* and *Doe v. St. Joseph's Hospital of Fort Wayne, 788 F.2d 411 (7th Cir. 1986),* overruled on other ground by *Alexander v. Rush North Shore Medical Center, 101 F.3d 487, 488 (7th Cir. 1996).* As the Court has noted, Columbia correctly asserts that *§ 1981* does not cover a claim of discrimination based solely on national [*41] origin. *See Anooya, 733 F.2d at 50* (holding that "in the absence of an allegation of racial animus, either explicit or reasonably inferable from the pleadings, plaintiff cannot maintain his *section 1981* action"); *Doe, 788 F.2d at 417-18* (holding that allegations suffice to state a claim where the court can reasonably infer that plaintiff "belongs to a group that is distinct from 'white citizens' as a matter of race or color"). Unlike the *Anooya* plaintiff, however, who merely alleged that he was "of Iraqi background" and that he "was discriminated against on account of his national origin, Iraq," *Anooya, 733 F.2d at 49,* Torrespico has repeatedly stated that he faced dis-

crimination because he is Hispanic and has not identified any country of origin. Moreover, his allegations are less nation-specific than those in *Doe*, where the Seventh Circuit held that the court could reasonably infer racial discrimination against Asians from a plaintiff's claim that she was Korean. *See Doe, 788 F.2d at 418.*

Having determined that Torrespico's erroneous invocation of the phrase "national origin" does not defeat his bid to invoke *§ 1981*, the Court further finds that his allegations [*42] regarding both his disciplinary hearing and employment termination state a claim under *§ 1981.* Generally speaking, a *§ 1981* plaintiff must allege that 1) he or she is a member of a racial minority; 2) the defendant intended to discriminate against the plaintiff on the basis of race; and 3) the defendant's activities concern the making, performance, modification, or termination of a contract, the enjoyment of the benefits of a contractual relationship, or the conditions of a contractual relationship. *Morris v. Office Max, Inc., 89 F.3d 411, 413 (7th Cir. 1996).*

Taking his allegation that Columbia discriminated against him in implementing its disciplinary hearing procedures first, the Court concludes that Torrespico has stated a claim for racial discrimination under *§ 1981.* Torrespico has alleged that he is Hispanic, and the hearing Columbia held led to his expulsion, ending his contractual relationship with Columbia as a student. *See, e.g., Parker by Parker v. Trinity High School, 823 F. Supp. 511, 519 (N.D. Ill. 1993)* (acknowledging that an expulsion could be intentionally racially discriminatory in violation of the statutory right to make and enforce contracts). Although [*43] Torrespico devotes only one sentence of his complaint to describing this basis for impermissible discrimination and fails to indicate which fact or facts he relies on in making this claim, the Court can infer from an earlier allegation that he may have a claim under *§ 1981.* Torrespico has alleged that Gordon was one of the two people who conducted his disciplinary hearing and that during the hearing she stated that his "too macho Latin attitude" was proof of his guilt. He further indicates that this statement was made in Lightfoot's presence. If true, this statement would provide direct evidence that Columbia intended to discriminate against Torrespico because he is Hispanic. Moreover, the Court construes Torrespico's complaint liberally to encompass any discriminatory irregularity in his hearing, not simply the procedures for that hearing. The Court thus finds that Torrespico has stated a claim under *§ 1981* as regards his disciplinary hearing.

Torrespico's second basis-that he was terminated from his work-study position because he is Hispanic-also states a claim. A plaintiff states a claim for racially discriminatory discharge by alleging that 1) he is a member of a protected class; [*44] 2) he was qualified for his position in that he was meeting his employer's legitimate expectations; 3) he suffered an adverse employment action; and (4) others, similarly situated but not in the protected class, were treated more favorably. *Morrow v. Wal-Mart Stores, Inc., 152 F.3d 559, 1998 WL 407708, at *2 (7th Cir. 1998); Hoffman v. MCA, Inc., 144 F.3d 1117, 1123 (7th Cir. 1988).*

Torrespico has dutifully alleged all four of these elements by alleging that he is Hispanic, that he was qualified for his position and performed his duties in accordance with Columbia's and Gold's legitimate expectations, that he was terminated, and that other similarly situated non-Hispanics were not terminated. In a *Rule 12(b)(6)* motion, Columbia's provision of an alternative explanation, however plausible, for Torrespico's termination cannot negate his allegations that racial discrimination played at least some role in his termination. Moreover, although Torrespico has not, as Columbia points out, explicitly pled his subjective understanding that Gold's comment about not being able to have a man like him "on the staff because there are too many women" referred to his [*45] Hispanic ethnicity and the Hispanic male stereotype, this is not fatal to his claim. Although the Court would be disinclined to infer racially discriminatory intent from Gold's statement, standing alone, Torrespico has coupled it with plain allegations of racially discriminatory firing. *Cf. Antia v. Thurman, 914 F. Supp. 256, 257 (N.D. Ill. 1996)* (holding that motorist's *§ 1981* complaint sufficiently alleged that police officer detained her because she was Hispanic; complaint alleged officer told motorist that he "know[s] how Puerto Rican girls are" and compared her to his ex-wife, whom he also described as Hispanic. The Court thus finds that Torrespico stated allegations sufficient to put both Columbia and Gold on notice of his claim and denies Columbia's motion to dismiss Count III.

**4. Count IV: Title VI National origin discrimination**

Torrespico brings his allegations of national origin discrimination under Title IV not only against Columbia but also against Lightfoot and Gordon. As discussed above, this Count is dismissed as to Lightfoot and Gordon for insufficiency of service of process. The Court further notes, however, that the Count would fail against Lightfoot [*46] and Gordon on its merits.

Columbia makes two separate arguments: one on behalf of Lightfoot and Gordon and one on its own behalf. As for Lightfoot and Gordon, Columbia argues that Title VI liability only extends to recipients of federal money and that Lightfoot and Gordon have received no such assistance. For itself, Columbia argues that the single comment Torrespico cites--Gordon's comment that Torrespico's "too macho Latin attitude" was proof of his

1998 U.S. Dist. LEXIS 15714, *

guilt--"does not demonstrate that anyone treated plaintiff any differently because he is Hispanic," much less that this comment resulted in his expulsion. Columbia's First Reply at 11. Torrespico responds only by arguing that Lightfoot and Gordon are "employees and beneficiaries of the federal funds received by the college and are similarly liable under Title VI." Plaintiff's First Response at 7.

Title VI states:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

*42 U.S.C. § 2000d.*

This Court addresses the claims against [*47] Lightfoot and Gordon first and dismisses the Title VI claim against each because Title VI only covers programs and activities receiving federal financial assistance. Although the Seventh Circuit has not directly addressed whether an individual may be held liable under Title VI, it recently rejected such liability in the context of Title IX, which contains nearly identical language. *See Smith v. Metropolitan School Dist., 128 F.3d 1014, 1019 (7th Cir. 1997), cert. denied, 118 S. Ct. 2367, 141 L. Ed. 2d 736 (1998)* (holding that a Title IX claim can only be brought against a grant recipient and not an individual because Title IX protects against discrimination only from an education program or activity receiving federal financial assistance). Title VI refers to "any program or activity receiving Federal financial assistance." *42 U.S.C. § 2000d.* Title IX refers to "any education program or activity receiving Federal financial assistance." *20 U.S.C. § 1681(a).* The addition of the word "education" clearly is not material to the Seventh Circuit's construction of the phrase, and there is no reason to believe the Court of Appeals would rule differently were it presented with the specific [*48] issue before this Court, particularly given that Title IX was patterned after Title VI. *See Cannon v. University of Chicago, 441 U.S. 677, 695-96, 60 L. Ed. 2d 560, 99 S. Ct. 1946 (1979).*

This Court further notes that at least one other court has reached the same conclusion specifically with regard to Title VI. *See Clemes v. Del Norte County Unified School Dist., 1994 U.S. Dist. LEXIS 8625,* at *13-14 (N.D. Cal. 1994) (holding that suits under Title VI are only appropriate against institutions, not individuals). Moreover, other courts have emphasized that the defendant's receipt of federal financial assistance is a

threshold requirement for suit. *See, e.g., Soberal-Perez v. Heckler, 717 F.2d 36, 38 (2d Cir. 1983)* (holding that Title VI was "meant to cover only those situations where federal funding is given to a non-federal entity which, in turn, provides financial assistance to the ultimate beneficiary"); *West Zion Highlands v. City of Zion, 549 F. Supp. 673, 675 (N.D. Ill. 1982)* (granting defendants' motion to dismiss because plaintiff could not meet Title VI's "threshold requirement" that "defendant actually be a recipient of the federal financial assistance used [*49] in the discriminatory manner"). This court notes that neither Lightfoot nor Gordon qualify as a "non-federal entity," nor have they been given federal funding, nor have they ever provided financial assistance to Torrespico, an ultimate beneficiary of the federal funding provided to Columbia.

This Court therefore holds that Title VI liability is limited to federal grant recipients. Neither Lightfoot nor Gordon qualifies as such a grant recipient. They are merely employees of a grant recipient, Columbia College. Of the three defendants named in this count, only Columbia constitutes a "program or entity" that receives federal financial assistance. Accordingly, for these reasons as well as for the untimely service discussed above, Torrespico's Title VI claims against Lightfoot and Gordon are dismissed.

Torrespico's Title VI claim against Columbia merits more serious consideration. Generally speaking, to state a claim for damages under Title VI, a plaintiff must allege that the entity involved is: 1) engaging in racial discrimination; and 2) receiving federal financial assistance. *Fobbs v. Holy Cross Health System Corp., 29 F.3d 1439, 1447 (9th Cir. 1994).* Torrespico has alleged that [*50] Columbia receives federal financial assistance, and whether this Court reads Torrespico's complaint to allege racial or national origin discrimination, it finds that Torrespico has made allegations sufficient to state a claim under Title VI.

Although Torrespico's complaint is exceedingly unspecific as to what actions constitute discrimination against him in "the implementation of the college's Student Discipline and Sexual Harassment Policy hearing procedures," the only charge Torrespico makes under Title VI, this Court will draw the same inference that it drew in sustaining Torrespico's *§ 1981* claim against Columbia's motion to dismiss. Torrespico has alleged that Gordon, one of the two people who conducted his disciplinary hearing, stated that his "too macho Latin attitude" was proof of his guilt and that Lightfoot was present at the time. If true, this statement would provide direct evidence that Columbia intended to discriminate against Torrespico because he is Hispanic. Moreover, although Torrespico never explicitly alleges in Count IV that Columbia improperly implemented its hearing pro-

cedures because he was Hispanic, the Court similarly construes liberally Torrespico's complaint [*51] to make this allegation. Columbia's motion to dismiss Count IV is denied.

### 5. Count V: Title IX Sex discrimination

Torrespico brings his Title IX claim against Columbia alone, asserting that the college "discriminated against" him when he was "forced to submit" to a disciplinary hearing "that did not include an administrative person of his gender," contrary to Columbia's Sexual Harassment Policy. SAC PP 31-32. Columbia argues that this allegation fails to state a claim because it is "not about plaintiff being denied anything because of his sex, as is required under Title IX." Columbia's Motion to Dismiss at 10. The Court agrees.

Title IX, which prohibits sex or gender discrimination by any educational program or activity that receives federal assistance, provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied benefits the of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance.

*20 U.S.C. § 1681.* To state a claim under Title IX, a plaintiff must allege 1) that he or she was excluded from participation in or denied benefits of or subjected [*52] to discrimination in an educational program; 2) that receives federal financial assistance; and 3) that the exclusion was on basis of sex, i.e., gender. *See, e.g., Seamons v. Snow, 84 F.3d 1226, 1232 (10th Cir. 1996).*

As required, the Court treats Torrespico's allegations as true and draws all reasonable inferences from them in his favor. Although Torrespico has adequately alleged the first and second elements of the prima facie case, he has inadequately pled the third element. Although Torrespico need not plead specific facts under notice pleading requirements, he must provide either facts or conclusory allegations sufficient to put Columbia on notice of his claim and from which the Court can infer that he has a cause of action.

Torrespico has chosen to identify a single basis for his Title IX sex discrimination claim: Columbia's failure to include an "administrative person of his gender" on the "hearing committee," as allegedly required by its sexual harassment policy, during the December 11 disciplinary hearing. SAC PP 31-32. He has pointed to no other facts or even conclusory allegations justifying his

Title IX claim. [11] Moreover, he has failed to cite any authority in support [*53] of his position that Count V is factually sufficient.

> 11 In the apparent absence of Seventh Circuit guidance in assessing a Title IX claim in this context, the Court finds instructive a similar Second Circuit case in which a male student accused of sexual harassment was found guilty after a college disciplinary hearing and suspended. *See Yusuf v. Vassar College, 35 F.3d 709, 713 (2d Cir. 1994).* The Second Circuit held that "the lack of a particularized allegation relating to a causal connection between the flawed outcome and gender bias" would be "fatal" to such a plaintiff's Title IX claim. *Id. at 715.* The Second Circuit further explained that allegations suggesting that gender bias was a motivating factor behind the erroneous decision might include statements by members of the disciplinary tribunal or pertinent school officials or "patterns of decision-making that also tend to show the influence of gender." *Id.* As this Court discusses below, Plaintiff has made no causal connection between the staffing of his hearing committee and any allegations of gender bias, nor has he provided any allegations from which this Court might reasonably infer such a connection.

[*54] Torrespico's Title IX complaint amounts to this: Columbia failed to staff a sexual harassment committee in conformity with its internal rules. Yet Torrespico has failed to link the staffing of this committee to his male gender. Torrespico does not allege that Columbia failed to include a male on the committee *on account of* his sex, and this is not a reasonable inference from the factual allegations he presents. He has not even alleged that Columbia's failure to include a man was an *intentional* decision, much less one made with his gender in mind. *See Cannon v. University of Chicago, 648 F.2d 1104, 1109 (7th Cir. 1981)* (affirming dismissal of a complaint where plaintiff failed to make any express allegations that defendant medical school purposely or intentionally rejected her application because of her sex, for Title IX violations require an intentional discriminatory act); *Smith, 128 F.3d at 1033-34* (holding that an educational institution is liable under Title IX only if it intentionally discriminated against plaintiff). Indeed, Torrespico never even alleges that anyone, including himself, brought this defect to Columbia's attention.

In short, on the basis of the [*55] factual allegations Torrespico has included in his complaint, this Court finds that he has failed to state a claim for sex discrimination under Title IX.

1998 U.S. Dist. LEXIS 15714, *

## III. CONCLUSION

All counts against Lightfoot, Gordon, and Barreto are dismissed without prejudice for insufficiency of service of process. Thus, Counts I and II are dismissed, as is Count IV as it pertains to Lightfoot and Gordon. Columbia's motion to dismiss Count III is denied. Count IV is denied as to Columbia. Count V is dismissed for failure to state a claim.

ENTER:

JOAN B. GOTTSCHALL

United States District Judge

DATED: September 29, 1998



**CUSTOM FOAM WORKS, INC., Plaintiff, vs. HYDROTECH SYSTEMS, LTD., and AQUATIC DEVELOPMENT GROUP, Defendants; HYDROTECH SYSTEMS, LTD., Counterclaim Plaintiff, v. CUSTOM FOAM WORKS, INC., and DANE TIPPETT, Counterclaim Defendant.**

Case No. 09-cv-0710-MJR

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ILLINOIS

*2011 U.S. Dist. LEXIS 30074*

March 23, 2011, Decided
March 23, 2011, Filed

**SUBSEQUENT HISTORY:** Motion to strike granted by *Custom Foam Works, Inc. v. Hydrotech Sys., LTD., 2011 U.S. Dist. LEXIS 58797 (S.D. Ill., June 1, 2011)*

**PRIOR HISTORY:** *Custom Foam Works, Inc. v. Hydrotech Sys., Ltd., 2011 U.S. Dist. LEXIS 24670 (S.D. Ill., Mar. 10, 2011)*

**COUNSEL:** [*1] For Custom Foam Works, Inc., Plaintiff, Counter Defendant: Lloyd M. Cueto, LEAD ATTORNEY, Law Office of Lloyd M. Cueto, P.C., Belleville, IL; Christopher F. Cueto, Michael J. Gras, Law Office of Christopher Cueto, LTD, Generally Admitted, Belleville, IL; Eugene C. Menges, Menges Law Offices, Generally Admitted, Belleville, IL.

For Hydrotech Systems, Ltd., Consolidated from case number 10-239-MJR, Plaintiff: Thomas W. Hayde, Jr., LEAD ATTORNEY, Spencer, Fane et al. - Clayton, Generally Admitted, Clayton, MO.

For Hydrotech Systems, LTD, Aquatic Development Group, Defendants: Francis X. Neuner, Jr., Thomas W. Hayde, Jr., LEAD ATTORNEYS, Spencer, Fane et al. - St. Louis, St. Louis, MO; Erik O. Solverud, Spencer, Fane et al. - Clayton, Generally Admitted, Clayton, MO.

For Dane Tippett, Consolidated from case number 10-239-MJR, Defendant, Counter Defendant: Christopher F. Cueto, LEAD ATTORNEY, Michael J. Gras, Law Office of Christopher Cueto, LTD, Generally Admitted, Belleville, IL; Eugene C. Menges, Menges Law Offices, Generally Admitted, Belleville, IL.

For Hydrotech Systems, LTD, Aquatic Development Group, Counter Claimants: Francis X. Neuner, Jr., Thomas W. Hayde, Jr., LEAD ATTORNEYS, Spencer, [*2] Fane et al. - St. Louis, St. Louis, MO.

**JUDGES:** MICHAEL J. REAGAN, United States District Judge.

**OPINION BY:** MICHAEL J. REAGAN

**OPINION**

MEMORANDUM AND ORDER

REAGAN, District Judge:

I. Introduction

In January 2005, Custom Foam Works, Inc., (CFW) entered into a contract with Hydrotech Systems, Ltd., and Aquatic Development (collectively, Defendants), under which CFW agreed to fabricate and deliver 32,232 square feet of architectural foam wall paneling to Hydrotech's indoor/outdoor water park construction project at the Massanutten Resort in Virginia.

On July 13, 2005, Defendants rejected a shipment of panels and terminated the contract. In September, 2009, CFW commenced this action, alleging common law fraud and breach of contract against Defendants. On June 11, 2010, the Court consolidated into this action the lat-



EXHIBIT

3

2011 U.S. Dist. LEXIS 30074, *

er-filed action *Hydrotech Systems, Ltd. v. Tippett*, Case No. 10-cv-0239-MJR.

Defendants Hydrotech and Aquatic move for partial summary judgment on CFW's fraud claims, Counts I and III of the first amended complaint (Doc. 57). The motion is fully briefed, and the Court now rules as follows.

II. Analysis

Summary judgment is appropriate where the pleadings, discovery materials, and any affidavits show that there are [*3] no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Turner v. The Saloon, Ltd., 595 F.3d 679, 683 (7th Cir. 2010); Durable Mfg. Co. v. U.S. Department of Labor, 578 F.3d 497, 501 (7th Cir. 2009)* (citing *FED. R. CIV. P. 56(c))*. *Accord Alabama v. North Carolina,         U.S.        , 130 S. Ct. 2295, 2308, 176 L. Ed. 2d 1070 (2010); Levy v. Minnesota Life Ins. Co., 517 F.3d 519 (7th Cir. 2008); Breneisen v. Motorola, Inc., 512 F.3d 972 (7th Cir. 2008)*(citing *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))*.

In ruling on a summary judgment motion, the district court must construe all facts in the light most favorable to, draw all legitimate inferences in favor of, and resolve all doubts in favor of the non-moving party. *National Athletic Sportswear, Inc. v. Westfield Ins. Co., 528 F.3d 508, 512 (7th Cir. 2008)*. *Accord Reget v. City of La Crosse, 595 F.3d 691 (7th Cir. 2010); TAS Distributing Co., Inc. v. Cummins Engine Co., Inc., 491 F.3d 625, 630 (7th Cir. 2007)*.

What the undersigned may *not* do in deciding a summary judgment motion is evaluate the weight of the evidence, judge the credibility of witnesses or determine the truth of the matter. The court's [*4] only role is to determine whether there is a genuine issue of triable fact. *National Athletic, 528 F.3d at 512* (citing *Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 443 (7th Cir. 1994))*.

A factual dispute is genuine "only if a reasonable jury could find for either party," and disputed facts must be outcome-determinative to be "material" and preclude summary judgment. *Montgomery v. American Airlines, Inc., 626 F.3d 382, 389 (7th Cir. 2010). See also Van Antwerp v. City of Peoria, Illinois, 627 F.3d 295, 297 (7th Cir. 2010)*. But, as very recently reiterated by the Seventh Circuit Court of Appeals, in assessing the record before him, the undersigned Judge bears in mind that "the party opposing the motion gets the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co., LLC., 636 F.3d 312, 2011 U.S. App. LEXIS 3421, 2011 WL 563765, *2 (7th Cir. Feb. 18, 2011)*.

In the instant case, the first question the Court must decide is whether CFW's fraud claim is governed by New York law or Illinois law. The parties dispute whether New York law governs both the contractual and the fraud claims or whether Illinois law must be applied to the fraud claims.

A federal court hearing a case under diversity [*5] jurisdiction must apply the substantive law of the state in which it sits. *Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)*. If the laws of more than one jurisdiction might apply, *Erie* principles require a federal court to apply the forum state's choice of law rules. *Midwest Grain Prods. of Il., Inc. v. Productization, Inc., 228 F.3d 784, 787 (7th Cir. 2000)*. Accordingly, this Court will apply Illinois choice of law rules to determine which state's substantive law applies to the claims at issue.

Generally, contractual choice of law provisions will be honored under Illinois law. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc., 199 Ill. 2d 325, 770 N.E.2d 177, 194, 264 Ill. Dec. 283 (Ill. 2002)*. To determine whether a choice of laws provision is intended to govern all disputes between the parties, the Court engages in a two-part analysis. The Court first examines the contract's language. *Kuehn v. Children's Hosp. of Los Angeles, 119 F.3d 1296, 1302 (7th Cir. 1997)* (a contractual choice of law provision "will not be construed to govern tort as well as contract disputes unless it is clear that is what the parties intended"). Second, the Court must determine whether the claims at issue are dependent on the contract, [*6] because if the claims are dependent on the contract, they are governed by the contract's choice of law provision. *Medeline Indus. Inc. v. Maersk Med. Ltd., 230 F.Supp.2d 857, 863 (N.D.Ill. 2002)*. "Claims involving fraud in the formation of the contract are subject to that contract's choice of law provisions." *Platinum Community Bank v. Marshall Investments Corp., 2008 U.S. Dist. LEXIS 60592, 2008 WL 4866343, *4 (N.D.Ill. 2008)* (citing *Doty v. Stoecker, 697 F.Supp. 1016, 1020 (N.D.Ill.1988))*.

The Subcontract Agreement states, "The Subcontract Documents shall be governed and interpreted in accordance with the laws of the State of New York" (Subcontract Agreement § 1). The Court finds nothing in this clause that indicates the parties' clear intent to apply New York law to *all* disputes between them. *See, e.g., Precision Screen Machines, Inc. v. Exelon, Inc., 1996 U.S. Dist. LEXIS 12487,1996 WL 495564, *2 (N.D.Ill. 1996)* . A plain language reading of the contract's choice of law provision evinces the parties' intent that New York law apply to interpretation and enforcement of the contract. Other matters, such as claims of fraud, are not governed by the contract's choice of law provision. So, the Court

2011 U.S. Dist. LEXIS 30074, *

proceeds to the second prong of the analysis [*7] -- whether the fraud claims are dependent on the contract.

To make this determination, the Court must ascertain whether "(1) the claim alleges a wrong based on the construction and interpretation of the contract; (2) the tort claim is closely related to the parties' contractual relationship; or (3) the tort claim could not exist without the contract." *Facility Wizard Software, Inc., v. Southeastern Technical Services, LLC, 647 F.Supp.2d 938, 943 (N.D.Ill. 2009)* (citations omitted).

The Court's review of CFW's First Amended Complaint leads the Court to the conclusion that the fraud claims are dependent on the contract. CFW alleges false statements of material facts (misrepresentation), fraud in the inducement, reliance and resulting damages as elements of its fraud claims. Each of these claims involves the formation, interpretation and/or construction of the contract. For example, CFW's fraud in the inducement claim states that Defendants made false statements "with the intent to induce [CFW] to act, when Defendant(s) subsequently failed to pay [CFW] for its performance under the contract."

All of CFW's statements are directly or closely related to Defendants' contractual promise to pay [*8] CFW for the fabrication and delivery of wall panels as called for in the contract. Accordingly, the Court finds that New York law governs CFW's fraud claims. [1]

> 1 This conclusion does not alter the outcome of the Court's fraud analysis because - as the parties concede - the elements necessary to support a fraud claim are substantively the same for New York and Illinois. *See, e.g., Bixby's Food Systems, Inc. v. McKay 193 F.Supp.2d 1053, 1065 (N.D.Ill. 2002)* (quoting *Salkeld v. V.R. Bus. Brokers, 192 Ill. App. 3d 663, 548 N.E.2d 1151, 1157, 139 Ill. Dec. 595 (Ill. 1989)); PPI Enters., Inc. v. Del Monte Foods Co., 2003 WL 22118977, at *19 (S.D.N.Y. 2003).*

"The elements of fraud under New York law are: (1) a misrepresentation or a material omission of material fact which was false and known by [the accused] to be false, (2) made for the purpose of inducing the [claimant] to rely on it, and (3) justifiably relied upon by the [claimant], (4) who then suffered an injury as a result of such reliance." *Fuji Photo Film U.S.A., Inc. v. McNulty, 669 F.Supp.2d 405, 413 (S.D.N.Y. 2009).*

A separate cause of action seeking damages for intentional fraud 'cannot stand when the only fraud alleged relates to breach of a contract.'" *Shlang v. Bear's Estates Dev. of Smallwood, N.Y., Inc., 194 A.D.2d 914, 599 N.Y.S.2d 141, 143 (1993)* [*9] (citations omitted). This is not, however, a "a wholesale prohibition against joining fraud and contract claims." *Id.* To sustain a claim for fraud and breach of contract, however, "the misrepresentations alleged in the pleadings must be more than merely promissory statements about what is to be done in the future; they must be misstatements of material fact or promises made with a present, albeit undisclosed, intent not to perform them." *Id.* (citing *Deerfield Communications Corp. v. Cheseborough-Ponds, Inc., 68 N.Y.2d 954, 502 N.E.2d 1003, 510 N.Y.S.2d 88 (N.Y. 1986)).*

According to Defendants, CFW has identified the following representations or actions in support of its fraud claim:

> a. Stop payment of check number 076763.
>
> b. Representation that progress on project was satisfactory and preliminary work regarding additional projects followed by termination.
>
> c. Project was months behind prior to contract with plaintiff; followed by using plaintiff as an excuse for being behind.
>
> d. Change in percentage of payment after approved contract.
>
> e. Refusal to accept deliveries.

Defendants maintain that, as a matter of law, these statements cannot support a claim for common law fraud because (1) future promises to perform contractual [*10] obligations cannot support a claim for common law fraud; and (2) none of the evidentiary bases identified by CFW represents an existing material fact and the statements, at best, merely restate CFW's claim that Defendants breached the payment terms of the contract.

The evidence submitted by CFW shows the following. CFW submitted a pay request for "panels on the site and more on the way" and e-mailed Defendants on May 25, 2005 asking for payment "per the agreement." Doc. 72, Exh. B. Defendants responded that they would have to "get with accounting" and would have the check sent out that day or the following day. *Id.* The check was not written until May 31, and Defendants later stopped payment on it. *Id.* Additionally, CFW submits a checking account statement reflecting that the account on which the check was written fluctuated between positive and negative balances during the week after the check was written.

On June 1, the day after the check was written, Defendants had a negative balance (-$734,055.80) in the account on which the check was drawn because a check for $1,000,000.00 was deducted from the account that

day. Doc. 73, p. 10. The following day, June 2, nearly $2,000,000.00 was [*11] deposited in the account, which then maintained a positive balance until June 8 when the account shows a one-day negative balance of -$665,218.29. *Id.*, p. 11. The June 8 negative balance coincides with the date on which Defendants promised to withdraw their stop-payment order: "It will be my pleasure to release the check today and can be easily done." Doc. 72, Exh. C.

According to Defendants' e-mail, the release of the check was contingent upon CFW's providing an overdue delivery schedule and CFW's President Dane Tippett's e-mailing that he agreed to visit the construction site to address concerns and to resolve issues related to the panels. *Id.* Tippett responded to Defendants' requests in letters dated June 10, 2005. Doc. 72, Exh. D. However, the check was not reissued. Moreover, Defendants added a stipulation as to how much and when CFW would be paid:

> Hydrotech will pay for $.50 on the dollar of the percentage of panels delivered as it relates to the total contract price. By way of example, if 5% of the total square footage of panels required under the contract is delivered to the jobsite, Hydrotech will pay 50% of 5% of the contract price until such time as the total value of all [*12] CFW's pay requests is within 5% of the amount previously paid. CFW will not make another pay request until 4 truckloads are on the jobsite. Doc. 72, Exh. E.

The Court's review of the bank account statements submitted shows that having a negative balance was not a normal operating procedure for Defendants, in that June 2 and 8 are the only dates on which Defendants carried a negative balance in the three months covered by the statements submitted. Doc. 73. In and of themselves, these fluctuations - oddly timed though they may be - might be insufficient to show an intent not to perform and, thus, to stave off summary judgment. But, when coupled with the failure to pay immediately, as promised, stopping payment on the check, again promising payment upon performance of certain acts by CFW and not paying after performance (or to date), CFW has shown that a genuine issue of material fact exists regarding whether Defendants' promise to pay was made with a present, undisclosed, intent not to perform it. The Court cannot say on the record before it that CFW was not injured by acting in reliance on Defendants' representation and continuing to perform under the contract.

In sum, the Court finds [*13] that giving the non-movant (CFW) the benefit of all facts and legitimate inferences that a reasonable fact-finder might find in its favor, summary judgment on the fraud counts is not warranted. Accordingly the Court **DENIES** Defendants' second motion for partial summary judgment (Doc. 57).

IT IS SO ORDERED.

DATED this 23rd day of March, 2011

/s/ Michael J. Reagan

MICHAEL J. REAGAN

United States District Judge



JACQUELINE SNYDER, Plaintiff, v. KOMFORT CORPORATION, Defendant.

No. 07 C 1335

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2008 U.S. Dist. LEXIS 60606*

**July 30, 2008, Decided**
**July 30, 2008, Filed**

**PRIOR HISTORY:** *Snyder v. Komfort, 2007 U.S. Dist. LEXIS 101903 (N.D. Ill., June 7, 2007)*

**COUNSEL:** [*1] For Jacqueline Snyder, Plaintiff: Brian G. Boylan, Norman H. Lehrer, William George Hutul, Norman H. Lehrer, P.C., Wheaton, IL; Nancy J. Lehrer, Norman H. Lehrer PC, Wheaton, IL.

For Komfort Corporation, Defendant: Paul E. Wojcicki, LEAD ATTORNEY, Anastasios T. Foukas, Segal, McCambridge, Singer & Mahoney, Ltd., Chicago, IL.

**JUDGES:** AMY J. ST. EVE, United States District Court Judge.

**OPINION BY:** AMY J. ST. EVE

**OPINION**

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

On February 1, 2007, Plaintiff Jacqueline Snyder ("Snyder") filed a four-count Complaint against Defendant Komfort Corporation ("Komfort") in the Circuit Court of Cook County, Illinois, Law Division, alleging claims of breach of written and implied warranty under the Magnuson-Moss Warranty Federal Trade Commission Improvement Act (the "Magnuson-Moss Act" or "Act"), *15 U.S.C. § 2301, et seq.*, revocation of acceptance pursuant to *810 ILCS 5/2-608*, and common law products liability. [1] On March 8, 2007, Komfort removed this action to federal court. Before the Court is Komfort's Motion for Summary Judgment pursuant to *Federal Rule*

*of Civil Procedure 56*. For the following reasons, the Court grants Komfort's motion.

1    In Response to Defendant's [*2] Motion for Summary Judgment, Snyder voluntarily dismisses her products liability claim under Count IV of the Complaint. (R. 69-1, Pl.'s Resp. at 3; R. 74-1, Pl.'s Resp. Brief, at 9.)

**BACKGROUND**

**I. Northern District of Illinois Local Rule 56.1**

When determining summary judgment motions, the Court derives the background facts from the parties' Local Rule 56.1 statements. *Local Rule 56.1* assists the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs., 233 F.3d 524, 527 (7th Cir. 2000)*. Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Ammons v. Aramark Uniform Servs., Inc., 368 F.3d 809, 817 (7th Cir. 2004)*. The purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan, 467 F.3d 1057, 1060 (7th Cir. 2006)*.

A litigant's failure to respond to a Local Rule 56.1 statement results in the Court admitting the uncontroverted statement [*3] as true. *Raymond v. Ameritech Corp., 442 F.3d 600, 608 (7th Cir. 2006)*. Moreover, the Court may disregard statements and responses that do not properly cite to the record. *See Cichon v. Exelon*

EXHIBIT
4



2008 U.S. Dist. LEXIS 60606, *

*Generation Co., L.L.C., 401 F.3d 803, 809-10 (7th Cir. 2005).* With these standards in mind, the Court turns to the relevant facts of this case.

## II. Relevant Facts

### A. Introduction

On May 5, 2004, Snyder entered into a sales contract with Pinehurst R.V. to purchase a 2005 Model Number 385KA Komfort Karry-All trailer (the "trailer") for $ 52,401.70. (R. 63-1, Def.'s Rule 56.1 Stmt. Facts P 5; R. 75-1, Pl.'s Rule 56.1 Stmt. Add'l. Facts P 34.) On July 9, 2004, Snyder traveled to Pinehurst, Idaho to picked up her trailer from Pinehurst R.V. (Def.'s Stmt. Facts P 6.) Komfort does not sell any products directly to consumers, but works through dealerships. (*Id.* PP 7, 15.)

### B. Limited Warranty

On July 9, 2004, Snyder received a Komfort owners' manual, which contained a Komfort two-year/twenty-four month limited warranty. (*Id.* PP 8, 9.) Komfort also faxed the two-year limited warranty to Snyder prior to her purchase of the trailer. (Pl.'s Stmt. Facts P 33.) The limited warranty states in relevant part:

In order [*4] to receive the benefits available under this warranty, you must do the following:

A. Once you discover a defect covered under this warranty, you must notify an authorized Komfort dealer of the problem and arrange for an appointment during normal business hours. You must deliver the trailer at the appointed time for inspection and performance of covered warranty service.

B. If it is not possible to contact or return the trailer to an authorized Komfort dealer, you must contact the Manufacturer for authorization to have the necessary inspection and warranty service work performed elsewhere. You must obtain the Manufacturer's authorization before any warranty service work is started. It is advisable to contact any service center in your area and arrange for an appointment to get an estimate of charges prior to calling the Manufacturer for authorization.

C. You must notify an authorized Komfort dealer or the Manufacturer of the problem within the terms of this warranty.

(Def.'s Stmt. Facts P 12.) The limited warranty also states:

All defects must be reported to an authorized dealer or the Manufacturer during the term of this warranty. The Manufacturer will arrange for and provide the repair [*5] or replacement (at its option) of any component covered by this warranty that proves to be defective in material or workmanship. Repair or replacement of a covered component will be provided only in the United States of America and Canada. The following components are not covered:

A. Those components installed by anyone other than the Manufacturer.

B. Tires and Batteries.

C. Any component if its defective condition is caused by:

1. Abuse, misuse, overloading or negligence of any person;

2. Collision, upset, road damage, accident, vandalism, theft, malicious mischief, riot or civil commotion;

3. Modification (this includes aftermarket installation of products to replace factory installed components), alteration, improper adjustment or repair, tampering, or improper connection of any component;

4. Hail, lightning, rain, water flood, fire smoke, contamination, and other environment conditions which include but not limited to: mold, tree sap, tar, chemicals, oil, salts, or acts of God;

5. Lack of proper maintenance as recommended by the manufacturers of your trailer or its components, or failure to

proper lubricate, or the use of fuels, oils, or lubricants other than those recommended by the manufacturers [*6] of your trailer or its components, or that are contaminated;

6. Normal deterioration due to wear or exposure, such as but not limited to fading of fabrics, carpet wear, yellowing of tubs, fixtures due to sun exposure, etc.;

7. Normal maintenance and service items, such as light bulbs, fuses, sealants, lubricants, etc.;

8. Failure to protect the trailer and its components from further damage after a defect appears;

9. Transportation to and from dealer or manufacturing plant, loss of time, inconvenience, commercial loss of use, bus fares, vehicle rental, incidental charges such as phone calls, hotel bills or other incidental or consequential damages. The Manufacturer will not be responsible to repair or pay for anything other than repair or replacement of components covered by this warranty that are defective in material or workmanship and reported as required....

(*Id.* P 13.) In addition, the limited warranty states:
Examples of what the manufacturer will not do include:

A. Pay for damages to property or injury to or death of any person due to any cause.

B. Pay for damages or expenses for loss of use, damage to or loss of contents, towing or transport, service calls, inconvenience, loss of income, [*7] substitute housing, lodging, meals, travel, car rental, emotional distress, or any other incidental or consequential damage.

C. Repair or replace any defective component that is not reported as required.

(*Id.* P 14.)

## C. September 2004 Repairs

On September 2, 2004, Snyder was towing her trailer over a bridge on the way to Lafayette, Louisiana when the trailer began to drift and bounce. (*Id.* P 16; Pl.'s Stmt. Facts P 39.) No one was physically injured in the September 2, 2004 incident, but there was property damage to the trailer. (Def.'s Stmt. Facts PP 17, 18; Pl.'s Stmt. Facts P 39.) Snyder then contacted Cassandra McMaster at Komfort Corporation to get authorization for the repairs and McMaster gave Snyder authorization to have the leaf spring components repaired by a non-Komfort dealer. (Pl.'s Stmt. Facts P 39.) Following the September 2, 2004 incident, Snyder took her trailer to Lafayette Spring Co., Inc. ("Lafayette") in Lafayette, Louisiana to repair the trailer. (*Id.;* Def.'s Stmt. Facts P 19.) After Lafayette repaired Snyder's trailer, Komfort declined to reimburse Snyder for the repair costs of approximately $ 880.00 because Snyder failed to provide adequate documentation substantiating [*8] the repair's costs. (Pl.'s Stmt. Facts P 39; Def.'s Stmt. Facts P 22.)

On September 10, 2004, Mobile Tire Service in Meridian, Mississippi repaired Snyder's tires and rims. (*Id.* P 23.) Mobile Tire Service is not an authorized Komfort dealership. (*Id.*) Snyder did not submit a written receipt or other written documentation to Komfort concerning the Mobile Tire Service repairs that cost approximately $ 200.00. (*Id.* PP 24, 25.) The costs for the repairs performed by Lafayette and Mobile Tire Service are the only repairs prior to May 24, 2005 that Komfort did not reimburse to Snyder. [2] (*Id.* P 26.) Moreover, Snyder never contacted Komfort regarding any problems or requested it to authorize or reimburse her for any repairs after May 24, 2005. (*Id.* P 28.)

2    Although Snyder denies Defendant's Statement P 26, her response fails to cite to any part of the record that refutes this statement, and thus the Court admits this statement as true. *See Cichon v. Exelon Generation Co., L.L.C., 401 F.3d 803, 809-10 (7th Cir. 2005).*

**D. Letter of Revocation/Offer of Judgment**

On October 5, 2005, Snyder sent a letter of revocation to Komfort demanding revocation of her sales contract that she entered into with Pinehurst [*9] R.V. (Pl.'s Stmt. Facts P 50.) Komfort rejected Snyder's demand for revocation. (*Id.*) Thereafter, Snyder commenced this lawsuit. (*Id.*) On March 20, 2007, Komfort made a Rule 68 Offer of Judgment in the amount of $ 3,500, plus costs and reasonable expenses. (Def.'s Stmt. Facts P 31.) Snyder rejected Komfort's offer. (*Id.*)

**SUMMARY JUDGMENT STANDARD**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P 56(c).* A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).* In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007).* The party seeking summary judgment has the burden of establishing the lack of any genuine issue [*10] of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).* After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, 477 U.S. at 255* (quoting *Fed R. Civ. P. 56(e)*).

**ANALYSIS**

**I. Breach of Written Warranty - Count I**

In Count I of her Complaint, Snyder alleges that Komfort failed to comply with the terms of the written limited warranty in violation of the Magnuson-Moss Act. The Magnuson-Moss Act is "a remedial statute designed to protect the purchases of consumer goods from deceptive warranty practices." *Miller v. Willow Creek Homes, Inc., 249 F.3d 629, 630 (7th Cir. 2001).* The Act "allows

a 'consumer' to bring a suit where he claims to be 'damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this [Act] or under a written warranty, implied warranty, or service contract.'" *Voelker v. Porsche Cars N. Am., Inc., 353 F.3d 516, 522 (7th Cir. 2003)* (quoting *15 U.S.C. § 2310(d)*). The warranty at issue is a limited warranty as defined by *15 U.S.C. § 2303(a)(2).* [*11] Because the Act does not set out requirements for limited warranties, the Court looks to Illinois law to determine Snyder's claim based on Komfort's alleged breach of the limited warranty. *See Schimmer v. Jaguar Cars, Inc., 384 F.3d 402, 405 (7th Cir. 2004)* (Act allows consumers to enforce written warranties in federal court by borrowing state law causes of action); *Razor v. Hyundai Motor Am., 222 Ill.2d 75, 85, 305 Ill.Dec. 15, 854 N.E.2d 607 (2006)* ("Act does not set out requirements for limited warranties").

A written warranty is a contract, and thus the Court turns to the contract's clear and unambiguous language to determine the parties' rights and obligations under the limited warranty. *See, e.g., Razor, 222 Ill.2d at 85, 99-100; Mydlach v. DaimlerChrysler Corp., 226 Ill.2d 307, 314 Ill.Dec. 760, 875 N.E.2d 1047 (2007); see also Utility Audit, Inc. v. Horace Mann Serv. Corp., 383 F.3d 683, 687 (7th Cir. 2004)* (Under Illinois law, courts interpret unambiguous contract terms according to their plain meaning - the interpretation of an unambiguous contract is a question of law). Based on the terms of the written warranty at issue it is a "repair and replacement" limited warranty as [*12] permitted under *810 ILCS 5/2-719(1)(a),* and not an express warranty relating to the quality or description of the goods. *See Mydlach, 226 Ill.2d at 320* ("an express warranty, for purposes of the UCC, obligates the seller to deliver goods that conform to the affirmation, promise, description, sample or model."). Accordingly, the limited warranty at issue is not the type of warranty that can be breached on "tender of delivery" as Snyder suggests. *Id. at 321-22.* [3] Instead, Komfort's performance under the limited warranty is triggered if a covered defect arises requiring repair. *See id. at 323.* Therefore, to establish her breach of written warranty claim, Snyder must show that she afforded Komfort an opportunity to comply with its obligations under the limited warranty and that Komfort failed to do so. *See id.; see also 15 U.S.C. § 2310(e)* (no action may be brought for failure to comply with written warranty unless person obligated under warranty is afforded reasonable opportunity to cure such failure to comply).

3    Snyder's argument that the Magnuson-Moss Act's "reasonable number of attempts" standard pursuant to *15 U.S.C. § 2304(a)(4)* applies under the circumstances is misplaced because [*13] limited warranties are not subject to *Section*

*2304. See Schimmer v. Jaguar Cars, 384 F.3d 402, 405 (7th Cir. 2004) (Section 2304 imposes minimum federal warranty standards for full warranties, not limited warranties); see also Skelton v. General Motors, 660 F.2d 311, 315 (7th Cir. 1981).* Because limited warranties are not subject to *Section 2304*, the Act's substantive remedies, such as a full refund of the purchase price, are not at issue here. *See Schimmer, 384 F.3d at 405.*

Looking to the plain language of the "repair and replacement" limited warranty, the warranty makes no promises about the quality of the trailer, but instead promises that if a defect in material or workmanship occurs during the limited warranty's twenty-four month period, Komfort will repair or replace the part at no cost to Snyder. Based on the undisputed facts, Komfort paid for all of Snyder's repairs except two - the Lafayette Spring Company repairs and the Mobile Tire Service repairs. [4] It is also undisputed that Snyder did not seek authorization or reimbursement from Komfort for any repairs performed after May 24, 2005. The Court thus turns to the two repairs at issue.

4    The manufacturer of the trailer's generator [*14] paid for generator repair work done in January 2005. (Pl.'s Stmt. Facts P 42, R. 79-1, Def.'s Resp. P 42; R. 71-1, Ex. 2, Snyder Aff. P 19, Ex. 3, Snyder's Resp. Interrog. at 3)

As to the tire repairs done by Mobile Tire Service, it is undisputed that Snyder never submitted a written receipt or other documentation to Komfort for reimbursement. In other words, Snyder failed to report and present documentation concerning this repair and also failed to obtain pre-authorization before the repair, thus she did not comply with the limited warranty's requirements. Therefore, Komfort did not breach the limited warranty for failing to reimburse Snyder for the Mobile Tire Service repairs.

Next, Komfort declined to reimburse Snyder for the spring repair work done by Lafayette because Snyder failed to present adequate documentation to substantiate her claim of $ 880.00. Because Snyder was required to provide proper documentation for reimbursement under the provisions of the limited warranty, Komfort did not breach the limited warranty by declining to pay the $ 880.00 repair costs. In sum, because Snyder failed to follow the limited warranty's procedures for reimbursement for the two repairs at issue, [*15] Komfort had no duty to reimburse her for these repairs. Accordingly, Komfort did not breach the limited warranty.

## II. Breach of Implied Warranty of Merchantability - Count II

In Count II of her Complaint, Snyder brings a claim of breach of the implied warranty of merchantability. *See 15 U.S.C. § 2301(7)* ("The term 'implied warranty' means an implied warranty arising under State law"). In claims brought under the Magnuson-Moss Act, state law governs the creation of implied warranties. *See Voelker, 353 F.3d at 525.* Indeed, the Act does not create implied warranties, but instead confers federal court jurisdiction for state law breach of implied warranty claims. *See Gardynski-Leschuck v. Ford Motor Co., 142 F.3d 955, 956 (7th Cir. 1998); see also Schimmer, 384 F.3d at 405* (Magnuson-Moss "allows consumers to enforce written and implied warranties in federal court, borrowing state law causes of action.").

Here, Komfort argues that Snyder's breach of implied warranty claim fails because her sales contract was with Pinehurst, R.V., and not Komfort, therefore, there was no privity of contract. *See Voelker, 353 F.3d at 525* (under Illinois law, privity of contract required to recover damages for [*16] breach of implied warranty). Snyder, on the other hand, argues that because Illinois courts permit non-privity consumers to bring implied warranties claims against manufacturers under the Magnuson-Moss Act, federal courts must follow. *See Rothe v. Maloney Cadillac, Inc., 119 Ill.2d 288, 292, 116 Ill.Dec. 207, 518 N.E.2d 1028 (1988)* (under Magnuson-Moss Act, non-privity consumer with written warranty may bring implied warranty claim); *Szajna v. General Motors Corp., 115 Ill.2d 294, 311, 104 Ill.Dec. 898, 503 N.E.2d 760 (1986)* (Magnuson-Moss broadens reach of UCC implied warranties).

While federal courts are obligated to follow the Supreme Court of Illinois' interpretation of Illinois law regarding privity, federal courts are not required to follow the Illinois courts' interpretation of the Magnuson-Moss Act promulgated by Congress. *See RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1276 (7th Cir. 1997)* ("federal courts are under no obligation to defer to state court interpretations of *federal* law") (emphasis in original). The Seventh Circuit has made clear that *Sections 2308* and *2304(a)* of the Magnuson-Moss Act "do not modify, or discuss in any way, a state's ability to establish a [*17] privity requirement," thus breach of implied warranty claims hinge on state law, namely, Illinois' adoption of UCC Article 2 requiring privity of contract. *See Voelker, 353 F.3d at 525; see also Rothe, 119 Ill.2d at 292* (Under UCC implied warranty of merchantability arises only between buyer and immediate seller). In short, the *Voelker* court did not adopt the Illinois court's interpretation that the Magnuson-Moss Act broadened the UCC's requirements by allowing for non-privity parties to bring implied warranty claims, and Snyder fails to persuade the Court why it should conclude otherwise. Indeed, other courts in this district have already rejected

2008 U.S. Dist. LEXIS 60606, *

this precise argument. *See Zaro v. Maserati N. Am., Inc., No. 07 C 3565, 2007 U.S. Dist. LEXIS 90137, 2007 WL 4335431, at \*3-4 (N.D. Ill. Dec. 6, 2007); Howton v. Winnebago, Inc., No. 04 C 8349, 2005 U.S. Dist. LEXIS 13061, 2005 WL 1500926, at \*2 (N.D. Ill. June 13, 2005); Kowalke v. Bernard Chevrolet, Inc., No. 99 C 7980, 2000 U.S. Dist. LEXIS 7154, 2000 WL 656660, at \*5 (N.D.Ill. Mar. 23, 2000); Larry J. Soldinger Assocs., Ltd. v. Aston Martin Lagonda of N.A., Inc., No. 97 C 7792, 1999 U.S. Dist. LEXIS 14765, 1999 WL 756174, at \*6-10 (N.D. Ill. Sept. 13, 1999).* Because Snyder lacks privity of contract with Komfort, her implied warranty claim fails.  [*18] *See Voelker, 353 F.3d at 525.*

Snyder nevertheless argues that the facts in the record establish a buyer-seller relationship between Komfort and Snyder. In support of her argument, Snyder points to the direct contact she made with Komfort concerning her selection of the trailer's counter-tops, woodwork, and other specifications; that Komfort transported her trailer to Pinehurst R.V.; and that Komfort directly faxed the limited warranty to her. Viewing these facts in a light most favorable to Snyder, she has failed to present sufficient evidence creating a genuine issue of material fact that Komfort was in privity of contract with her, especially in light of her admission that on "May 5, 2004, the Plaintiff entered into a sales contract with Pinehurst, R.V. to purchase a 2005 385KA Komfort Karry-All Trailer for $ 52,401.70." (*See* Pl.'s Stmt. Facts P 34.) Finally, Snyder does not support her factual arguments with any legal authority explaining how these circumstances constitute a buyer-seller relationship. Accordingly, Snyder's breach of implied warranty claim fails.

**III. Revocation of Acceptance Claim - Count III**

In Count III of her Complaint, Snyder seeks revocation of acceptance under  [*19] *UCC § 2-608* as codified by *810 ILCS 5/2-608*. Snyder's revocation claim fails as a

matter of law because revocation of acceptance against a remote manufacturer, like Komfort, is not permissible under Illinois law. *See Mydlach v. DaimlerChrysler Corp., 226 Ill.2d 307, 332, 314 Ill.Dec. 760, 875 N.E.2d 1047 (2007)* ("Revocation of acceptance contemplates a buyer-seller relationship."); *Smith v. Monaco Coach Corp., 334 F.Supp.2d 1065, 1070 (N.D. Ill. 2004)* (Illinois law does not provide equitable remedy of revocation against manufacturer); *Kutzler v. Thor Indus., Inc., No. 03 C 2389, 2003 U.S. Dist. LEXIS 11886, 2003 WL 21654260, at \*6-7 (N.D. Ill. July 14, 2003)* ("language of *Section 2-608* on its face contemplates that the remedy of revocation would be available against the seller, and not against a non-seller who manufactured the goods").

Based on the facts set forth above, Snyder nonetheless argues that Komfort is not a non-selling manufacturer, but instead Komfort's actions during the sale process were the actions of a seller. Again, without legal authority supporting this argument, Snyder has failed to establish that Komfort was the actual "seller" under the circumstances. Because the Court grants Komfort's summary  [*20] judgment motion as to the remaining counts in Snyder's Complaint, the Court need not examine Komfort's alternative argument that its offer of judgment rendered Snyder's claims moot.

**CONCLUSION**

For these reasons, the Court grants Defendant's Motion for Summary Judgment and denies Defendant's Motion to Strike as moot.

Dated: July 30, 2008

/s/ Amy J. St. Eve

**AMY J. St. EVE**

**United States District Court Judge**