## EXHIBITS 5 through 10



**BB SYNDICATION SERVICES, INC., Plaintiff, v. LM CONSULTANTS, INC., Defendant.**

**Case No. 09-cv-1268**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2011 U.S. Dist. LEXIS 23888*

**March 7, 2011, Decided**
**March 7, 2011, Filed**

**COUNSEL:** [*1] For BB Syndication Services, Inc., Plaintiff: Patricia C. Till, LEAD ATTORNEY, John M. Gillum, Manier & Herod, Nashville, TN.

For LM Consultants, Inc., Defendant: Douglas Richard Allen, LEAD ATTORNEY, Douglas J. Palandech, LEAD ATTORNEY, Foran Glennon Palandech Ponzi & Rudloff PC, Chicago, IL.

**JUDGES:** JOAN B. GOTTSCHALL, United States District Judge.

**OPINION BY:** JOAN B. GOTTSCHALL

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff BB Syndication Services, Inc. ("BBSS") brought this diversity action against defendant LM Consultants, Inc. ("LM") alleging breach of contract, negligence, professional negligence, and negligent misrepresentation. Currently before the court is LM's motion for partial summary judgment requesting that the court enforce a limitation of liability clause in LM's consulting contract with BBSS. [1] For the foregoing reasons, the court grants LM's motion. Because the court finds that the limitation of liability clause is valid and enforceable, LM's potential liability is limited to an amount below the statutorily required threshold for diversity jurisdiction. Therefore, the court dismisses the action for lack of subject matter jurisdiction under *28 U.S.C. § 1332(a)*.

1  The court treats LM's "motion for summary [*2] determination" as a motion for partial summary judgment under *Rule 56(a)*.

**I. BACKGROUND**

BBSS is a Wisconsin corporation, with its principal offices in Madison, Wisconsin; LM is an Illinois corporation with its principal offices in Vernon Hills, Illinois. (LM's Statement of Undisputed Material Facts ("Statement of Facts") ¶¶ 1-2.) [2] BBSS and LM entered into an Agreement for Construction Evaluation and Monitoring Services (the "LM Agreement") on December 12, 2005, in connection with the Park Condominiums project located at 222 South Caldwell Street, Charlotte, North Carolina (the "Project"). (Statement of Facts ¶ 5.) The LM Agreement provided that LM would perform certain services related to the Project's pre-construction ("pre-construction phase services"), and construction phases ("construction phase services"). (Statement of Facts, Ex. B, (the LM Agreement) at 1-3.) Pre-construction phase services included reviewing certain Project documents and conducting a construction cost review. (LM Agreement at 1-2.) The construction phase services required LM to provide field reports that reviewed "construction progress, compliance with the Project Schedule, Appropriateness of the Contractor's [*3] Application for Payment, Change of Orders, Compliance with Project Documents, and Quality of the work." (LM Agreement at 2.)

2  BBSS does not dispute any of the facts in LM's Statement of Undisputed Material Facts. (*See* BBSS's Response to LM's Statement of Undisputed Material Facts ¶¶ 1-18.) The six addi-



EXHIBIT
5

2011 U.S. Dist. LEXIS 23888, *

tional facts submitted by BBSS are not relevant in determining this motion. (*See id.* ¶¶ 19 - 24.)

In its complaint, BBSS alleges that, based on LM's representations and certifications to BBSS that the Project could be constructed for $33,937,000, BBSS "entered into numerous agreements with other parties to become the lender for the Project," including entering into a Construction Loan Agreement with 222 South Caldwell Street Limited Partnership, the Project's owner. (Am. Compl. ¶¶ 7-8.) BBSS asserts that it advanced a total sum of $26,168,876 in connection with the Project based on LM's representations made pursuant to the LM Agreement. (*Id.* ¶ 10.) BBSS claims that while LM initially represented that the Project was approximately seventy percent complete in February 2008, in March 2008 the Project's owner and contractor informed BBSS that additional funds were needed. (*Id.* ¶¶ 11-12.) In [*4] April 2008, LM reviewed the owner's representations and reported that $34,500,000 in additional funds would be needed to complete the Project. (*Id.* ¶ 12.) Because the Project's owner had defaulted under the Construction Loan Agreement, BBSS ceased advancing funds in connection with the Project, the Project's owner was placed into an involuntary bankruptcy proceeding, and the Project was foreclosed. (*Id.* ¶ 13.) BBSS subsequently filed this lawsuit against LM.

The LM Agreement contained the following provision (hereinafter the "LM limitation of liability clause"):

> Client [BBSS] and persons claiming through Client agree to limit the liability of the Consultant [LM] for all claims arising out of, in connection with, or resulting from the performance of this Agreement to the amount of fees paid under this Agreement.

(Statement of Facts ¶ 11; LM Agreement at 4.) Defendants argue that this clause limits their potential liability to BBSS to the amount of fees BBSS paid to LM under the LM Agreement. BBSS paid a total of $43,500 in fees to LM. (Statement of Facts ¶ 12.) Presently at issue is whether the LM limitation of liability clause is valid and enforceable and if it applies to all of BBSS's [*5] claims against LM. If so, BBSS's potential recovery from LM is capped at $43,500.

BBSS's amended complaint consists of four state-law-based claims against LM: breach of contract, "ordinary negligence," "professional negligence," and negligent misrepresentation. BBSS requests relief for each claim "in an amount sufficient to fully compensate [BBSS] for all damages, costs and other expenses as

proven." (Am. Compl. ¶ 27.) There is complete diversity of citizenship between the parties.

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" *Fed. R. Civ. P. 56(a)*. Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*.

At the summary judgment stage, the court should view the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor. *Cedillo v. Int'l Ass'n of Bridge and Structural Iron Works, Local Union No. 1, 603 F.2d 7, 11 (7th Cir. 1979)*.

## III. [*6] ANALYSIS

Because there are no disputes as to any material fact pertaining to the LM limitation of liability clause, the issue of its validity and enforceability is ripe for summary judgment. *See Fed. R. Civ. P. 56(a)*.

### A. Applicable Law

The parties disagree as to which law governs the interpretation of the LM Agreement and the enforceability of the LM limitation of liability clause. The LM Agreement does not contain a choice-of-law provision. In diversity cases, the federal court applies the choice of law principles of the forum state in which it sits to determine which state's substantive laws will apply. *Tanner v. Jupiter Realty Corp., 433 F.3d 913, 915 (7th Cir. 2006)*. Illinois uses the "most significant contacts" test from the *Restatement (Second) of Conflicts § 188* (1971) in all choice-of-law disputes involving contracts, so that the laws of the state with the most significant contacts apply. *Hinc v. Lime-O-Sol Co., 382 F.3d 716, 719 (7th Cir. 2004)*. The most significant contacts analysis includes "the place of contracting, negotiation, performance, location of the subject matter of the contract, and the domicile, residence, place of incorporation, and business of the parties." *Id.* [*7] (quotations and citations omitted).

LM and BBSS disagree as to which state has the most significant contacts; LM argues that Illinois law should apply and BBSS argues for Wisconsin law. However, the court need not determine which state's law applies because the outcome would be the same in either state. As discussed in more detail below, under either

Illinois or Wisconsin law, the LM limitation of liability clause is valid and enforceable.

## B. The LM Limitation of Liability Clause is Enforceable

Both Wisconsin and Illinois law generally recognize that parties may shift risk of negligence liability by contract. *See Harris v. Walker, 119 Ill. 2d 542, 519 N.E.2d 917, 919, 116 Ill. Dec. 702 (Ill. 1988)* ("Regarding contracts that shift the risks of one's own negligence to another contracting party, the general rule is to enforce exculpatory contracts . . . ."); *Rainbow Country Rentals and Retail v. Ameritech Publ'g, Inc., 2005 WI 153, 286 Wis. 2d 170, 706 N.W.2d 95, 103-07 (Wis. 2005)* (holding that a stipulated damages clause in a contract for a business listing in a telephone directory was valid and enforceable). A clause that shifts risk of liability by contract can remove all of a party's potential liability (often referred to as an exculpatory clause), [*8] or can limit the total amount of damages one party can pay. *See Rainbow Country, 706 N.W.2d at 105* (noting the difference between an exculpatory clause releasing a party from all liability and a stipulated damages clause limiting damages). Here, the LM limitation of liability clause purports to limit the amount of damages LM can pay BBSS to the amount of the fees that BBSS paid to LM under the contract. As such, it can be described as either a partial exculpatory clause or a stipulated damages clause.

At the outset, the court notes that BBSS erroneously argues that neither Wisconsin nor Illinois law allows a contractual limitation of damages provision to apply to a tort claim, and fails to examine any relevant law on the issue. (*See* BBSS's Resp. in Opp'n to LM's Mot. for Summ. Determination ("BBSS Opp'n") at 7-9 ("There is no case law in Wisconsin that applies a limitation of damage clause set forth in a contract to tort causes of action. . . . There is no legal basis [under Illinois law] that provides [for] the application of contract language to tort claims made by Plaintiff in its Amended Complaint.).) Instead of addressing whether or not the LM limitation of liability clause is [*9] valid and enforceable under the laws of Illinois or Wisconsin, BBSS inexplicably argues as to its ability to bring both the tort actions and the contract actions, including a discussion of Illinois' *Moorman* doctrine.[3] (*See* BBSS Opp'n at 7-13.) However, this argument is irrelevant to the current motion because LM does not contend that BBSS was barred from bringing the tort claims. At issue in this motion is whether or not the limitation of liability clause limits LM's potential liability, including the tort claims, to $43,500.

[3] Illinois' *Moorman* doctrine provides that a plaintiff may not recover damages under a tort theory, including negligence, for a purely economic loss. *See Moorman Mfg. Co. v. Nat'l Tank Co., 91 Ill. 2d 69, 435 N.E.2d 443, 453, 61 Ill. Dec. 746 (1982)*. There is an exception to the doctrine that allows for recovery for negligent misrepresentation by a person "who is in the business of supplying information for the guidance of others in their business transactions." *Id. at 89*.

## 1. Enforceability under Illinois law

Although exculpatory clauses are not favored under Illinois law and are to be construed strictly against the party they benefit, for "contracts that shift the risks of one's own negligence [*10] to another contracting party, the general rule is to enforce exculpatory contracts unless it would be against a settled public policy of the State to do so, or there is something in the social relationship of the parties militating against upholding the agreement." *Harris, 519 N.E.2d at 919*; *Hamer v. City Segway Tours of Chicago, LLC, 402 Ill. App. 3d 42, 930 N.E.2d 578, 581, 341 Ill. Dec. 368 (Ill. App. Ct. 2010)* (upholding a release between Segway tour company and a tour participant); *see also Winston Network, Inc. v. Indiana Harbor Belt R.R. Co., 944 F.2d 1351, 1359 (7th Cir. 1991)* ("Illinois courts will generally enforce contracts of indemnity against one's own negligence."). An exculpatory clause must "spell out the intention of the parties with great particularity and will not be construed to defeat a claim which is not explicitly covered by [its] terms." *Scott & Fetzer Co. v. Montgomery Ward & Co., 112 Ill. 2d 378, 493 N.E.2d 1022, 1029-30, 98 Ill. Dec. 1 (Ill. 1986)* (finding that an exculpatory clause in a lease did not prevent the third-party tenant from bringing a contribution action against the beneficiary of the clause). The Illinois Supreme Court has stated that for exculpatory clauses in contracts that do not involve publicly regulated areas, [*11] there is a "widespread policy of permitting competent parties to contractually allocate business risks as they see fit." *McClure Eng'g Assocs., Inc., v. Reuben Donnelley Corp., 95 Ill. 2d 68, 447 N.E.2d 400, 402-03, 69 Ill. Dec. 183 (Ill. 1983)*. Indeed, in discussing Illinois law on exculpatory clauses, the Seventh Circuit has stated:

> [I]n Illinois, at least when contracts between parties of relatively equal bargaining strength are being construed, the risk that a party will be guilty of negligence is treated like any other commercial risk that may cause harm to the other party to a commercial transaction. In the evaluation of foreseeable commercial

risks, Illinois seems to attach greater importance to the commercial interest in certainty than to the policy of deterring negligence.

*Rutter v. Arlington Park Jockey Club, 510 F.2d 1065, 1067 (7th Cir. 1975)* (quoting *Gates Rubber Co. v. USM Corp., 508 F.2d 603, 614 (7th Cir. 1975)*).

In *Rosenstein v. Standard & Poor's Corp., 264 Ill. App. 3d 818, 636 N.E.2d 665, 201 Ill. Dec. 233 (Ill. App. Ct. 1993)*, an Illinois appellate court affirmed the dismissal of the plaintiff's negligent misrepresentation claims against Standard and Poor's Corporation ("S & P") because of an exculpatory clause in the license agreement between [*12] S & P and the Chicago Board Options Exchange ("CBOE"). *Id. at 666.* The exculpatory clause at issue stated, in bold, "S & P makes no warranty, express or implied, as to results to be obtained by any person or any entity from the use of the S & P indexes or any data included therein . . . CBOE Rules shall expressly include [this] disclaimer language . . . ." *Id. at 667.* The plaintiff held 241 option contracts with CBOE. *Id. at 666.* The court found that, because S & P was in the business of supplying information for the guidance of others in their business transactions, the *Moorman* doctrine did not preclude the plaintiff's recovery for economic losses. *Id. at 669-70.* Nevertheless, the court affirmed the lower court's dismissal, because the exculpatory clause "directly relate[d] to the transactions upon which plaintiff's cause of action is predicated." *Id. at 671.* The court held that the clause was valid because "there [was] no claim of disparity in bargaining power . . . the relationship between plaintiff and S & P was voluntarily entered into and not of such a semi-public character that limitations upon liability might be contrary to public policy." *Id. at 672.*

Here, the LM limitation [*13] of liability clause applies to all of BBSS's claims in its amended complaint because all of the claims directly relate to LM's performance under the agreement. The LM limitation of liability clause states that it covers "all claims arising out of, in connection with, or resulting from the performance of this Agreement . . . ." (LM Agreement at 4.) Count I of the amended complaint, a breach of contract claim, is plainly a claim arising from LM's performance of the LM Agreement. Despite BBSS's argument to the contrary, Counts II, III, and IV are all directly based on LM's performance under the LM Agreement. [4] Count II, for "ordinary negligence," states that "LM failed to properly carry out its *duties and obligations* to BBSSI and was *negligent of its services* for BBSSI" (Am. Compl. ¶ 19 (emphasis added)), Count III, for "professional negligence," states that LM "committed errors and omissions

as aforesaid *in performing its professional services* and failed to properly carry out its *duties and obligations* to BBSSI as licensed professionals in the fields of engineering and construction" (*Id.* ¶ 23 (emphasis added)), and Count IV, for negligent misrepresentations, states "LM made numerous [*14] erroneous and negligent misrepresentations to BBSSI *in connection with the Project.*" (*Id.* ¶ 26 (emphases added).) All of these claims are based on LM's alleged failure to perform its duties and services under the LM Agreement. BBSS has failed to identify any other "duties or obligations" LM owed to BBSS outside of those specified by the LM Agreement. Although the wording of the LM limitation of liability clause is fairly broad, it limits the range of claims covered to those that are connected to the contract. Thus, the LM limitation of liability clause applies to all of claims BBSS alleged in its amended complaint.

> 4 BBSS argues that because the clause covers only claims that arose from the LM Agreement and "not any claims which are outside of the agreement," "pleading professional negligence and negligent misrepresentation show[s] that claims outside the contract were made, [sic] possible by law and not precluded by the contract itself and should be left for determination by the fact-finder." (BBSS Opp'n at 7.) Yet, BBSS does not explain how the professional negligence and negligent misrepresentation claims were based on conduct that was not connected to the LM Agreement. Because both [*15] claims are based on LM's alleged inadequate conduct in fulfilling its duties under the LM Agreement, the claims fall squarely within the clause's provisions.

Next, there do not appear to be any public policy grounds that preclude enforcement of the clause, nor does the relationship of the parties prevent enforcing the agreement. The court is unaware, and BBSS does not address the issue, of any public policy in Illinois that would invalidate a liability limiting provision in a contract where a financing party hires a consultant to review and monitor a construction project. Meanwhile, the parties' relationship as competent commercial entities entering into a contract does not require invalidating the clause. BBSS has not argued or presented any evidence indicating that it is not a competent commercial entity, or that it had inferior bargaining power in negotiating the LM Agreement. [5] *See Chicago Steel Rule & Die Fabricators Co. v. ADT Sec. Sys., 327 Ill. App. 3d 642, 763 N.E.2d 839, 845, 261 Ill. Dec. 590 (Ill. App. Ct. 2002)* (noting that the plaintiff "is a commercial entity and there is no evidence of disparity in the bargaining power of the parties to the contract" in affirming the lower court's dismissal of the plaintiff's [*16] claims based on an

2011 U.S. Dist. LEXIS 23888, *

exculpatory clause). In essence, the clause "contractually allocate[d] business risks," capping LM's liability to the amount of the fees paid for its services. *See McClure Eng'g, 447 N.E.2d at 402-03.*

> 5   BBSS does dispute LM's claim that BBSS is a "highly sophisticated entity that entered into the LM Agreement in a position of superior bargaining power," and asks the court to disregard these "facts" because they were not listed as material facts. (BBSS Opp'n at 13.) However, BBSS need not be "highly sophisticated" or have "superior bargaining power" for the clause to be enforceable. *See McClure Eng'g, 447 N.E.2d at 403* (discussing the "widespread policy" of allowing "competent parties" to "allocate business risks" through contract); *see also Rutter, 510 F.2d at 1067* (discussing Illinois' policy of treating contractual clauses pertaining to negligence as any other commercial risk when the contract is between parties of "relatively equal bargaining power").

## 2. Enforceability under Wisconsin law

Similar to Illinois law, exculpatory clauses are not favored under Wisconsin law. An exculpatory contract "must be construed strictly against the party seeking to rely on it," and   [*17] is analyzed based on contract law principles and on public policy grounds. *Atkins v. Swimwest Family Fitness Ctr., 2005 WI 4, 277 Wis. 2d 303, 691 N.W.2d 334, 338 (Wis. 2005)* (holding that a swim facility's liability waiver was unenforceable as against public policy). Wisconsin law differentiates between an exculpatory clause and stipulated damages clause. *Rainbow Country, 706 N.W.2d at 105.* For a stipulated damages clause, "the overall single test of validity is whether the clause is reasonable under the totality of circumstances," which requires examining the reasonableness at "the time of the formation and at the time of the breach." *Id. at 103-04* (quotations omitted). The Wisconsin Supreme Court looks to three main factors in determining a stipulated damages clause's reasonableness: "(1) whether the parties intended to provide for damages or for a penalty; (2) whether the injury caused by the breach would be difficult or incapable of accurate estimation at the time of entering into the contract," with the harder it is to calculate damages, the more reasonable the stipulated damages; and "(3) whether the stipulated damages are a reasonable forecast of the harm caused by the breach." *Id. at 103* (citation omitted).   [*18] The harm caused by the breach includes the anticipated harm "at the time of contract formation and the actual harm at the time of breach." *Id.* (citation omitted). "The factors are not meant to be mechanically applied, and courts may give some

factors greater weight than others." *Id.* (quotations and citations omitted).

Additionally, Wisconsin also considers the policy grounds favoring and disfavoring a stipulated damages clause. The factors favoring enforcement of such a clause include allowing parties to control their exposure to risk, avoiding the uncertainty, delay and expense of the judicial process, allowing parties to create a "remedy consistent with economic efficiency in a competitive market," as well as general policy considerations favoring freedom to contract. *Id.* (quotations omitted) Conversely, the Wisconsin Supreme Court also recognizes that stipulated damages are an exception to the general rule that "public law, not private law, ordinarily defines the remedies of the parties," and thus "courts must ensure that the private remedy does not stray too far from the legal principle of allowing compensatory damages." *Id.*

In *Rainbow Country,* the Wisconsin Supreme Court held that   [*19] a stipulated damages clause in a contract between two businesses for a telephone book advertisement was a "reasonable award of damages in light of the completely speculative damages that [the plaintiff] may have suffered." *706 N.W.2d at 104.* Noting that it had found *every* exculpatory contract it had reviewed over the previous 25 years to be unenforceable, the court stated that there was a "fundamental difference" between an exculpatory clause attempting to "avoid *all* liability for death or serious personal injuries arising from virtually any conduct, including intentional or reckless acts, of the owner operator," and a stipulated damages clause where "one business entity agree[s] to limit the maximum financial recovery for a potential mistake of the other business entity." *Id. at 105.*

Applying Wisconsin law to the LM limitation of liability clause at issue here, the clause is valid and enforceable. First, the LM limitation of liability clause is more similar to the stipulated damages clause at issue in *Rainbow Country* than to the exculpatory clauses that the Wisconsin Supreme Court has consistently held to be unenforceable. *See Rainbow Country, 706 N.W.2d at 105.* The LM limitation of   [*20] liability clause does not attempt to avoid all liability for a personal injury, but instead involves two businesses agreeing to limit one party's liability to the amount of the fees paid to that party for its services. *Id. at 105.* Based on the totality of the circumstances factors discussed in *Rainbow Country*, the clause is reasonable and therefore valid. The first factor is not relevant to this clause because there is no indication that the clause was intended to be a penalty. Because the second and third factors are "intertwined" and require looking at the reasonableness at the time of contracting and the time of the breach, they are examined together. *Id. at 104.* The potential damages resulting from a breach by LM were extremely difficult to esti-

mate at the time of the contracting given their entirely speculative nature. An accurate forecast of potential damages - beyond the cost of the fees paid under the contract - was nearly impossible given the multitude of factors that could influence the amount of damages. Even at the time of the alleged breach, LM's potential liability is difficult to ascertain because other parties had an integral role in causing any harm, and there are [*21] a number of variables that could alter the amount of LM's liability to BBSS. By its nature, a consulting services contract to evaluate and monitor a third party is likely to have unpredictable consequential damages resulting from a breach by the consulting party. *See e.g., Wartsila NSD N. Am,, Inc. v. Hill Int'l, Inc., 530 F.3d 269, 278 (3d. Cir. 2008)* (holding that, under Maryland law, an exculpatory clause in the plaintiff construction company's contract with a consulting firm was enforceable to limit the consulting firm's damages and stating that "some of the damages submitted to the jury resulted from a long series of contingent events, each one dependent upon specific decisions made by [the plaintiff] based upon the facts and interests before it at the time") Because of this unpredictability, the LM limitation of liability clause's provision for returning the fees paid for services is a reasonable damages provision.

Wisconsin's public policy considerations for a stipulated damages clause also favor enforcing the LM limitation of liability clause. Allowing two business parties to allocate risk through a contract is economically efficient because it allows the parties to factor [*22] potential risk exposure into the contract's terms. *See Rainbow Country, 706 N.W. 2d at 103.* This is especially important where a contract for consulting services could potentially lead to liability much greater than the value of the actual services. Indeed, the alleged $26,168,876 that BBSS advanced in connection with the Project dwarfs the $43,500 in total fees paid to LM under the LM Agreement. Without a limitation of liability clause, such services may not be economically feasible for the consultant. Additionally, avoiding the uncertainty and expense of the judicial process is valuable where potential liability is entirely speculative and, at least possibly, dependent on other parties. *See Rainbow Country, 706 N.W. 2d at 103.*

As a court in another state has noted, a limitation of liability clause can limit damages without eliminating a consulting party's "substantial interest in exercising due care" in performing under the contract by making the damages the "very thing that induced [the consultant] to enter into the contract in the first place," the fees paid for the consultant's services. *Ocotillo, LLC v. WLB Grp., Inc., 219 Ariz. 200, 196 P.3d 222, 225 (Arizona 2008)* (holding that a clause limiting [*23] a surveying firm's liability to the amount of fees paid in a contract with a

real estate developer was enforceable and not against public policy under Arizona law). Here, the terms of the LM limitation of liability clause do not justify judicial interference as the contractual remedy provided is reasonable given that LM would be liable for the full amount of fees it was paid. As in *Rainbow Country,* even though BBSS may have been completely innocent, the return of the fees paid to LM "were all the parties contemplated and agreed to," and there is no policy reason to invalidate the clause. *See Rainbow Country, 706 N.W. 2d at 106.*

Thus, under both Illinois and Wisconsin law, the LM limitation of liability clause is valid and enforceable. Notably, BBSS's amended complaint does not contain any allegations that LM acted intentionally or that LM's conduct was willful or wanton, which would fall outside the scope of the LM limitation of liability clause. *See Cat Iron, Inc. v. Bodine Envtl. Servs., No. 10-CV-2102, 2010 U.S. Dist. LEXIS 102191, 2010 WL 3767986, *3 (C.D. Ill. Sept. 28 2010)* (denying the defendant's motion for partial summary judgment because an otherwise valid and enforceable damages limitation clause did [*24] not apply to the willful and wanton misconduct claims alleged by the plaintiff).

## C. Subject Matter Jurisdiction

Because the LM limitation of liability clause is valid, BBSS's potential recovery for LM's alleged breach, including BBSS's tort claims, is limited to $42,500. This amount is below the $75,000 required for subject matter jurisdiction for diversity of citizenship. *28 U.S.C. § 1332(a).* This court has the power to dismiss for want of jurisdiction based on the validity of the limitation of liability clause limiting damages to below the jurisdictional requirement. *Pratt Central Park Ltd P'ship v. Dames & Moore, Inc., 60 F.3d 350, 353 (7th Cir. 1995)* ("[T]he district judge possesses the power to eject a case when a contract holds damages below the jurisdictional amount.") In *Pratt,* the Seventh Circuit stated that it agreed with the principle that "a court has the power to dismiss for want of jurisdiction after deciding that a limitation-of-liability clause (or a state statute) caps damages as less than the jurisdictional amount." *Pratt, 60 F.3d at 353.* Therefore, because BBSS's potential recovery is capped below the amount required for subject matter jurisdiction, BBSS's claims are [*25] dismissed.

## IV. CONCLUSION

For the foregoing reasons, LM's motion for partial summary judgment is granted. Because this action fails to meet the jurisdictional amount in controversy requirement for diversity jurisdiction, the case is dismissed for lack of subject matter jurisdiction.

2011 U.S. Dist. LEXIS 23888, *

/s/                                      United States District Judge

JOAN B. GOTTSCHALL                       DATED: March 7, 2011



UNION OIL COMPANY OF CALIFORNIA, a California Corporation, Plaintiff, vs. JOHN BROWN E&C, a Division of JOHN BROWN, INC., a Delaware Corporation, Defendants.

No. 94 C 4424

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*1998 U.S. Dist. LEXIS 2442*

**February 20, 1998, Decided**
**February 20, 1998, Docketed**

**DISPOSITION:** [*1] Plaintiff's motion for reconsideration DENIED.

**COUNSEL:** For UNION OIL COMPANY OF CALIFORNIA, plaintiff: Steven R. McMannon, Douglas C. Crone.

For JOHN BROWN E&C, defendant: William T. Weaver, Joseph P. Beckman, Lord, Bissell & Brook, Chicago, IL.

**JUDGES:** Edward A. Bobrick, U.S. Magistrate Judge.

**OPINION BY:** Edward A. Bobrick

**OPINION**

**MEMORANDUM ORDER**

Before the court is the motion of plaintiff Union Oil Company of California ("Unocal") for reconsideration of this court's order of September 8, 1995.

**I. BACKGROUND**

Unocal originally filed suit against John Brown, Inc. ("John Brown") for damages arising out of John Brown's design and construction of Unocal's Kankakee, Illinois polymer plant. The suit alleged breach of contract, and various tort claims, including gross negligence. The tort counts were dismissed, and John Brown moved for summary judgment, arguing that the contract capped the damages available against it at $ 332,000. Unocal argued

that because John Brown was grossly negligent, an exception to the cap applied. The court rejected Unocal's position and granted John Brown partial summary judgment on the issue of limitation of damages in an order dated September 8, 1995. [*2] On September 22, 1995, Unocal filed a motion to alter that decision under *Fed.R.Civ.P. 59(e).* John Brown moved to strike that filing, arguing that a *Rule 59(e)* motion was an inappropriate means to address an order that was not final. In a hearing on Unocal's motion on October 2, 1995, the court found merit in John Brown's position, but chose to deny Unocal's motion on the merits. It then denied John Brown's motion as moot. (*Minute Order of October 2, 1995*).

Because it was not worth it to Unocal to continue litigation over just $ 332,000, the parties fashioned and entered into a stipulated order whereby they would appeal the damage cap, settle the case if the appellate court affirmed, or continue to litigate if the appellate court overturned. They filed their appeals in July of 1996. On August 5, 1997, the appellate court neither affirmed nor overturned, finding it had no jurisdiction to hear the parties' dispute because there was no final, appealable order in the case. The parties then returned to settlement negotiations and hearings, and further efforts to come up with an appealable order. Now, four months after the appellate court decision, and well over two years after the [*3] original order was issued, Unocal moves for reconsideration of the court's September 8, 1995 order.

**II. ANALYSIS**



EXHIBIT
6

tabbies®

1998 U.S. Dist. LEXIS 2442, *

Unocal correctly points out that neither *Fed.R.Civ.P. 59(e)* nor *60(b)* cover motions to reconsider interlocutory orders. This gives Unocal the advantage of not having to comply with the standards and time constraints applicable under those rules and their attendant case law. Even so, such a motion serves a limited purpose, and is appropriate only where:

> the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issues to the Court. Such problems rarely arise and the motion to reconsider should be equally rare.

*Bank of Waunakee v. Rochester Cheese Sales, Inc., 906 F.2d 1185, 1191 (7th Cir. 1990)*. Unfortunately, such motions are not rare, but increasingly common and generally ill-founded. *Huff v. UARCO, Inc., 925 F. Supp. 550, 561, 561 n.3 (N.D.Ill. 1996)* (collected cases); [*4] *Zip Dee, Inc. v. Dometic Corp., 1995 U.S. Dist. LEXIS 15233, 1995 WL 611840 (N.D.Ill. Oct. 16, 1995)* (motion to reconsider inevitable "as night follows day"); *Asllani v. Board of Educ. of City of Chicago, 845 F. Supp. 1209, 1226 (N.D.Ill. 1993)* (such "motions . . . do nothing but express dissatisfaction with a prior ruling and ask the court to change its mind"); *Quaker Alloy Casting Co. v. Gulfco Inds., Inc., 123 F.R.D. 282, 288 (N.D.Ill. 1988)* (". . . opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure."). They needlessly take the court's attention from current matters and visit inequity upon opponents who, prevailing in an earlier proceeding, must nevertheless defend their position again and again. In the instant case, there is more than one reason for denial of Unocal's motion, and we find the circumstances under which it was brought such that the *Fed.R.Civ. P. 11(c)* is applicable.

First, Unocal has waited two years and four months to file this motion. Had Unocal attempted to proceed under *Rule 59(e)*, or *Rules 60(b)(1), (2)*, or *(3)*, this motion would be at least a year late. *Rule 59(e)* proscribes a ten-day limit on filings, and the first [*5] three subsections of *Rule 60(b)* require filing within a year. Under the remainder of *Rule 60(b)* -- subsections (4), (5), and (6) -- motions must be filed within a reasonable time. Courts have interpreted this provision to deny relief after far less time has passed than the 27 months in this case. *Neuberg v. Michael Reese Hospital Foundation, 123 F.3d 951, 955 (7th Cir. 1997)* (collected cases). This is especially the case where, as here, the moving party provides no explanation for its delay. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd., 507 U.S. 380, 393, 113 S. Ct. 1489, 1497, 123 L. Ed. 2d 74 (1993)* (party must show extraordinary circumstances suggesting it is faultless after delay of one year). While it is true that Unocal is bringing a common law motion that is not fettered by these rules, we see no reason for not requiring such a motion be made within a reasonable time. The prevailing party -- here, John Brown -- should be entitled to some closure, even in the wake of an interlocutory order. Indeed, Unocal would be untimely under the case it cites in support of its entitlement to relief. *Burke v. Warren County Sheriff's Dept., 916 F. Supp. 181, 184 (N.D.N.Y. 1996)* [*6] (common law motion must be filed within *ten days*). [1] Simply put, we find that an unexplained delay of two years and three months unreasonable, and Unocal's motion untimely.

> 1   In the other case upon which Unocal relies, the movant filed about a month after the court entered its summary judgment order. *Acme printing Ink Co. v. Menard, Inc., 891 F. Supp. 1289, 1294 (E.D.Wis. 1995)*. In addition, the court found it appropriate to grant relief because several years passed between the parties' presentation of issues for summary judgment and the court's resolution of those issues. *Id. at 1295*. No such circumstances are at work here.

Second, the instant motion is the second time Unocal has sought reconsideration of the September 8, 1995 order. Thus, John Brown has had to defend its summary judgment success once already. To allow successive motions for reconsideration of the same judgment would render nearly meaningless the original proceeding and resultant order. This is especially the case here, where [*7] Unocal offers no explanation or special circumstances that would justify consideration of the same arguments for a third time.

Third, and even more troubling, Unocal misrepresents the disposition of its first motion for reconsideration. According to Unocal, "without ruling on the substantive issues, the trial court denied Unocal's motion as moot on October 2, 1995." (*Motion to Reconsider*, at 2). Review of the October 2 minute order demonstrates that Unocal's motion was not denied as moot. Review of the October 2 proceedings show that the court, although mindful of the fact that Unocal should not have brought its motion under *Rule 59(e)*, discussed the substance of the motion and denied it *on its merits*. It appears that Unocal hopes to make its argument appear somewhat fresher by claiming, falsely, that they were not considered in its previous motion. Unocal's misrepresentation of the proceeding and disposition attendant to its first

1998 U.S. Dist. LEXIS 2442, *

motion to reconsider is sanctionable conduct under Fed.R.Civ.P 11(b)(3).

Fourth, even if we were to ignore each of the foregoing flaws, Unocal would still not be entitled to relief by way of a motion for reconsideration. As noted above, a party [*8] must demonstrate the existence of one of four grounds to be entitled to relief: 1) that the court has patently misunderstood the party, 2) that the court has made a decision outside the adversarial issues presented, 3) that the Court has made an error not of reasoning but of apprehension, or that there has been a controlling or significant change in the law or facts since the submission of the issues to the court. *Bank of Waunakee, 906 F.2d at 1191*. Here, Unocal argues that the court misinterpreted its position and failed to interpret the terms of the contract or apply California law. (*Motion to Reconsider*, at 4). Thus, although Unocal does not acknowledge the limited grounds for reconsideration, it would apparently submit that the court "patently misunderstood" it. We did not. We suspected that Unocal was merely attempting to resurrect its recently dismissed tort claims, but nevertheless interpreted the contract and did, in fact, apply California law. (*Memorandum Order of September 8, 1995*, at 6-8). Unocal is merely attempting to do what is impermissible in a motion for reconsideration: rehash old arguments. In fact, Unocal has presented the same arguments not just three, [*9] but perhaps four times. [2] That is three times too many.

> 2   In addition to the summary judgment proceedings, and the two motions to reconsider, Unocal advanced similar arguments to the court (Conlon, J.) regarding the validity of its tort claims, which the court ultimately dismissed in an order dated September 30, 1994.

Finally, we will briefly address the substance of Unocal's claim. Unocal originally brought five claims: breach of contract, negligent misrepresentation, negligence, gross negligence, and breach of implied covenant. The negligent misrepresentation, negligence, and gross negligence claims were dismissed; judgment on the pleadings was entered in John Brown's favor on the breach of implied covenant claim. That left the breach of contract claim, and the issue of limitation of damages under the contract. The salient contractual term, section 9.16(g) provided as follows:

> (g) [John Brown's] maximum aggregate liability to Unocal with respect to subsections 9.16(a) through 9.16(f) above, shall [*10] not exceed the proceeds of the applicable insurance coverages plus eighty percent (80%) of the aggregate fee paid to [John Brown]. . .

> The limitations on [John Brown's] liability as specified above, shall apply whether such liability arises at contract, tort (including negligence or strict liability), or otherwise. The above notwithstanding, **said limitations on liability shall not apply to all or any portion of such liability which arises out of the gross negligence, fraud, or willful misconduct of [John Brown] . . . [John Brown] shall not be liable to Unocal for any special, indirect, or consequential damages (including without limitation, loss of profit or revenue), whether arising at contract, tort (including negligence or strict liability), or otherwise.**

(emphasis added). Thus in order to avoid the limitation of damages, Unocal had to establish John Brown's liability for gross negligence, fraud, or willful misconduct. Although its gross negligence claim had been dismissed, Unocal submitted that it could prove John Brown's breach of the contract was grossly negligent, and thereby avoid the damages limitation.

Unocal's only remaining claim is for breach [*11] of contract. It wants to apply a tort concept to that claim and prove John Brown was grossly negligent in breaching the contract. California law, however, does not distinguish between varying degrees of breaches, such as "bad" breaches or "willful" breaches. *Applied Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 28 Cal. Rptr. 2d 475, 482, 869 P.2d 454, 461 (1994); Freeman & Mills, Inc. v. Belcher Oil Co., 11 Cal. 4th 85, 44 Cal. Rptr. 2d 420, 427, 900 P.2d 669, 676 (1995)*. "Gross negligence" would be relevant to conduct amounting to a breach of contract only when that conduct violates an independent duty arising from principles of tort law. *Applied Equipment, 28 Cal. Rptr. 2d at 480, 869 P.2d at 460*. The only duty applicable here, however, is a contractual duty. It is the only claim Unocal has left; there are no remaining allegations of duties independent of the contract to which tort concepts like "gross negligence" or "wilfulness" would be applicable. Thus, John Brown's liability, if any, arises out of breach of contract, not gross negligence. The limitation of liability, then, remains as applicable now as it was 27 months ago.

## III. CONCLUSION

Unocal's [*12] instant motion for reconsideration of the September 8, 1995 order is its second. It was filed more than two years after the order without explanation. It contains misrepresentations to the court regarding the disposition of the previous motion. It presents the same

1998 U.S. Dist. LEXIS 2442, *

arguments that Unocal has presented on three previous occasions. It forces John Brown to once again defend a position it has already prevailed upon. Thus, the motion is untimely, ill-founded, and fails to meet the standards applicable to a common law motion for reconsideration.

For the foregoing reasons, plaintiff's motion for reconsideration is hereby DENIED, and pursuant to *Fed.R.Civ.P. 11(c)(1)(B)*, the plaintiff and counsel are ordered to show cause why they should not be sanctioned for violation of *Fed.R.Civ.P. 11(b)(1), (2)*, and *(3)* within 15 days of receipt of this order.

**ENTERED:**

**Edward A. Bobrick**

**U.S. Magistrate Judge**

   **DATE:** February 20, 1998



ROSSI DISTRIBUTORS, INC., Plaintiff, vs. LAVAZZA PREMIUM COFFEES
CORPORATION, Defendant.

01 C 9271

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

*2002 U.S. Dist. LEXIS 18807*

October 2, 2002, Decided
October 2, 2002, Docketed

**PRIOR HISTORY:** *Rossi Distribs. v. Lavazza Premium Coffees Corp., 2002 U.S. Dist. LEXIS 13071.*

**DISPOSITION:** [*1] Lavazza's motion to dismiss Counts II, III, IV and VIII denied; motion to dismiss Counts I, V, VI and VII granted.

**COUNSEL:** For ROSSI DISTRIBUTORS, INC., plaintiff: Joseph Nicholas Stella, Ronald Eric Bentsen, Morris & Stella, Chicago, IL.

For LAVAZZA PREMIUM COFFEES CORPORATION, defendant: Richard Lewis Reinish, Jonathan Samuel Goodman, D'Ancona & Pflaum, Chicago, IL.

**JUDGES:** Charles P. Kocoras, Chief Judge, United States District Court.

**OPINION BY:** Charles P. Kocoras

**OPINION**

**MEMORANDUM OPINION**

CHARLES P. KOCORAS, Chief +District Judge:

This matter is before the court on Defendant Lavazza Premium Coffees Corporation's ("Lavazza") motion to dismiss. For the reasons stated below, we deny Lavazza's motion to dismiss Counts II, III, IV, and VIII. We grant Lavazza's motion to dismiss Counts I, V, VI and VII. We shall treat Count IX as a request for relief as is appropriate.

**BACKGROUND**

Plaintiff Rossi Distributor's, Inc. ("Rossi") is engaged in the business of selling coffee and coffee products in the Chicago area. Lavazza is an Italian Corporation that is an exporter of premium coffees and coffee equipment. Rossi and Lavazza both agree that they entered into a valid [*2] oral contract which gave Rossi the exclusive rights to distribute Lavazza products in the Chicago area. Rossi also claims that Lavazza agreed to make investments in furtherance of developing a market for Lavazza products. After approximately three and a half years Lavazza put an end to the contract and entered the Chicago market with its products in competition with Rossi. Plaintiff filed a complaint which includes claims for: 1) breach of contract, 2) tortious interference with contractual relations, 3) intentional interference with economic opportunity, 4) estoppel, 5) unjust enrichment, 6) fraudulent misrepresentation, 7) unfair trade practices, and 8) misappropriation of trade secrets. On February 4, 2002 we denied Lavazza's motion to dismiss, or in the alternative to stay, pursuant to *Federal Rule of Procedure 12(b)(1)* and 735 ILCS 5/2-619(a)(3). Lavazza now brings a motion to dismiss pursuant to *Rule 12(b)(6)*.

**LEGAL STANDARD**

The purpose of a motion to dismiss under *Rule 12(b)(6)* is to test the legal sufficiency of a complaint. *Triad Associates, Inc. v. Chicago Hous. Auth., 892 F.2d 583, 586 (7th Cir. 1989).* In ruling on a motion to dismiss, the court [*3] must construe the allegations of the complaint in the light most favorable to the plaintiff, and all well-pleaded facts and allegations in the complaint must be accepted as true. *Bontkowski v. First Nat'l Bank*



EXHIBIT
1

Case: 1:12-cv-00712 Document #: 6-3 Filed: 02/08/12 Page 14 of 40 PageID #:116

Page 2

2002 U.S. Dist. LEXIS 18807, *

*of Cicero, 998 F.2d 459, 461 (7th Cir. 1993)*. The allegations of a complaint should not be dismissed for a failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. Nonetheless, in order to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. *Lucien v. Preiner, 967 F.2d 1166, 1168 (7th Cir. 1992)*.

The court must draw all reasonable inferences from the allegations in favor of the plaintiff, *Perkins v. Silverstein, 939 F.2d 463, 466 (7th Cir. 1991)*, and the plaintiff can plead conclusions in addition to facts. *Kyle v. Morton High school, 144 F.3d 448, 455 (7th Cir. 1998)*. However, any conclusions plead must "provide the defendant with at [*4] least minimal notice of the claim," *Id.*, and the plaintiff cannot satisfy federal pleading requirements merely "by attaching bare legal conclusions to narrated facts which fail to outline the bases of their claims." *Perkins v. Silverstein, 939 F.2d 463, 466-67 (7th Cir. 1991)*.

## DISCUSSION

Rossi first argues that Lavazza's motion was not timely because it was not filed within 10 business days plus three additional days as required by *Federal Rules of Civil Procedure 6* and *12(a)(4)*. However, Federal *Rule 12(a)(4)* also gives this court discretion to fix a different filing date and we consider the motion to be timely. We also note that Rossi and Lavazza both concur that Count IX entitled "Injunction" is not a claim, but is a remedy. Accordingly we shall treat Count IX as a request for relief as is appropriate.

## I. Whether Oral Agreement was Terminable at Will

Lavazza argues that the breach of contract claim in Count I is deficient because Rossi does not allege that the oral distribution contract was to continue for any set period. To properly plead a breach of contract cause of action under Illinois law plaintiffs must allege: "(1) the existence of a valid [*5] and enforceable contract; (2) their own performance under the terms of the contract; (3) a breach of the contract by the defendant; and (4) an injury suffered as a result of the defendant's breach." *Bell Enters. Venture v. Santanna Natural Gas Corp., 2001 U.S. Dist. LEXIS 23684 (N.D. Ill 2001)(citing Petri v. Gatlin, 997 F. Supp. 956, 964 (N.D. Ill. 1997))*. Under Illinois law an executory contract that contains no durational term is deemed terminable at will. *First Commodity Traders, Inc. v. Heinold Commodities, Inc., 766 F.2d 1007, 1012 (7th Cir. 1985); Ruca Hardware v. Chien, 1995 U.S. Dist. LEXIS 6678 (N.D. Ill. 1995)(citing Ryan v. Wersi Elec. GmbH & Co., 3 F.3d 174, 181 (7th Cir. 1993))*. Where the contract terms do not indicate a defi-

nite duration, a duration may be implied by looking at the surrounding circumstances and determining the parties' intentions. *First Commodity Traders, Inc., 766 F.2d at 1012; N.J. Morgan & Assocs. v. Amerisource Health Corp., 1999 U.S. Dist. LEXIS 19473 (N.D. Ill. 1999)*.

In this case Rossi has not alleged any durational [*6] term for the distribution contract. Neither are there alleged any circumstances that would indicate that a duration was implied. [1] Rossi is completely silent as to the duration of the contract. If the contract was perpetual then it was terminable at will. Therefore, since Rossi has failed to allege an essential element of its claim the motion to dismiss Count I is granted.

> 1 We note that Rossi has also indicated that New York law might apply in this case and that under New York Law a reasonable duration can be implied by the circumstances. *See Colony Liquor Distributors v. Jack Daniel Distillery, 22 A.D.2d 247, 254 N.Y.S.2d 547 (App. Div. 3rd Dept. 1964)*. In the case before us Rossi has not alleged any circumstances that would indicate that the distribution contract was anything other than a perpetual contract, terminable at will by either party.

## II. Tortious Interference with Contractual Relations

To properly plead a tortious interference with a contractual relationship claim, a plaintiff must allege: [*7] "(1) the existence of a valid contract between the plaintiff and a third party; (2) defendants' knowledge of the contract; (3) the defendants' intentional and malicious inducement of the breach; (4) a subsequent breach by the third party due to defendants' wrongful conduct; and (5) damages resulting from the breach." *Oil Express Nat'l Inc. v. Burgstone, 1996 U.S. Dist. LEXIS 16938, 1996 WL 666698, *6 (N.D. Ill. 1996)*. Lavazza asserts that Rossi has failed to allege that any third parties breached their contracts with Rossi or that they stopped doing business with Rossi as a result of Lavazza's inducement. Although Rossi does not specifically state that third parties breached their contracts with Rossi in the complaint, it can be reasonably inferred from the facts given that third parties did so. Rossi alleges that Lavazza entered the Chicago area market and took business from Rossi. Rossi also alleges that Lavazza interfered with the contracts between Rossi and its clients. From those statements it can be inferred that the clients breached their contracts with Rossi. Lavazza also complains that Rossi has not stated the identities of the parties that breached contracts with Rossi. Under the federal [*8] pleadings standard Rossi is not required to list the parties by name that are the subject of the claim. Stating that the third

parties in breach were Rossi's clients is sufficient. We therefore deny the motion to dismiss Count II.

## III. Tortious Interference with Economic Opportunity

The tort of tortious interference with prospective economic advantage has four elements: "1) plaintiff must have a reasonable expectancy of a valid business relationship with a third party; (2) defendant must know of the prospective business relationship; (3) defendant must intentionally interfere with the prospective relationship such that the prospective business relationship never materializes; and (4) the interference must damage the plaintiff." *Lynch Ford, Inc. v. Ford Motor Co., Inc., 957 F. Supp. 142, 145-46 (N.D. Ill. 1997)*. Lavazza argues that Rossi has failed to identify which third parties were allegedly interfered with and that the general assertion that Lavazza "interfered" with Rossi's client base is insufficient. It is true that Rossi fails to identify any specific instances when it lost a client and had a reasonable expectation of obtaining that client. However, Rossi [*9] states in its complaint that Lavazza became its competitor in the Chicago area and that Lavazza purposefully interfered with Rossi's client base. We think that provides Lavazza with a sufficient basis for the claim under *Rule 12(b)(6)*. Under the liberal standard of *Rule 12(b)(6)* Rossi is not required to plead the names of all potential clients lost.

## IV. Estoppel Claim

Lavazza first argues that Rossi's estoppel claim in Count IV is a promissory estoppel claim and that it is not applicable in this case because Rossi claims that a valid contract existed. Where there is no disagreement that there was a valid contract governing the parties' rights, even one terminable at will, the doctrine of promissory estoppel is not applicable. *See LaSalle National Bank v. Metropolitan Life Insurance Co., 18 F.3d 1371, (7th Cir. 1994)*(stating that promissory estoppel doctrine does not apply where there is a valid contract); *Jackson v. Encyclopedia Britannica Educ. Corp., 1996 U.S. Dist. LEXIS 15493 (N.D. Ill. 1996)*(stating that promissory estoppel doctrine does not apply when the validity of the contract is not disputed). Rossi's only response is to claim that Lavazza [*10] denies the existence of a valid contract. However, Lavazza alleges that there was a valid contract that was terminable at will. Therefore, the doctrine of promissory estoppel would not be appropriate in this case.

Rossi also argues that Count IV states an equitable estoppel claim. To satisfy the requirements of the doctrine of equitable estoppel a plaintiff must show: "(1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment." *Lewis v. Washington, 300 F.3d 829, 834 (7th Cir. 2002)*.

In this case Rossi asserts that Lavazza orally agreed to let Rossi have an exclusive distributorship. Rossi asserts that it incurred expenses and altered its business position to be able to promote Lavazza's products. Finally Rossi asserts that Lavazza breached the agreement, leaving Rossi holding the bag after it had incurred expenses and changed its business position to accommodate Lavazza's products. Therefore we find that Count IV states a claim for equitable estoppel and the motion to dismiss Count IV is denied.

## V. Unjust Enrichment Claim

Lavazza argues that Rossi's unjust enrichment claim is not applicable in this case [*11] because Rossi and Lavazza both agree that there was a valid contract between them. An unjust enrichment claim is not appropriate where a valid contract, even one terminable at will, governs the rights of the parties. *First Commodity Traders, Inc. v. Heinold Commodities, Inc., 766 F.2d 1007, 1012 (7th Cir. 1985)*; *See also U.S. v. Broadway Constr., Inc., 1998 WL 246385, *5-6 (N.D. Ill. 1998)*(stating that unjust enrichment is based on a contract implied at law and is not applicable where a contract governs parties' rights). Rossi's response is to seek to include unjust enrichment as an alternative claim to the breach of contract claim. Other courts in this district have allowed a plaintiff to state a breach of contract claim and an unjust enrichment claim alternatively. *See Asad v. Hartford Life Insurance Co., 116 F. Supp. 2d 960, 964 (N.D. Ill. 2000)*(stating that *First Commodity Traders, Inc.* is limited to summary judgment stage); *Quadion Corp. v. Mache, 738 F. Supp. 270, 278 (N.D. Ill. 1990)*(stating that *First Commodity Traders, Inc.* is limited to summary judgement stage and that *Federal Rule of Civil Procedure* [*12] *8(e)(2)* allows alternative claims of breach of contract and unjust enrichment). However, we have held that such claims cannot be pled alternatively. *See Broadway Constr., Inc., 1998 WL 246385 at *5-6*(stating that unjust enrichment is based on a contract implied at law and is not applicable where a contract governs parties' rights).

Rossi also claims that Lavazza denies the existence of a valid contract. However, Lavazza states explicitly in its memorandum in support of its motion to dismiss that it does not deny the existence of a valid distributorship contract with Rossi. Lavazza states that its defense is that the contract was a terminable at will arrangement. Thus both Rossi and Lavazza agree that there was a valid contract that governed their rights. Therefore the doctrine of unjust enrichment is inappropriate in this case and the motion to dismiss count V is granted.

## VI. Fraud Claim

Lavazza argues that Rossi failed to plead the fraud claim in Count VI with particularity. *Rule 9(b)* states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Fed.R.Civ.P. 9(b)*. Under *Rule 9(b)* Plaintiffs [*13] must allege the "identity of the person who made the representation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merchant Svcs., Inc., 20 F.3d 771, 777 (7th Cir. 1994)*(quoting *Bankers Trust Co. v. Old World Republic Ins. Co., 959 F.2d 677, 683 (7th Cir. 1992))*; *WFS Financial, Inc. v. South Chicago Dodge, Inc., 2001 U.S. Dist. LEXIS 13600, 2001 WL 1002463, *3-5 (N.D. Ill. 2001)*. Rossi does not respond to the accusation that it has not met this heightened pleading requirement. Rossi's states that it made general allegations sufficient to plead the various elements of fraudulent misrepresentation and promissory fraud and asks for leave to amend its complaint if more specificity is required. The complaint contains only general terms and does not provide the required specificity. The complaint does not indicate the content of the alleged misrepresentations or method used to make the misrepresentations, nor the times or dates of the misrepresentations. Therefore the motion to dismiss Count VI is granted.

VII. Uniform Deceptive Trade Practices Act

[*14] Rossi claims in Count VII that Lavazza violated Uniform Deceptive Trade Practices Act, *815 ILCS § 510/2 et seq.,* by misappropriating Rossi's customer information and stealing its customers. Lavazza is correct to point out that these allegations do not fall under any of the examples listed as deceptive trade practices in *§ 510/2* of the Uniform Deceptive Trade Practices Act. In its answer Rossi fails to respond to Lavazza's assertion and is completely silent regarding its claim brought under the Uniform Deceptive Trade Practices Act. Therefore we grant the motion to dismiss Count VII.

VIII. Trade Secrets Claim

Rossi includes a claim for misappropriation of trade secrets in Count VIII. Lavazza points out that a common law claim for misappropriation of trade secrets is pre-empted by the Illinois Trade Secrets Act. *765 ILCS 1065/8*. Rossi then responds in its answer that Count VIII

states a claim for a violation of the Illinois Trade Secrets Act. Lavazza claims that since Rossi specifically alleged a misappropriation of trade secrets in its complaint, Count VIII should be dismissed. A plaintiff is required to plead facts and conclusions to give a basis for a claim, but a plaintiff [*15] is not required to allege a particular cause of action or supporting law. *See Bartholet v. Reishauer A.G., 953 F.2d 1073, 1078 (7th Cir. 1992)*(stating that although ERISA preempted breach of contract claim, case should not have ben dismissed because plaintiff was not required to plead law that supported allegations). Therefore, pre-emption by the Illinois Trade Secrets Act does not mean that no claim exists in Count VIII.

Rossi claims that it had customer information that was proprietary in nature and was kept in a secure place. Rossi also alleges that Lavazza misappropriated that information. Lavazza's response is that Rossi has not alleged facts specific enough to show that the customer information was a trade secret. The Seventh Circuit has held that in alleging trade secret violations a plaintiff must do more than "point to broad areas of technology and assert that something there must have been secret." *Composite Marine Propellers, Inc. v. Van Der Woude, 962 F.2d 1263, 1266 (7th Cir. 1992)*. The secrets alleged must be concrete. *Id.* In this case Rossi has done more than assert that broad areas of information were secret. In its complaint Rossi [*16] refers to a specific source of secret customer information kept in a specific secure place. *See Curtis 1000, Inc. v. Suess, 24 F.3d 941, 947-48 (7th Cir. 1994)*(stating that customer list can be a trade secret). Therefore we deny the motion to dismiss Count VIII.

**CONCLUSION**

Based on the foregoing analysis we deny Lavazza's motion to dismiss Counts II, III, IV, and VIII. We grant Lavazza's motion to dismiss Counts I, V, VI, and VII. We shall treat Count IX as a request for relief as is appropriate.

Charles P. Kocoras, Chief Judge

United States District Court

Dated: October 2, 2002



JF ENTERPRISES, LLC, Plaintiff, v. FIFTH THIRD BANK, Defendant.

No. 11 CV 3759

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

*2011 U.S. Dist. LEXIS 132031*

November 15, 2011, Decided

**COUNSEL:** [*1] For JF Enterprises, LLC, Plaintiff: John L. Mullen, LEAD ATTORNEY, PRO HAC VICE, Nicholas P. Hillyard, PRO HAC VICE, Franke, Schultz & Mullen, Kansas City, MO; Jeffrey Daniel Javors, Chicago, IL.

For Fifth Third Bank, Defendant: G. Edgar James, LEAD ATTORNEY, PRO HAC VICE, Polsinelli Shughart PC, Kansas City, MO; George Jackson, III, LEAD ATTORNEY, Paula S Kim, Polsinelli Shughart PC, Chicago, IL.

**JUDGES:** Ruben Castillo, United States District Judge.

**OPINION BY:** Ruben Castillo

**OPINION**

## MEMORANDUM OPINION AND ORDER

JF Enterprises, LLC, brings this diversity action against Fifth Third Bank, alleging state law claims for breach of the covenant of good faith and fair dealing, negligence, negligent misrepresentation, and fraudulent misrepresentation. (R. 1, Compl.) Presently before the Court are Fifth Third's motions to dismiss the fraudulent misrepresentation claim under *Federal Rule of Civil Procedure 9(b)*, to strike JF Enterprises' jury trial demand, and for leave to file counterclaims and to join additional counterclaim defendants under *Rules 13, 19* and *20*. (R. 4, Fifth Third's Mot. Dismiss; R. 6, Fifth Third's Mot. Strike; R. 36 Fifth Third's Countercl. Mot.) For the reasons stated below, Fifth Third's motions are [*2] granted.

## RELEVANT FACTS

JF Enterprises is a limited liability company doing business as a car dealer in Kansas City, Missouri. (R. 1, Compl. ¶ 1.) On or about December 7, 2005, JF Enterprises entered into a financing agreement with Fifth Third Bank to provide funds for the purchase of new and used vehicles at JF Enterprises' dealerships. (*Id.* ¶ 6.)

Beginning in December 2008, a business dispute arose between the parties. (*Id.* ¶ 14.) To resolve the dispute, the parties entered into a Settlement Agreement on April 20, 2009. (*Id.* ¶ 21.) Under the terms of the Settlement Agreement, JF Enterprises acknowledged it and others (collectively referred to as "Borrowers") owed Fifth Third $3,755,857.69. (R. 4, Fifth Third's Mot. Dismiss, Ex. 1, Settlement Agreement ¶ 2.) The Borrowers agreed to immediately pay $1.6 million and to execute a promissory note in the amount of $500,000. (*Id.* ¶¶ 7-8.) Fifth Third agreed to extinguish $1,655,857.69 of debt. (*Id.* ¶ 7.) Both parties released their respective claims. (*Id.* ¶¶ 5-6.)

JF Enterprises alleges that it entered into a separate agreement with Fifth Third. (R. 1, Compl. ¶ 23.) This agreement required Fifth Third to allocate $604,302.36 in extinguished [*3] debt to JF Enterprises and the remaining amount to other Borrowers. (*Id.*) JF Enterprises claims that its tax planning took into account this allocation of the debt extinguishment. (*Id.* ¶ 25.) JF Enterprises claims that Fifth Third initially issued it a Form 1099-C, Cancellation of Debt, reflecting the agreed-to amount; however, Fifth Third then issued a second 1099-C allocating the full $1,655,857.69 to JF Enterprises. (*Id.* ¶ 32.) JF Enterprises claims that this increase in income and the multiple 1099-Cs issued by Fifth Third caused it to be audited by the IRS and will cause it to sustain damages between $330,000 and $500,000. (*Id.* ¶¶ 33-38.)



EXHIBIT
8

## PROCEDURAL HISTORY

On March 3, 2011, JF Enterprises filed suit in the Western District of Missouri. (R. 1, Compl.) In its complaint, JF Enterprises presents four claims: (1) breach of the covenant of good faith and fair dealing; (2) negligence; (3) negligent misrepresentation; and (4) fraudulent misrepresentation. (*Id.* ¶¶ 39-79.)

On March 5, 2011, Fifth Third filed two motions. First, Fifth Third filed a motion to dismiss for improper venue or, in the alternative, to dismiss the fraudulent misrepresentation claim. (R. 4, Fifth Third's Mot. Dismiss.) [*4] Second, Fifth Third filed a motion to strike JF Enterprises' jury trial demand. (R. 6, Fifth Third's Mot. Strike.) On May 31, 2011, Judge Ortrie Smith of the Western District of Missouri ruled on Fifth Third's motion to dismiss for improper venue and transferred the case to the Northern District of Illinois, leaving Fifth Third's motions to dismiss the fraudulent misrepresentation claim and to strike the jury demand pending. (R. 20, Order.) Fifth Third subsequently filed a motion for leave to file counterclaims against JF Enterprises and additional counterclaim defendants that it seeks to join on October 12, 2011. (R. 36, Fifth Third's Countercl. Mot.)

Now pending before the Court are Fifth Third's motions requesting the Court to dismiss the fraudulent misrepresentation claim for lack of particularity under *Rule 9(b)* or as contractually precluded, to strike JF Enterprises' jury trial demand as contractually precluded, and for leave to file counterclaims and to join counterclaim defendants. (R. 4, Fifth Third's Mot. Dismiss; R. 6, Fifth Third's Mot. Strike.; R. 36, Fifth Third's Countercl. Mot.) In support of its motion to dismiss the fraudulent misrepresentation claim, Fifth Third argues [*5] that JF Enterprises has failed to allege fraud with sufficient particularity. (R. 5, Fifth Third's Mot. Dismiss Mem. at 5.) Alternatively, Fifth Third argues that Count IV is contractually precluded by the integration clause of the Settlement Agreement. (*Id.* at 6-8.) In support of its motion to strike JF Enterprises' jury trial demand, Fifth Third argues that it is contractually precluded by the Settlement Agreement's jury trial waiver clause. (R. 7, Fifth Third's Mot. Strike Mem.) Finally, Fifth Third requests the Court to grant it leave to file its proposed counterclaims because the counterclaims arise out of the same transaction or occurrence that is the subject matter of JF Enterprise's complaint, and to join the additional counterclaim defendants pursuant to *Rules 13, 19,* and 20 of the Federal Rules of Civil Procedure. (R. 36, Fifth Third's Countercl. Mot. at 4.)

## LEGAL STANDARDS

A motion to dismiss pursuant to *Rule 12(b)(6)* "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7, 570 F.3d 811, 820 (7th Cir. 2009).* When reviewing a motion to dismiss, the Court accepts as true all factual [*6] allegations in the complaint and draws all reasonable inferences in the non-movant's favor. *Id.* Pursuant to *Rule 8(a)(2),* a complaint must contain "a 'short and plain statement of the claim showing that the pleader is entitled to relief,' sufficient to provide the defendant with 'fair notice' of the claim and its basis." *Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir. 2008)* (quoting *Fed. R. Civ. P. 8(a)(2)* and *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).* "The allegations in the complaint must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level; if they do not, the plaintiff pleads itself out of court." *George v. Nat'l Collegiate Athletic Ass'n, 613 F.3d 658 (7th Cir. 2010)* (quoting *Equal Emp't Opportunity Comm'n v. Concentra Health Servs., Inc., 496 F.3d 773, 776 (7th Cir. 2007))* (internal quotation marks omitted).

JF Enterprises' allegations of fraudulent misrepresentation trigger *Rule 9(b) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 9(b). Rule 9(b)* requires that a plaintiff alleging fraud plead the "circumstances constituting fraud" with particularity. *Id.* These circumstances include "the identity [*7] of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., 536 F.3d 663, 668 (7th Cir. 2008)* (internal quotation marks and citations omitted). On a motion to dismiss under *Rule 9(b),* the Court accepts the plaintiffs' factual allegations as true, and draws all reasonable inferences in their favor. *Borsellino v. Goldman Sachs Grp., Inc., 477 F.3d 502, 507 (7th Cir. 2007).* A court may consider materials outside of the pleadings when those materials are referred to in the complaint, concededly authentic, and central to the plaintiff's claim. *Tierney v. Vahle, 304 F.3d 734, 738 (7th Cir. 2002).*

## ANALYSIS

## I. Motion to dismiss Count IV

Fifth Third first argues that JF Enterprises' fraudulent misrepresentation claim should be dismissed for lack of particularity. (R. 5, Fifth Third's Mot. Dismiss Mem. at 4-5.) The elements of a cause of action for fraudulent misrepresentation are: (1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) intent to induce the other [*8] party to act; (4) action by the other party in justifiable reliance on the truth of the statement; and (5) damage to the other party

2011 U.S. Dist. LEXIS 132031, *

resulting from such reliance. *Prime Leasing, Inc. v. Kendig, 332 Ill. App. 3d 300, 773 N.E.2d 84, 94, 265 Ill. Dec. 722 (Ill. App. Ct. 1st Dist. 2002)*.[1] Under *Rule 9(b)*, a party who alleges fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." *Fed. R. Civ. P. 9(b)*. While the exact substance of the particularity standard "may vary on the facts of a given case," the requirement is often described as requiring the "who, what, when, where, and how of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co., 631 F.3d 436, 441-42 (7th Cir. 2011)* (internal citations omitted). The particularity requirement is designed to protect the defendant against the stigmatic injury that comes with alleging fraud and to "discourage a sue first, ask questions later philosophy." *Id. at 441* (internal citations and quotation marks omitted).

> 1   The parties do not identify which state law governs the claims in this case, however, the elements of fraudulent misrepresentation do not vary between Illinois and Missouri. *See Renaissance Leasing, LLC v. Vermeer Mfg. Co., 322 S.W.3d 112, 131-32 (Mo. 2010)*.

JF [*9] Enterprises points to paragraphs 21 and 23 of the complaint in arguing that it meets the heightened pleading requirements of *Rule 9(b)*. (R. 13, JF Enterprises' Mot. Dismiss Resp. at 9.) In the complaint, JF Enterprises alleges that in April of 2009 it entered into the Settlement Agreement and that it was "motivated to accept the terms of the Settlement Agreement because of an agreement" on how the extinguished debt would be allocated. (R. 1, Compl. ¶¶ 21, 23.) Additionally, JF Enterprises provides an email exchange between Jeremy Franklin, member manager of JF Enterprises, and Brad Tinsley at Fifth Third discussing the issuance of the 1099-Cs to JF Enterprises and the other entities. (R. 1, Compl. ¶¶ 29-30.) JF Enterprises argues that this email acknowledges the prior agreement on the allocation of the extinguished debt. (R. 13, JF Enterprises' Mot. Dismiss Resp. at 9.) In these paragraphs, JF Enterprises presents what it alleges to be the false statement: that the extinguished debt would be allocated in a particular way. JF Enterprises also describes how its reliance on this representation caused it to act to its detriment through tax planning. (R. 1, Compl. ¶¶ 24-27, 33-38.)

The Court [*10] concludes, however, that this level of detail is insufficient under *Rule 9(b)*. Although states of mind may be pleaded generally, "[t]he rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom Inc. v. Harbridge Merch. Servs., Inc., 20 F.3d 771, 777*

*(7th Cir. 1994)*. JF Enterprises does not identify--in either the complaint or the email it claims "acknowledges" the agreement--the representative of Fifth Third who made the fraudulent misrepresentation, when the fraudulent misrepresentation allegedly occurred, where the fraudulent misrepresentation took place, or the how the fraudulent misrepresentation was communicated to JF Enterprises. *See Windy City Metal Fabricators & Supply, Inc., 536 F.3d at 668* (affirming the dismissal of fraud claims where plaintiffs failed to plead who had made a fraudulent statement, when the fraudulent statement was made, and how the fraudulent statement was communicated). JF Enterprises must identify the relevant dates, names, locations, and documents, if any documents exist, surrounding [*11] the alleged fraud. Because these details are lacking, the Court finds that JF Enterprises has not met the heightened pleading requirements of *Rule 9(b)* and dismisses Count IV with leave to amend.[2]

> 2   Fifth Third also argues that the fraudulent misrepresentation claim is contractually precluded by the integration clause of the Settlement Agreement. (R. 4, Fifth Third's Mot. Dismiss.) Because whether the claim is precluded may depend on the circumstances surrounding the fraudulent misrepresentation, which are not provided, and because it has now dismissed this claim, the Court does not address this argument at this time.

## II. Motion to strike

Next, Fifth Third requests the Court to strike JF Enterprises' request for a jury trial arguing that it conflicts with the terms of the Settlement Agreement, which includes a waiver to a jury trial. (R. 7, Fifth Third's Mot. Strike Mem.) When a contract is governed by state law, the validity of a jury trial waiver is similarly governed by state law. *IFC Credit Corp. v. United Bus. & Indus. Fed. Credit Union, 512 F.3d 989, 993-94 (7th Cir. 2008)*. Here, because the Settlement Agreement states it "shall be construed in accordance with the applicable laws [*12] of the State of Illinois and applicable federal law," the Court applies Illinois law. (R. 4, Fifth Third's Mot. Dismiss, Ex. 1, Settlement Agreement ¶ 27.) While the Illinois Supreme Court has not spoken as to the enforceability of jury trial waivers, it has determined that the enforceability of an arbitration agreement turns upon fundamental principles of contract law, not on a higher "knowing and voluntary" standard sometimes used by other courts. *Melena v. Anheuser-Busch, Inc., 219 Ill. 2d 135, 847 N.E.2d 99, 106, 301 Ill. Dec. 440 (Ill. 2006)*. An agreement to a bench trial cannot logically be treated less favorably than an agreement to arbitrate--an agreement that surrenders more rights. *IFC Credit Corp., 512 F.3d at 994*. Therefore, in Illinois, the validity of a jury trial waiver is determined by fundamental principles of

contract law. *See AEL Fin. LLC v. Tri-City Auto Salvage, Inc., No. 08-cv-04384, 2009 U.S. Dist. LEXIS 77573, 2009 WL 3011211, at *3 n.1 (N.D. Ill. Aug. 31, 2009)* (discussing the standard to be applied to jury trial waivers under Illinois law).

JF Enterprises makes no claim that the Settlement Agreement or the jury trial waiver is unjust, unreasonable, or invalid for any reason. Rather, it argues that the jury trial waiver does [*13] not apply to the current litigation. (R. 14, JF Enterprises' Mot. Strike Resp.) This argument requires the Court to determine the waiver's scope.

Under Illinois law, the Court must interpret the language of the contract in accordance with its plain meaning and must construe the contract as a whole. *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., 212 F.3d 373, 378 (7th Cir. 2000)* (interpreting Illinois law); *William Blair & Co., LLC. v. FI Liquid Corp., 358 Ill. App. 3d 324, 830 N.E.2d 760, 770, 294 Ill. Dec. 348 (Ill. App. Ct. 1st Dist. 2005)*. The Court also must ascertain and give effect to the intent of the parties. *W.W. Vincent and Co. v. First Colony Life Ins., Co., 351 Ill. App. 3d 752, 814 N.E.2d 960, 966, 286 Ill. Dec. 734 (Ill. App. Ct. 1st Dist. 2004)*. A written contract is presumed to speak the intention of the parties who signed it, and their intentions must be determined from the language used. *Id.* Additionally, "a court cannot alter, change or modify the existing terms of a contract or add new terms or conditions to which the parties do not appear to have assented, write into the contract something which the parties have omitted or take away something which the parties have included." *Gallagher v. Lenart, 367 Ill. App. 3d 293, 854 N.E.2d 800, 807, 305 Ill. Dec. 208 (Ill. App. Ct. 1st Dist. 2006)*. [*14] A presumption exists against provisions that easily could have been included in the contract but were not. *Id.* Further, where a contract purports on its face to be a complete expression of the parties' entire agreement, courts will not add another term about which the agreement is silent. *Id.* A court's analysis begins with the language of the contract itself, and "[i]f the language unambiguously answers the question at issue, the inquiry is over." *Emergency Med. Care, Inc. v. Marion Mem. Hosp., 94 F.3d 1059, 1061 (7th Cir. 1996)* (interpreting Illinois law).

The Court turns, then, to the language of the Settlement Agreement. The Settlement Agreement provides that the parties waive their right to a trial by jury "in any litigation based on or arising out of this agreement or the loan documents, any of the transactions contemplated by this agreement or the loan documents, or any course of conduct, dealing, statements or actions between any or all of them and Lender (collectively, 'Claims')." (R. 4, Fifth Third's Mot. Dismiss, Ex. 1, Settlement Agreement ¶ 24) (capitalization and emphasis omitted). Fifth Third

argues that the current litigation arises out of "transactions contemplated" [*15] by the Settlement Agreement. (R. 7, Fifth Third's Mot. Strike Mem.) JF Enterprises argues that the current claims arise out of the tortious issuance of an additional 1099-C, not out of the Settlement Agreement or any transactions contemplated by the Settlement Agreement. (R. 14, JF Enterprises' Mot. Strike Resp.)

The question of whether this litigation arises out of "transactions contemplated" by the Settlement Agreement has already been addressed by Judge Smith of the Western District of Missouri. (R. 20, Order at 4.) Judge Smith looked at the same clause and found that it did so arise. *Id.* The Court agrees. JF Enterprises alleges that a separate agreement to allocate the extinguished debt exists and that that alleged agreement motivated JF Enterprises to accept the terms of the Settlement Agreement. (R. 1, Compl. ¶ 23.) Insofar as JF Enterprises argues that it was motivated to enter into the Settlement Agreement by the debt allocation, it concedes that it contemplated the allocation of that debt--the transaction giving rise to this litigation. The cancellation of debt was established by the Settlement Agreement, and the current litigation directly flows from this cancellation of debt. [*16] (R. 4, Fifth Third's Mot. Dismiss, Ex. 1, Settlement Agreement ¶ 7.) The parties, sophisticated entities represented by counsel, were aware that there were tax implications to the Settlement Agreement. Indeed, the harm allegedly inflicted upon JF Enterprises was caused when the issuance of the 1099-C contradicted its careful tax planning. (R. 1, Compl. ¶¶ 24-27.) The parties' intent--demonstrated by the Settlement Agreement's unambiguous language--was that the jury trial waiver would apply to claims like the one before the Court. The Court accordingly strikes JF Enterprises' jury trial demand.

### III. Motion for leave to file counterclaims and join counterclaim defendants

Finally, Fifth Third requests leave to file counterclaims against JF Enterprises and the additional counterclaim defendants that Fifth Third also seeks to join. (R. 36, Fifth Third's Countercl. Mot.) Specifically, Fifth Third seeks to join the other Borrowers involved in the Settlement Agreement--Olathe's Showcase Cars, Inc. f/k/a Jack Michael Enterprises, LLC, Jeremy Franklin, and Hector Espinosa (collectively, "Additional Counterclaim Defendants")--and file counterclaims against JF Enterprises and the Additional Counterclaim [*17] Defendants related to the prior business dispute that was resolved by the Settlement Agreement. (*Id.* at 1-2.) Fifth Third contends that the filing of the present suit by JF Enterprises rendered the Settlement Agreement null and void, and as a consequence, Fifth Third "is entitled to

exercise any and all of its rights and remedies against" JF Enterprises and the Additional Counterclaim Defendants. (*Id.* at 3-4.)

Under *Federal Rule of Civil Procedure 13(a),* which addresses compulsory counterclaims, a pleading must state as a counterclaim any claim the pleader has against an opposing party if the claim: "(A) arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction." *Fed. R. Civ. P. 13(a).* JF Enterprises argues that the Court should not grant Fifth Third leave to file the proposed counterclaims because they fail to meet the requirements of *Rule 13(a).* (R. 39, JF Enterprises' Countercl. Resp. at 3.)

Regarding the first element of a compulsory counterclaim, the Seventh Circuit uses a "logical relationship" test to determine whether the "transaction [*18] or occurrence" giving rise to the counterclaim is the same for purposes of *Rule 13(a).* *Bd. of Regents of Univ. of Wis. Sys. v. Phoenix Int'l Software, Inc.,* 653 F.3d 448, 470 (7th Cir. 2011). In *Burlington Northern v. Strong,* the Seventh Circuit explained:

> Courts generally have agreed that the words "transaction or occurrence" should be interpreted liberally in order to further the general policies of the federal rules and carry out the philosophy of *Rule 13(a)....* As a word of flexible meaning, "transaction" may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their *logical relationship.*

*907 F.2d 707, 711 (7th Cir. 1990)* (internal quotation marks and citations omitted). Accordingly, a court "must examine carefully the factual allegations underlying each claim to determine if the logical relationship test is met." *Id.*

The "logical relationship" test appears satisfied here. In its proposed counterclaims, Fifth Third seeks damages for JF Enterprise's--and the Additional Counterclaim Defendants'--breach of the Settlement Agreement. Despite JF Enterprise's efforts to recharacterize this dispute as having nothing to do with [*19] the Settlement Agreement, as discussed above, JF Enterprises seeks damages for conduct by Fifth Third arising out of the Settlement Agreement. Specifically, JF Enterprises alleges that it was "motivated to accept the terms of the Settlement Agreement because of an agreement" with Fifth Third about how the debt extinguished by Fifth

Third pursuant to the Settlement Agreement would be allocated. (R. 1, Compl. ¶¶ 22-23.) The basis for this suit--the extinguished debt allocation agreement that JF Enterprises claims was made between it and Fifth Third--is logically related to the basis of Fifth Third's counterclaims--the breach of the Settlement Agreement that extinguished the debt. Although the technical elements of the claims in question are not identical, the totality of the claims, and particularly the respective factual backgrounds of the claims, lead the Court to conclude that the claims are logically related. *See Bd. of Regents of Univ. Wis. Sys.,* 653 F.3d at 470 (noting that the "logical relationship" test "focuses on the facts of the case, rather than on the technical elements of the claims in question").

Whether the second element of a compulsory counterclaim--the Court's jurisdiction [*20] over the Additional Counterclaim Defendants--is present here is difficult to determine at this stage due to the parties' cursory treatment of the issue. According to Fifth Third, the Court has both diversity and supplemental jurisdiction over the Additional Counterclaim Defendants under *28 U.S.C. §§ 1332* and *1367(a).* (R. 36, Fifth Third's Countercl. Mot. at 5.) In its reply, Fifth Third also asserts that the Court has personal jurisdiction over the Additional Counterclaim Defendants because they have conducted business in Illinois. (R. 40, Fifth Third's Reply at 4-5.) Although JF Enterprises disputes that the Court "has jurisdiction over the out-of-state defendants sought to be added," JF Enterprises fails to provide any support for this contention or develop it in any way. (R. 39, JF Enterprises' Resp. at 3.) Because JF Enterprises fails to point the Court to any specific impediments to personal jurisdiction, the Court will assume, for purposes of ruling on this motion, that jurisdiction over the proposed Additional Counterclaim Defendants is appropriate. It may be of no matter, however, because if the Court lacks personal jurisdiction over one of the Additional Counterclaim Defendants, [*21] "this would make the counterclaim permissive as to that defendant." *Asset Allocation Mgmt. Co. v. W. Emp'rs Ins. Co.,* 892 F.2d 566, 574 (7th Cir. 1989); *Fed. R. Civ. P. 13(b).* Thus, even if Fifth Third's proposed counterclaims are not compulsory, they may properly be asserted under *Rule 13(b).* *Fed. R. Civ. P. 13(b)* ("A pleading may state as a counterclaim against an opposing party any claim that is not compulsory.").

Joinder of the Additional Counterclaim Defendants is also appropriate. *Rules 19* and *20 of the Federal Rules of Civil Procedure* govern the joinder of additional parties as counterclaim defendants. *Fed. R. Civ. P. 13(h).* Under *Rule 20(a)(2),* parties may be joined in one action as defendants if "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect

2011 U.S. Dist. LEXIS 132031, *

to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." *Fed. R. Civ. P. 20(a)(2).* Here, Fifth Third asserts breach of contract claims against JF Enterprises and the Additional Counterclaim Defendants that arise out of the same transaction, and all of the  [*22] breaches relate to the Settlement Agreement and the underlying loan documents. Additionally, there are common questions of law and fact relating to the parties' obligations under the Settlement Agreement and whether JF Enterprises' initiation of the present suit rendered the Settlement Agreement null and void for all of the parties. Accordingly, the Court finds that the permissive joinder requirements under *Rule 20* are met and joins the Additional Counterclaim Defendants.

**CONCLUSION**

For the reasons stated above, the Court GRANTS, with leave to amend, Fifth Third's motion to dismiss Count IV. (R. 4.) The Court also GRANTS Fifth Third's motion to strike JF Enterprises' jury trial demand. (R. 6.) Finally, the Court GRANTS Fifth Third's motion for leave to file a counterclaim and join additional counterclaim defendants. (R. 36.) The parties are directed to reevaluate their settlement positions in light of this opinion and to exhaust all efforts to settle this case. The parties shall appear for a status on December 1, 2011, at 9:45 a.m. to set a firm litigation schedule.

**Entered:**

**Judge Ruben Castillo**

**United States District Court**

**Dated:** November 15, 2011



® LexisNexis®

**THE SECURITY CENTER, INC., and ARIA KOZAK, Plaintiffs, v. AMERICAN TELEPHONE & TELEGRAPH COMPANY, PRIME SECURITY DISTRIBU-TORS, INC. a/k/a PRIME CHOICE SECURITY DISTRIBUTORS, WORLDNET, INC., ANNE SCHRIEFFER, as Special Administrator of the Estate of Larry Voitik, EDWARD SLOMINSKI, and MICHAEL BAGNI, Defendants.**

94 C 6707

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1995 U.S. Dist. LEXIS 6540*

**May 15, 1995, Decided**
**May 16, 1995, DOCKETED**

**COUNSEL:** [*1] For SECURITY CENTER INC., THE, ARIA KOZAK, plaintiffs: Mark Paul Miller, David M. Simon, Wildman, Harrold, Allen & Dixon, Chicago, Il.

For AMERICAN TELEPHONE & TELEGRAPH COMPANY, defendant: Alan Francis Curley, Judi A. Lamble, Fay Clayton, Cynthia H. Hyndman, Robinson, Curley & Clayton, P.C., Chicago, IL. Lois Lipton, Chicago, IL.

For PRIME SECUIRTY DISTRIBUTORS, INC. aka Prime Choice Secuirty Distributors, WORLDNET INC, ANNE SCHRIEFFER, as Special Administrator of the Estate of Larry Voitik, EDWARD SLOMINSKI, MI-CHAEL BAGNI, defendants: Alan Francis Curley (See above), Judi A. Lamble (See above), Cynthia H. Hynd-man (See above). Lois Lipton (See above).

**JUDGES:** David H. Coar, U.S. District Judge

**OPINION BY:** David H. Coar

**OPINION**

**MEMORANDUM OPINION**

On October 7, 1994, plaintiffs, The Security Center, Inc. ("Security") and Aria Kozak ("Kozak"), filed a four-teen (14) count complaint against defendants American Telephone & Telegraph Corporation, improperly sued as American Telephone & Telegraph Company," ("AT&T"), Prime Security Distributors, Inc. ("Prime"), Worldnet, Inc. ("Worldnet"), Anne Schrieffer ("Schrief-fer") as Special Administrator of the Estate of Larry Voi-tik ("Voitik"), Edward Slominski ("Slominski") and Michael Bagni ("Bagni"), in the Circuit Court of Cook County, Illinois, County Division, Law Department, case number 94 L 12700. On November 9, 1994, AT&T filed its Notice of Removal pursuant to *28 U.S.C. sections 1441(b)* and *1446* on the basis of diversity jurisdiction. All of the defendants except Schrieffer have consented to the removal petition; AT&T did not solicit Schrieffer's consent because it considers her a nominal party fraudulently joined to prevent diversity jurisdiction. In addition to its removal petition, AT&T has filed a "Motion to Dismiss Anne Schrieffer as a Party Defendant" and a "Motion to Disqualify Mark Miller, [*2] David Simon and Wildman, Harrold, Allen & Dixon." All of the other defendants, excluding Schrieffer, have joined in these motions. Plaintiffs, in turn, have filed a Motion to Re-mand. All of these motions are presently before the court.

I. Nature of the Claim

AT&T manufacturers and sells security alarm systems, among other products. In the Spring of 1991, Carlton Dawson, who owns and manages an alarm company, contacted Larry Voitik, an AT&T Midwest Region alarm products sales representative, to discuss AT&T's new 8300 alarm system. (Compl., at PP 7, 8). Dawson told Voitik that he would be interested in starting a new



EXHIBIT
9

1995 U.S. Dist. LEXIS 6540, *

AT&T alarm dealership in Chicago if AT&T would sell its alarm products to him directly. (Id. at P8). Voitik allegedly answered in the affirmative. (Id.) Voitik allegedly further responded that "AT&T would not establish any other new dealers in the Chicagoland area through at least the end of 1991" and that AT&T would continue to refrain from establishing other new dealerships if, by the start of 1992, the new dealership was selling a sufficient number of alarm systems. (Id.)

In reliance on Voitik's representations, Dawson approached Kozak, a potential [*3] investor and experienced alarm company manager, about establishing a direct AT&T dealership in Chicago. (Id. at PP 9-10). On April 26, 1991, Kozak and Dawson met with Voitik and James Smith, AT&T's regional manager, to discuss the possible dealership. (Id. at P12). Smith and Voitik allegedly promised that AT&T would directly supply them with AT&T products and all necessary sales support. They also allegediy repeated Voitik's earlier representations concerning an exclusive dealership through 1991 and possibly into 1992, depending upon sales volume. (Id.).

In reliance on Smith and Voitik's alleged representations, Dawson and Kozak incorporated The Security Center, Inc. On May 30, 1991, Edward May, AT&T's Sales Vice President, signed a Dealership Agreement on behalf of AT&T and sent the Agreement to Dawson and Kozak with a cover letter which stated in part that AT&T "look[ed] forward to a long profitable relationship with The Security Center, Inc." (Id. at P13). In reliance on Voitik, Smith and May's representations, Security executed the Dealership Agreement in June and became a franchisee of AT&T. (Id. at P14).

Unbeknownst to Security, AT&T had allegedly already [*4] promised the exclusive rights to sell AT&T alarm products in the Chicagoland area to Prime Security Distributors. (Id. at P16). AT&T had named Prime its exclusive wholesaler for AT&T alarm products in Massachusetts, Rhode Island and Connecticut in 1989. In January 1990, AT&T expanded Prime's territory to include Indiana, Michigan and Illinois, excluding Cook and DuPage Counties. (Id. at P18). However, Prime had the right to add both counties to its sales territory. The exclusive wholesaler agreement provided that AT&T would notify Prime if AT&T decided to market its products in Cook and DuPage Counties through a wholesale distributor rather than directly to dealers. Prime would then have ten (10) days to exercise its right of first refusal. (Id.)

Although AT&T was selling its products directly to dealers in Cook and DuPage Counties when it entered into its agreement with Security, plaintiffs allege that AT&T planned to cease its direct sales to dealers and instead sell exclusively to Prime, a wholesale distributor. Once this occurred, Prime could exercise its right of first refusal. (Id. at P19). Plaintiffs allege that AT&T failed to reveal either that it had already [*5] promised the Chicagoland territory to Prime or that it intended to sever its contractual relationships with dealers and instead deal exclusively through Prime. (Id. at P20). Plaintiffs maintain that they would not have executed the Dealership Agreement had they known this information. (Id.)

On October 15, 1991, John Alaburda, AT&T's National Sales Manager, sent Dawson a letter terminating Security's Dealership Agreement. (Id. at P21). After receiving the termination notice, Dawson contacted Voitik and asked for an explanation. Plaintiffs allege that Voitik admitted in response that "internal discussions at AT&T about this expansion of Prime's Territory to include Cook and DuPage Counties had been going on for at least several months before AT&T had entered into its Dealership Agreement with Security." (Id. at P22).

AT&T subsequently promised Security that Prime would sell it AT&T alarm products at "direct pricing." (Id. at P24). Bagni, Prime's President, also promised sales and marketing support to AT&T's former direct dealers. In reliance on AT&T and Prime's representations, Kozak agreed to become a dealer through Prime and signed a consulting agreement with [*6] Worldnet, an affiliate of Prime. Worldnet agreed not to compete with Security. (Id. at P25). However, Prime and Worldnet allegedly failed to live up to their promises. Ultimately, Prime and Worldnet terminated their agreements with Security. (Id. at P32).

Plaintiffs' complaint advances claims for fraud in the inducement, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), breach of contract, promissory estoppel, fraud, violation of the Franchise Disclosure Act, intentional interference with contractual relations, and intentional interference with prospective business relations. Of these claims, fraud in the inducement (Count I) and violating the Consumer Fraud Act (Count II) are directed at Voitik.

## II. Challenges to Jurisdiction

As previously stated, defendants, excluding Schriefer, removed plaintiffs' complaint to federal court on the basis of diversity jurisdiction. [1] "For a case to be within the diversity jurisdiction of the federal courts, diversity of citizenship must be 'complete' meaning that no plaintiff may be a citizen of the same state as any defendant." *Hoosier Energy Rural Elec. Co-op., Inc. v. Amoco Tax* [*7] *Leasing IV Corp., 34 F.3d 1310, 1314-15 (7th Cir. 1994).* As presently plead, this court lacks diversity jurisdiction over plaintiffs' complaint because complete

1995 U.S. Dist. LEXIS 6540, *

diversity does not exist; specifically, Security and Voitik's Estate are both citizens of the State of Illinois. Defendants maintain, however, that diversity jurisdiction exists for two reasons: first, Schrieffer is a nominal party and thus must be disregarded when determining jurisdiction; and second, plaintiffs fraudulently joined Voitik's Estate for the sole purpose of destroying diversity jurisdiction. Defendants therefore contend that this court has subject matter jurisdiction.

> 1     As a general rule, all defendants must join in a removal petition; however, nominal or fraudulently joined parties are disregarded for removal purposes and need not join in the removal petition. See *Roe v. O'Donohue, 38 F.3d 298, 301 (7th Cir. 1994); Northern Ill. Gas. Co. v. Airco Indus. Gases, 676 F.2d 270, 272 (7th Cir. 1994).*

The standards governing removal [*8] of actions are well established. "Courts should interpret the removal statute narrowly and presume that the plaintiff may choose his or her forum." *Doe v. Allied-Signal, Inc., 985 F.2d 908, 911 (7th Cir. 1993)* (citations omitted). The party seeking removal has the burden of establishing federal jurisdiction. Id. "Any doubt regarding jurisdiction should be resolved in favor of the states" *(i.e.,* remand). Id. Alternatively stated, "questions on removal are . . . strictly construed against federal jurisdiction." *Katonah v. USAir, Inc., 868 F. Supp. 1031, 1033 (N.D. Ill. 1994)* (citations omitted).

A. Nominal Party

To determine whether complete diversity exists, the court must disregard nominal or formal parties to the action and determine jurisdiction based solely only upon the citizenship of the real parties to the controversy. See *Navarro Sav. Ass'n v. Lee, 446 U.S. 458, 460, 100 S. Ct. 1779, 1781-82, 64 L. Ed. 2d 425 (1980).* A "real party" in interest is one who, by the substantive law, has the duty sought to be enforced or enjoined. See *Rose v. Giamatti, 721 F. Supp. 906, 914 (S.D. Ohio 1989);* see also Wright, Miller & Kane, Federal Practice & Procedure: [*9] Civil 2d § 1542 (West 1990). In contrast, a "nominal party" does not have an interest in the subject matter litigated but holds the property at issue in the litigation in a "subordinate or possessory capacity" *(e.g.,* as a trustee, agent or depository). See *S.E.C. v. Cherif, 933 F.2d 403, 414 (7th Cir. 1991), cert. denied 502 U.S. 1071, 112 S. Ct. 966, 117 L. Ed. 2d 131 (1992).* A nominal party "can be joined to aid the recovery of relief without an assertion of subject matter jurisdiction only because he has no ownership interest in the property which is subject of litigation." Id. A nominal party is not concerned about which side of the controversy succeeds, see id. (citing *Bacon v. Rives, 106 U.S. 99, 1 S. Ct. 3, 27 L. Ed. 69*

*(1882));* rather, its role is limited to turning over the property in its possession to the prevailing party pursuant to a final judgment order. Id.

Based upon these principles and plaintiffs' allegations, Voitik's Estate is clearly not a nominal party. As explained *infra,* Voitik's Estate may be severally liable to plaintiffs if he fraudulently induced Security into executing the Dealership Agreement as alleged. Contrary to [*10] AT&T's unsupported contention, an estate's ability (or lack thereof) to pay a judgment does not determine whether it is a "real" or "nominal" party in interest for the purposes of establishing diversity jurisdiction. Even if Voitik's Estate has no assets as AT&T claims, it still has a real interest in the outcome of the litigation.

AT&T's citation to the decision in *Wilson v. Republic Iron & Steel Company, 257 U.S. 92, 42 S. Ct. 35, 66 L. Ed. 144 (1921),* does not require a contrary result. In that case, the plaintiff filed a negligence action in state court against his employer and a co-employee. *Id. at 93, 42 S. Ct. at 36.* The defendants argued that the co-employee had been fraudulently joined to defeat diversity jurisdiction and thereby preclude removal. *Id. at 94, 42 S. Ct. at 36.* The plaintiff did not respond to this argument. The Court interpreted the plaintiff's silence as assenting to the truth of the defendants' verified fraudulent joinder petition. *Id. at 97-98, 42 S. Ct. at 37-38.* The Court therefore concluded that the uncontested facts contained in the removal petition established that the plaintiff had fraudulently joined the co-employee without good faith [*11] and for the sole purpose of defeating the employer's ability to remove the case. Id. Wilson is inapposite for two reasons: first, the issue was not whether the co-employee was a nominal party but rather whether he had been fraudulently joined; and second, the default rule applied in Wilson does not apply in this case because the plaintiffs have contested the defendants' charge of fraudulent joinder.

Accordingly, this court declines to label Voitik's Estate as a nominal party for diversity jurisdiction purposes.

B. Fraudulent Joinder

It is well established that "diversity jurisdiction cannot be destroyed by joinder of nondiverse parties if such joinder is fraudulent." *Hoosier Energy, 34 F.3d at 1315* (quoting *Gottlieb v. Westin Hotel Co., 990 F.2d 323, 327 (7th Cir. 1993)).* Fraudulent joinder occurs "either when there is no possibility that a plaintiff can state a cause of action against nondiverse defendants in state court, or where there has been outright fraud in plaintiff's pleading of jurisdictional facts." Id. Since AT&T does not allege that plaintiffs' engaged in "outright fraud" in pleading their jurisdictional facts, the issue is whether

plaintiffs can [*12] state a cause of action against Voitik in Illinois state court. See id.; *Katonah, 868 F. Supp. at 1034.*

An out-of-state defendant alleging fraudulent joinder has a heavy burden to satisfy. *Poulos v. NAAS Foods, Inc., 959 F.2d 69, 73 (7th Cir. 1992).* The defendant "must show that, after resolving all issues of fact *and law* in favor of the plaintiff, the plaintiff cannot establish a cause of action against the in-state defendant." Id. (citing *B., Inc. v. Miller Brewing Co., 663 F.2d 545, 549 (5th Cir. 1981)* (emphasis added by Seventh Circuit)). To apply this standard, the court must "evaluate all of the factual allegations in the light most favorable to the plaintiff, resolving all contested issues of substantive fact in favor of the plaintiff . . . and must resolve any uncertainties as to the current state of controlling substantive law in favor of the plaintiff." *B., Inc. v. Miller Brewing Co., 663 F.2d 545, 549 (5th Cir. 1981)* (citations omitted). The court's inquiry is limited to the allegations of plaintiff's present complaint; the defendant need not negate any possible theory that the plaintiff could allege in the future. *Poulos, 959 F.2d at 74.* The [*13] plaintiff's motive for adding an in-state defendant is irrelevant to this analysis. [2] *Id. at 73*; *Katonah, 868 F. Supp. at 1034.*

> 2 Why plaintiffs elected to sue only Voitik instead of all three AT&T employees involved in the alleged misrepresentations -- Voitik, Smith and May -- is thus not relevant. Similarly, AT&T's speculative conclusion that Schrieffer should be dismissed because plaintiffs "have no intention of prosecuting their claims in earnest against Schrieffer or Mr. Voitik's Estate" is also not relevant to the court's analysis.

The threshold showing required to defeat a fraudulent joinder claim is extremely low. There must be *"no possibility that a plaintiff can state a cause of action against nondiverse defendants in state court."* *Hoosier Energy, 34 F.3d at 1315* (emphasis added). Accordingly, if there is even a possibility that a state court could find a cause of action against the in-state defendant, then joinder is proper and complete diversity does not exist. B, Inc., 663 F.2d at 550. [*14] In effect, the federal court "must engage in an act of prediction: is there any reasonable possibility that a state court would rule against the non-diverse defendant?" *Poulos, 959 F.2d at 73.*

Whether a state court would recognize a cause of action against the in-state defendant is determined according to the state court's standards for a motion to dismiss. *Katonah, 868 F. Supp. at 1034.* Under Illinois law, a motion to dismiss brought pursuant to section 2-615 of the Illinois Code of Civil Procedure addresses whether the complaint alleges sufficient facts which, if proved,

would entitle the plaintiff to relief. [3] See *Urbaitis v. Commonwealth Edison, 143 Ill. 2d 458, 475, 575 N.E.2d 548, 555, 159 Ill. Dec. 50 (1991).* In deciding a section 2-615 motion, the court must accept as true all well-plead facts and all reasonable inferences which can be drawn from those facts. [4] *Kaden v. Kagann, 260 Ill. App. 3d 256, 257, 635 N.E.2d 515, 517, 200 Ill. Dec. 176 (2d Dist. 1994)* (citing *Kolegas v. Heftel Broadcasting Corp., 154 Ill. 2d 1, 8-9, 607 N.E.2d 201, 205, 180 Ill. Dec. 307 (1992)).* The complaint must be liberally construed to do justice between the parties. [*15] *Kaden, 260 Ill. App. 3d at 257, 635 N.E.2d at 517* (citing *735 ILCS 5/2-603(c)).* Accordingly, a motion to dismiss should not be granted unless it clearly appears that the plaintiff could not recover under any proven set of facts. See *Meerbrey v. Marshall Field & Co., 139 Ill. 2d 455, 473, 564 N.E.2d 1222, 1230, 151 Ill. Dec. 560 (1990).* To that end, a motion to dismiss should be denied where a cause of action is stated, even if it is not the cause of action intended by the plaintiff. See *Doe v. Calumet City, 161 Ill. 2d 374, 388, 641 N.E.2d 498, 505, 204 Ill. Dec. 274 (1994).*

> 3 A motion to dismiss brought pursuant to section 2-619 admits the legal sufficiency of the complaint but asserts an affirmative defense or other matter which avoids or defeats the claim. See *T&S Signs, Inc. v. Village of Wadsworth, 261 Ill. App. 3d 1080, 1083, 634 N.E.2d 306, 308, 199 Ill. Dec. 467 (2d Dist. 1994).*
> 4 Conclusions of law and conclusions of facts unsupported by the allegations are not deemed admitted for the purposes of a motion to dismiss. See *Parrillo, Weiss & Moss v. Cashion, 181 Ill. App. 3d 920, 923, 537 N.E.2d 851, 852, 130 Ill. Dec. 522 (1st Dist. 1989).*

[*16] To apply these principles to the facts of this case requires a two-step analysis. First, the court must determine whether Voitik, and in turn his estate, can be held liable under the legal theories advanced by the plaintiffs. Second, it must determine whether the plaintiffs' complaint properly pleads a cause of action against Voitik's Estate. As previously discussed, plaintiffs' complaint advances claims against Voitik's Estate for fraud in the inducement (Count I) and violations of the Illinois Consumer Fraud Act (Count II).

1. The Liability of Voitik and of his Estate

Although Voitik made certain alleged misrepresentations while a servant of AT&T acting within the scope of his employment, he can be held liable in his individual capacity for his allegedly fraudulent conduct. Under Illinois law, "one who knowingly participates in a fraudulent act is guilty of fraud." *Ronan v. Rittmueller, 105 Ill. App. 3d 200, 208, 434 N.E.2d 38, 44, 61 Ill. Dec. 101 (2d*

1995 U.S. Dist. LEXIS 6540, *

*Dist. 1982)* (citing *Citizens Sav. & Loan v. Fischer, 67 Ill. App. 2d 315, 323, 214 N.E.2d 612, 616 (5th Dist. 1966)).* "A plaintiff need not name each employee of a defendant corporation to prevail against the company and [*17] may sue either master or servant or both for they are jointly and severally liable." *Suarez v. Ro-Mar Terminal Warehouse Co., 244 Ill. App. 3d 228, 231, 613 N.E.2d 1223, 1225, 184 Ill. Dec. 631 (1st Dist. 1993)* (citations omitted); *Lasko v. Meier, 394 Ill. 71, 67 N.E.2d 162, 166 (1946).* Plaintiffs can likewise sue Voitik individually for his alleged violations of the Consumer Fraud Act. See *People ex rel. Hartigan v. All Am. Aluminum & Constr. Co., 171 Ill. App. 3d 27, 33, 524 N.E.2d 1067, 1070, 121 Ill. Dec. 19 (1st Dist. 1988)* (complaint stated a Consumer Fraud Act claim against two corporate officers who were sued in their individual and official capacities).

More importantly, plaintiffs may pursue both of these fraud theories against Voitik's Estate. Under the Illinois survival statute, actions for fraud or deceit survive the death of a party and do not abate. [5] See *People ex rel. Hartigan v. Lann, 225 Ill. App. 3d 236, 587 N.E.2d 521, 526, 167 Ill. Dec. 252 (1st Dist. 1992)* ("it is undisputed that a consumer fraud action does not abate upon a defendant's death"); *People ex rel. Fahner v. Testa, 112 Ill. App. 3d 834, 840, 445 N.E.2d 1249, 1253, 68 Ill. Dec. [*18] 396 (1st Dist. 1983)* (action under Consumer Fraud Act survived defendant's death).

>     5    The survival statute provides in pertinent
> part:
>
>           In addition to the actions which
>     survive by common law, the fol-
>     lowing also survive: . . . actions
>     for fraud or deceit. . . .

**735 ILCS § 5/27-6.**

Accordingly, plaintiffs can advance claims for fraudulent inducement and violations of the Consumer Fraud Act against both Voitik and AT&T. Because these claims survive Voitik's death, plaintiffs can proceed against Voitik's Estate. The pivotal question thus becomes whether plaintiffs' complaint properly states a cause of action against Voitik's Estate under either theory.

2. The Fraud in the Inducement Claim

To state a claim for fraud in the inducement under Illinois law, a plaintiff must allege the following:

>           (1) a false statement of material fact;
>           (2) known or believed to be false by the

person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance [*19] on the truth of the statement; and (5) damages to the other party resulting from such reliance.

*Havoco of Am., Ltd. v. Sumitomo Corp. of Am., 971 F.2d 1332, 1341 (7th Cir. 1992)* (citing *Cotter v. Parrish, 166 Ill. App. 3d 836, 520 N.E.2d 1172, 1175, 117 Ill. Dec. 821 (5th Dist. 1988)); Renovitch v. Kaufman, 905 F.2d 1040, 1049 (7th Cir. 1990).* If established, fraudulent inducement is sufficient to invalidate a contract. *Seward v. B.O.C. Div. of General Motors Corp., 805 F. Supp. 623, 630 (N.D. Ill. 1992).* Justifiable reliance is an essential element of the claim, *Ryan v. Wersi Electronics GmbH & Co., 3 F.3d 174, 180 (7th Cir. 1993),* and is subject to a rule of reasonableness. *Paper Express, Ltd. v. Pfankuch Maschinen, 972 F.2d 753, 757 (7th Cir. 1992).* "It is only where parties do not have equal knowledge or means of obtaining knowledge of the facts which are allegedly misrepresented that a person may justifiably rely on them." *Ryan, 3 F.3d at 180-81* (quoting *Chicago Export Packing Co. v. Teledyne Indus., Inc., 207 Ill. App. 3d 659, 566 N.E.2d 326, 329, 152 Ill. Dec. 639 (1st Dist. 1990)).* Accordingly, a party may not reasonably rely on a misrepresentation [*20] known by that party to be false. *Havoco, 971 F.2d at 1342* (citing *Wilkinson v. Appleton, 28 Ill. 2d 184, 190 N.E.2d 727, 729 (1963)).*

Plaintiffs base their fraudulent inducement claim against Voitik upon four alleged misrepresentations or omissions of material fact attributed to him: first, Voitik failed to disclose AT&T's prior agreement with Prime wherein Prime was awarded the right to add Cook and DuPage Counties to its sales territory (Compl., at P34(a)); second, he represented that AT&T was entering into a long-term relationship with plaintiffs, when he either knew or believed such representations to be false (*id. at* P34(b)); third, he knew or believed that AT&T did not intend to adhere to the Dealership Agreement and intended instead to almost immediately sever its contractual relationship with Security (*id. at* P34(c)); and fourth, he falsely represented that AT&T would not establish any other new dealerships in the Chicagoland area. (*Id. at* P34(d)).

a. Exclusive Dealership Representation

AT&T initially argues that Security cannot establish that it reasonably relied upon Voitik's alleged representation of an exclusive dealership because the representation [*21] was directly contradicted by the express terms of the dealership agreement. Paragraph 1.2 of the Security Systems Authorized Dealer Agreement provided in that regard:

1995 U.S. Dist. LEXIS 6540, *

Buyer [Security] agrees that it has *no exclusive right* to market the Products and no franchise is granted herein. No payment of any fee or similar charge is required as a condition of this Agreement. *Seller* [AT&T] *expressly reserves the right to contract with others to market such Products and to itself engage in such marketing in competition with Buyer.*

(Compl., Exh. B) (emphasis added). The Dealer Agreement also contained an "entire agreement" provision which expressly disclaimed any prior oral representations not included in the written agreement. [6]

6   Paragraph 29 of the Agreement provided:

ENTIRE AGREEMENT

The terms and conditions contained in this Agreement supersede all prior oral or written understandings between the parties and constitute the entire agreement between them concerning the subject matter of this Agreement and shall not be contradicted, explained or supplemented by any course of dealing between Seller or any of its affiliates and Buyer or any of its affiliates. Seller's employees' statements and its advertisements or descriptions other than its published specifications do not constitute warranties or other contractual obligations and shall not be relied upon by Buyer as such. There are no understandings or representations, express or implied, not expressly set forth in this Agreement. . . .

[*22]   Security correctly argues that the agreement's "entire agreement" or "integration clause" does not preclude a claim for fraud in the inducement under Illinois law. See *Wilsmann v. Stearns, 664 F. Supp. 386, 390 (N.D. Ill. 1987); Lovejoy Electronics, Inc. v. O'Berto, 616 F. Supp. 1464, 1467-68 (N.D. Ill. 1985)* (citing *Shanahan v. Schindler, 63 Ill. App. 3d 82, 93-95, 379 N.E.2d 1307, 1316-17, 20 Ill. Dec. 239 (1st Dist. 1978); American Buyers Club of Mt. Vernon, Ill., Inc. v. Honecker, 46 Ill. App. 3d 252, 254, 361 N.E.2d 1370,*

*1371-72, 5 Ill. Dec. 666 (5th Dist. 1977)); Mother Earth, Ltd. v. Strawberry Camel, Ltd., 72 Ill. App. 3d 57, 52, 390 N.E.2d 393, 406, 28 Ill. Dec. 226 (1st Dist. 1979);* but see *Seward, 805 F. Supp. at 631* (plaintiff could not rely on defendant's alleged representation that plaintiff could rescind the release -- a representation which was not contained in the text of the release -- because plaintiff acknowledged in the release that "no other 'representations, promises or agreements' relating to his retirement had been made").

Security's fraud claim cannot survive, however, the explicit, unequivocal language of paragraph 1.2, which provides [*23]   that Security was not granted an exclusive right to market AT&T's alarm products. As a result of paragraph 1.2, Security cannot establish that it justifiably relied upon Voitik's alleged representation of an exclusive dealership as a matter of Illinois law. [7]

7   AT&T also argues that the plaintiffs' cannot maintain any of their fraud claims as a matter of law because the fraud allegations are contradicted by the written agreement and, as such, the written agreement controls, citing *Pelelas v. Caterpillar Tractor Co., 30 F. Supp. 173, 177 (S.D. Ill. 1939),* aff'd *113 F.2d 629 (7th Cir. 1940); Johnson v. Johnson, 244 Ill. App. 3d 518, 614 N.E.2d 348, 355, 185 Ill. Dec. 214 (1st Dist. 1993).* AT&T has seriously misconstrued these decisions. Pelelas and Johnson establish only that where there is a conflict between a description of the contents of a written document and the text of the written document, the text of the document controls.

It is well established that a defense of fraud is ordinarily [*24]   unavailable to avoid the effect of a written agreement if the complaining party could have discovered the fraud by reading the instrument and was afforded a full opportunity to do so. *Seward, 805 F. Supp. at 630* (citing *Belleville Nat'l Bank v. Rose, 119 Ill. App. 3d 56, 456 N.E.2d 281, 74 Ill. Dec. 779 (5th Dist. 1983).* "The law is that a party who signs an instrument relying upon representations as to its contents when he has had an opportunity to ascertain the truth by reading the instrument and has not availed himself of the opportunity, cannot be heard to say that he was deceived by misrepresentations." *Belleville Nat'l Bank, 119 Ill. App. 3d at 59, 456 N.E.2d at 284* (quoting *Leon v. Max E. Miller & Son, Inc., 23 Ill. App. 3d 694, 699-700, 320 N.E.2d 256, 260 (1st Dist. 1974)).* Accordingly, "Illinois courts have consistently refused to extend the doctrine of fraudulent inducement to vitiate contracts where the complaining party could have discovered the fraud by reading the instrument and had the opportunity to do so." *Kolson v. Vembu, 869 F. Supp. 1315, 1322 (N.D. Ill. 1994)* (cita-

tions omitted); see also *American Sav. Ass'n v. Conrath, 123 Ill. App. 3d* [*25] *140, 146, 462 N.E.2d 849, 854, 78 Ill. Dec. 730 (5th Dist. 1984)* ("absent manifest inequality between the respective parties, one who is aware of the nature and character of the instrument being signed cannot subsequently avoid the terms of the instrument by claiming to have been deceived by representations outside the instrument itself").

In this case, plaintiffs had an opportunity to read the agreement prior to its execution. [8] (See Compl., at P14). Had they read nothing more than the first page, plaintiffs would have discovered the contradiction between Voitik's alleged representation and the agreement's express statement that Security was not granted an exclusive dealership. Security therefore could not have justifiably relied upon Voitik's alleged representation as a matter of law. See, e.g., *Paper Express, 972 F.2d at 757-58* (plaintiff, a sophisticated international businessman, could not have reasonably relied on defendant's alleged misrepresentation about the meaning of "VDMA rules" referenced in a venue selection provision printed in German where plaintiff had an opportunity to read the VDMA rules and, had he done so, would have learned that the defendant's oral [*26] explanation was directly contrary to the provision's ordinary meaning); *Mack v. Earle M. Jorgensen Co., 467 F.2d 1177, 1179 (7th Cir. 1972)* (plaintiffs could not justifiably rely on an alleged oral promise where the terms of the parties' subsequent written agreement directly conflicted with the oral promise); *Hurley v. Frontier Ford Motors, Inc., 12 Ill. App. 3d 905, 911, 299 N.E.2d 387, 392 (1973)* (buyer of used car could not reasonably rely on salesman's oral promise to repair the car because buyer executed agreement selling car "as is"). [9]

8 The failure to read a document before signing it is normally not an excuse or defense for the party who signs it. *Breckenridge v. Cambridge Homes, Inc., 246 Ill. App. 3d 810, 819, 616 N.E.2d 615, 620, 186 Ill. Dec. 425 (2d Dist. 1993)*.

9 In a case with facts closely analogous to the case at bar, a federal district court applying Wisconsin law concluded that the plaintiff could not have reasonably relied upon the defendant's exclusive dealership representations as a matter of law for two reasons: first, the representation was directly contradicted by the first paragraph of the contract, which stated that plaintiff was a "non-exclusive Contract Dealer;" and second, paragraph fourteen of the contract expressly barred reliance on any promises or oral or written statements not included in the Agreement. See *Durkee v. Goodyear Tire & Rubber Co., 676 F.*

*Supp. 189, 190 (W.D. Wis. 1987)*. This decision is persuasive authority only.

[*27] b. "Long Term Relationship"

Plaintiffs' second claim concerning an alleged representation of a "long term relationship" likewise fails to state a cause of action. Specifically, plaintiffs have not alleged either that Voitik made such a representation or that the representation can otherwise be attributed to him; rather, plaintiffs attribute the representation to May. (Compare Compl. P13 with Compl. PP 8, 12, 22). Under Illinois law, "the facts which comprise an alleged fraud must be plead with sufficient specificity, particularity and certainty to apprise the other party of how he is to defend himself." *Heider v. Leewards Creative Crafts, Inc., 245 Ill. App. 3d 258, 264, 613 N.E.2d 805, 811, 184 Ill. Dec. 488 (2d Dist. 1993)* (citing *Board of Educ. v. A, C & S, Inc., 131 Ill. 2d 428, 457, 546 N.E.2d 580, 137 Ill. Dec. 635 (1989)*). "The pleadings must contain specific allegation of facts from which fraud is the necessary or probable inference." Id.

Accordingly, this court concludes that plaintiffs' complaint, as plead, fails to state a claim for fraudulent inducement against Voitik with respect to any representations concerning a "long-term relationship" between [*28] AT&T and Security.

c. Failure to Disclose

Plaintiffs two remaining fraud claims against Voitik involve his alleged failure to disclose AT&T's prior agreement with Prime and that AT&T intended almost immediately to sever its contractual relationship with Security. A failure to disclose material information may constitute fraud by omission.

The elements of fraud by omission are (1) concealment of a material fact; (2) with the intent to deceive; and (3) that Plaintiffs were unaware of the concealed the fact and would have acted differently had they known of it. See *Frain v. Andy Frain, Inc., 660 F. Supp. 97, 99 (N.D. Ill. 1987)*. The omission or concealment of the material fact must occur under circumstances which create the opportunity and duty to speak. See *Warren Chevrolet, Inc. v. Bemis, 197 Ill. App. 3d 680, 555 N.E.2d 101, 103, 144 Ill. Dec. 204 (3d Dist. 1990)*; *Havoco, 971 F.2d at 1341* (citing *Cotter, 166 Ill. App. 3d at 841, 520 N.E.2d at 1175*). A special or fiduciary relationship will create a duty to speak. See *State Sec. Ins. Co. v. Frank B. Hall & Co., 258 Ill. App. 3d 588, 591, 630 N.E.2d 940, 943, 196 Ill. Dec. 775 (1st Dist. 1994)*; Farm Credit Bank [*29] of *St. Louis v. Isringhausen, 210 Ill. App. 3d 724, 732, 569 N.E.2d 235, 240, 155 Ill. Dec. 235 (4th Dist. 1991)*.

AT&T argues that the complaint fails to allege specifically that Voitik knew of AT&T's agreement with

1995 U.S. Dist. LEXIS 6540, *

Prime. The complaint states in this regard that after AT&T terminated the dealership agreement, Dawson contacted Voitik and asked for an explanation. Voitik allegedly responded that "internal discussions at AT&T about this expansion of Prime's Territory to include Cook and DuPage Counties had been going on for at least several months before AT&T had entered into its Dealership Agreement with Security." (Compl., at P22). While it is true that the allegation does not specifically state that Voitik knew about the alleged plans to expand Prime's territory before the Security deal was completed, the question is whether Voitik's alleged statement supports a probable inference of fraud. A reasonable and proper inference that may be drawn from Voitik's reference to "internal discussions" over "several months" is that he had prior knowledge of the Prime deal and the intended expansion of Prime's territory. This reasonable inference, which the court must draw in plaintiffs' favor, [*30] supports a probable inference of fraud by omission. Although it is a close call, this court believes that an Illinois court applying its own standards for a motion to dismiss would conclude that the complaint has stated a cause of action for fraud based upon the reasonable and probable inferences drawn from Voitik's alleged statement. [10]

> 10 AT&T argues that the failure to disclose Prime's conditional right of first refusal was not material. Plaintiffs contend to the contrary that it was material. (See Compl., at P20). Resolution of the materiality of the omission is for the trier of fact to decide.

AT&T argues in passing, however, that Voitik's statements are barred by the Illinois Dead Man's Act, 735 ILCS § 5/8-201. [11] The Act renders an adverse party or directly interested person incompetent to testify at trial to any conversation with the deceased or any event that took place in the presence of the deceased. See id. The purpose of the Act is to prevent an adverse party from testifying about conversations [*31] or events which the decease could have refuted. See Foster v. Englewood Hosp. Ass'n, 19 Ill. App. 3d 1055, 313 N.E.2d 255, 265-66 (1st Dist. 1974). It "guards against the temptation to give false testimony" and "puts the two parties upon terms of equality in regard to the opportunity of giving testimony." Van Meter v. Goldfarb, 317 Ill. 620, 148 N.E. 391 392 (1925). In addition to the statutory exceptions, a party may waive the "privilege" created by the Dead Man's Act by, inter alia, failing to assert the Act's protections.

> 11 The Dead Man's Act provides:
>
> > In the trial of any action in which any party sues or defends as the representative of a deceased

person . . ., no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased . . . or to any event which took place in the presence of the deceased or person under legal disability, except in the following circumstances:

(a) If any person testifies on behalf of the representative to any conversation with the deceased . . . or to any event which took place in the presence of the deceased . . ., any adverse party or interested person, if otherwise competent, may testify concerning the same conversation or event.

(b) If the deposition of the deceased . . . is admitted in evidence on behalf of the representative, any adverse party or interested person, if otherwise competent, may testify concerning the same matters admitted in evidence.

(c) Any testimony competent under Section 8-401 of this Act, is not barred by this Section.

* * *

As used in this section:

* * *

(b) "Representative" means any executor, administrator, heir or legatee of a deceased person . . .

### 735 ILCS § 5/8-201.

[*32] AT&T has not, and indeed cannot, establish at this early stage of the litigation that the Dead Man's Act will bar testimony about Voitik's statements. AT&T cannot establish this prohibition because plaintiffs have relied upon Voitik's statements to advance separate claims against Voitik's Estate and against AT&T. Schrieffer, as the special administrator of Voitik's estate, has the right to assert or waive the Dead Man's Act protections with respect to the claims against the estate. AT&T may also have the right to assert or waive the Act's protections with respect to the claims advanced against it since Voitik made the alleged statements while

1995 U.S. Dist. LEXIS 6540, *

acting within the scope of his authority as a servant or employee of AT&T. AT&T has indicated that it intends to assert the Dead Man's Act; however, Schrieffer has not indicated her intentions in this regard. Without knowing whether Schrieffer will assert or waive the privilege, the court cannot determine at this juncture whether the Dead Man's Act will bar testimony about Voitik's conversation with Dawson. [12]

> 12 The court has not found an Illinois case which addresses the application of the Dead Man's Act under unique circumstances such as these where the plaintiffs have sued both the deceased employee's estate and the employer for whom he worked. It is unclear whether the estate's rights under the Dead Man's Act are primary, equal, or secondary to the employer's rights under the Act. Alternatively stated, it is unclear what effect the estate's waiver of the Act would have on the employer's ability to assert the Act's protections. If the estate waived the Act's protections, it is entirely possible that the testimony could be admitted with respect to the claims against the estate but barred via limiting instructions from consideration with respect to the claims against the employer.

> Because unsettled questions of law must be resolved in plaintiffs' favor under the standards for fraudulent joinder, the court concludes under these limited circumstances and at this preliminary stage of the case that the Dead Man's Act would not preclude Dawson's testimony about Voitik's pivotal statement.

[*33] The court therefore concludes that there is more than a mere possibility that plaintiffs' complaint states a cause of action against Voitik's Estate for fraud under Illinois law. [13] In accordance with this finding, the court further concludes that Voitik's Estate was not fraudulently joined. The court thus lacks subject matter jurisdiction, unless Schrieffer's appointment as special administrator was void *ab initio* as a matter of Illinois law. If the appointment was void *ab initio,* Voitik's Estate would not be considered in determining whether diversity jurisdiction exists.

> 13 In light of this finding, the court does not need to determine whether plaintiffs' remaining fraud allegation or Consumer Fraud Act claims state a cause of action under Illinois law.

C. The Appointment of Schrieffer as Special Administrator

AT&T argues that Schrieffer's appointment as special administrator of Voitik's Estate was improper for five reasons: first, the appointment was invalid because it was not made pursuant [*34] to or in accordance with the requirements of the Probate Act; second, if the appointment was made pursuant to section 5/2-1008(b), the appointment was invalid because that section only permits appointment of special administrators to actions already pending at the time of the decedent's death; third, plaintiffs' petition was defective because it did not disclose that Schrieffer was a secretary at plaintiffs counsel's law firm; fourth, Schrieffer's appointment as special administrator created an irreconcilable conflict of interest between her fiduciary obligations to the estate and her fiduciary duty to her employer; and fifth, the appointment was made *ex parte* without notice to AT&T or Voitik's surviving heirs. Citing *28 U.S.C. section 1450,* AT&T further argues that this court may decide whether the Circuit Court's order appointing Schrieffer was proper because that order has the same case number as the plaintiffs' state court complaint and is thus part of the entire case removed to federal court.

At this juncture, however, the Court has only a very limited basis upon which it may review Schrieffer's appointment. Chapter 28 *section 1450* provides in pertinent part:

> All [*35] injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court.

However, a federal court only acquires the power to modify or dissolve state court orders under *section 1450* once it has determined that it has jurisdiction over the removed case. See *Ex parte Fisk, 113 U.S. 713, 718, 729-30, 5 S. Ct. 724, 725, 729-30, 28 L. Ed. 1117 (1885)* (where the court first determined that federal jurisdiction existed before addressing whether the circuit court, in a removal case, should have declined to execute a state court contempt order under section 4 of the Act of March 3, 1875, which provided that "orders of the state court, in a case afterwards removed, to be in force until dissolved or modified by the circuit court"); *Reilly v. Waukesha County, Wis., 993 F.2d 1284 (7th Cir. 1993)* (in a case properly removed on the basis of federal question jurisdiction, the court held that it could review on appeal the antecedent interlocutory rulings of the state court judge that where were absorbed into the district court's final judgment). Accordingly, unless and until this court [*36] determines that it has jurisdiction over the case, it cannot modify or dissolve the order appointing Schrieffer as special administrator except as specifically provided by Illinois law.

1995 U.S. Dist. LEXIS 6540, *

Under Illinois law, the regularity of an administrator's appointment may not be attacked in a collateral proceeding unless it is demonstrated that the appointment was void *ab initio*. See *Daniels v. USS Agri-Chemicals, 965 F.2d 376, 382 (7th Cir. 1992)* (citing *Alfaro v. Meagher, 27 Ill. App. 3d 292, 326 N.E.2d 545 (1st Dist.1975)* and *In re Redmer's Estate, 348 Ill. App. 76, 108 N.E.2d 25 (1952))*. A court's order is void either if it was obtained by fraud or if the court lacked jurisdiction to enter it. Id. (citing *Green v. Wilmot Mountain, Inc., 92 Ill. App. 3d 176, 415 N.E.2d 1076, 1078 n.2, 47 Ill. Dec. 763 (1st Dist. 1980))*; see also *Vulcan Materials Co. v. Bee Constr., 96 Ill. 2d 159, 165, 449 N.E.2d 812, 814, 70 Ill. Dec. 465 (1983)* ("An order is not rendered void by error or impropriety but by lack of jurisdiction by the issuing court."). To render an order void by fraud, the fraud must be of the type which gives the court only "colorable jurisdiction" as opposed to [*37] any fraud which occurs after the court has obtained jurisdiction, such as obtaining an order or decree by false testimony or concealment. [14] *Schwarz v. Schwarz, 27 Ill. 2d 140, 144, 188 N.E.2d 673, 676 (1963)*. Fraud which gives the court only "colorable jurisdiction" involves "false allegations that are determinative of the court's jurisdiction." *Daniels, 965 F.2d at 382* (quoting *In re Marriage of Hanlon, 116 Ill. App. 3d 157, 163, 452 N.E.2d 60, 64, 72 Ill. Dec. 128 (1st Dist. 1983)*.

> 14   This latter type of fraud will render the court's orders voidable, but not void for lack of jurisdiction. *Vulcan Materials Co., 96 Ill. 2d at 165, 449 N.E.2d at 814.*

Under Illinois law, a court has jurisdiction to appoint a special administrator where the court has "jurisdiction over the *case*--that is over an 'asset' of the deceased." *Daniels, 965 F.2d at 382* (citing *In re Hoffman's Estate, 6 Ill. App. 3d 438, 286 N.E.2d 103, 104 (1972))*. Where the court has subject matter jurisdiction, an appointment [*38] is not void regardless of how erroneous it may be. See *In re Redmer's Estate, 348 Ill. App. 76, 80, 108 N.E.2d 25, 27 (2d Dist. 1952)*.

In this case, AT&T does not allege that plaintiffs advanced false jurisdictional allegations in their petition for appointment of special administrator; similarly, AT&T does not dispute that the Circuit Court of Cook County had jurisdiction to make such an appointment. In the absence of allegations sufficient to raise the issue of whether the order was void *ab initio*, AT&T's five reasons why the appointment was in error represent impermissible collateral attacks upon the appointment order. [15] The court therefore lacks the authority to modify or dissolve the state court's order appointing Schrieffer as special administrator. The court must therefore include the estate in determining whether diversity jurisdiction ex

ists. Because the presence of Voitik's estate breaks diversity, the case is remanded to the Circuit Court of Cook County, Illinois. [16]

> 15   The cases and customs cited by the parties demonstrate that there is significant confusion under Illinois law about the proper procedure by which a special administrator is appointed for an alleged tortfeasor who has died prior to the filing of a lawsuit. What is certain is that section 2-1008(b) provides for the appointment of a special administrator in situations in which a "living being who is already a party to a pending action passes away; the provision was not meant to encompass a situation [where the tortfeasor died prior to the initiation of the lawsuit]." *Vaughn v. Speaker, 126 Ill. 2d 150, 157, 533 N.E.2d 885, 888, 127 Ill. Dec. 803 (1988)*. It is not clear, as AT&T suggests, that the appointment may only be made by the probate court. *Furst v. Brady, 375 Ill. 425, 31 N.E.2d 606 (1940)*, which AT&T cites in support of this proposition, does not so hold. In addition, even if it did, the apparent custom and practice employed in the Circuit Court of Cook County, Law Division, is to the contrary. Plaintiffs have provided this court with orders appointing special administrators from four (4) different current Cook County judges (including the appointment order in this case) in which the judges appointed a special administrator for a deceased tortfeasor prior to the filing of a complaint and without a probate estate being opened. To that end, the Fourth District Appellate Court has concluded that to preserve an injured party's recourse against a deceased tortfeasor for whom a probate estate has not been opened, "the better practice would be to first proceed with the appointment of the special administrator. This appointment would then be followed with the filing of a complaint listing the special administrator as a party defendant." *Lindsey v. Special Administrator of Estate of Phillips, 219 Ill. App. 3d 372, 377, 579 N.E.2d 445, 448, 161 Ill. Dec. 897 (4th Dist. 1991)*; *Sisk v. Lewis, 245 Ill. App. 3d 689, 693-94, 615 N.E.2d 46, 49, 185 Ill. Dec. 751 (4th Dist. 1993)*. The plaintiffs followed this procedure and the apparent custom and practice of the Cook County Court in securing Schrieffer's appointment. Under these circumstances, this court declines to find that the appointment -- even if it was grossly erroneous -- was void *ab initio*.

Finally, in *Greene v. Helis, 252 Ill. App. 3d 957, 625 N.E.2d 162, 192 Ill. Dec. 202 (1st Dist. 1993)*, the plaintiff, upon his motion, had a secretary in his counsel's law firm appointed as the

1995 U.S. Dist. LEXIS 6540, *

special administrator of the deceased tortfeasor's estate. Contrary to AT&T's argument, the Greene decision does not provide the rule of decision for this case. Greene is factually distinguishable because the plaintiff in that case initially filed his complaint against the deceased defendant. More than one year later, the plaintiff had the special administrator appointed and then filed an amended complaint naming the special administrator in place of the decedent. In addition, the legal issue before the court was whether the amended complaint was barred by the statute of limitations. The court initially determined that the amended complaint did not relate back to the filing of the initial complaint; it then addressed whether the amended complaint was timely under section 13-209, which permits the filing of an action against the decedent's executors or administrators after the applicable statute of limitations has expired provided the action is filed "within six months after the issuing of the letters of office for the decedent's estate." *Id. at 961, 625 N.E.2d at 165* (citing Ill. Rev. Stat. ch. 110, par. 13-209 (1989)). The court concluded that the appointment of the special administrator under section 2-1008(b) did not trigger section 13-209's protection. In that regard, the court noted that section 2-1008(b) "authorizes the appointment of a special administrator to be substituted for someone already a party to an action who dies during the pendency of that action." Id. The court concluded that section 2-1008(b) "is inapplicable to situations like this one, where the defendant died before suit was instituted." Id. (citing *Vaughn v. Speaker, 126 Ill. 2d 150, 533 N.E.2d 885, 127 Ill. Dec. 803 (1988)*). The court did not otherwise address the propriety of the special administrator's appointment, and the decision cannot be construed to hold that a court may not appoint a special administrator before filing litigation against an already deceased tortfeasor.

[*39]
16 Subject to standing, the more appropriate forum for AT&T's challenges to Schrieffer's appointment is the Circuit Court of Cook County. See *Alfaro v. Meagher, 27 Ill. App. 3d 292, 296-97, 326 N.E.2d 545, 549-50 (1st Dist. 1975)* (where the law division court declined to exercise its concurrent jurisdiction to review a challenge to the legal propriety of a probate court order appointing an estate administrator since the probate court entered the order with full and complete subject matter jurisdiction; as such, the court concluded that any challenge to the order had to be submitted to the probate division); accord *In*

*re Redmer's Estate, 348 Ill. App. at 80, 108 N.E.2d at 28.*

III. Motion to Disqualify

Because it lacks subject matter jurisdiction, AT&T's Motion to Disqualify is moot. See *Rice v. Rice Foundation, 610 F.2d 471, 478-79 (7th Cir. 1979)* (district court must have and exercise subject matter jurisdiction before ruling on motion to disqualify). [17] If there is a conflict of interest, that conflict existed prior to AT&T's improper removal and will remain following the remand [*40] of this case to state court. The Motion to Disqualify should be decided by the Illinois circuit court judge who will preside over the remanded case.

17 AT&T argues that this court may decide the motion to disqualify regardless of whether subject matter jurisdiction exists pursuant to the court's "inherent 'power' to engage in those judicial acts attendant to the presence of a live controversy before the court." *Wojan v. General Motors Corp., 851 F.2d 969, 972 (7th Cir. 1988)*. The plaintiff in that case had filed a motion for sanctions based upon the defendant's failure to cite to the court a controlling case that was contrary to the argument defendant advanced in response to plaintiff's motion in limine. *Id. at 971.* During the hearing on the motion for sanctions, the district court concluded, after presiding over the case for five years, that the parties were not diverse and that the court therefore lacked subject matter jurisdiction. *Id. at 970-71.* The Seventh Circuit held, however, that the district court had the authority to decide plaintiff's Rule 11 motion for sanctions notwithstanding the dismissal of the cause of action for want of jurisdiction. *Id. at 973.*

Wojan does not empower this court to decide the motion to disqualify, which is substantively different from a Rule 11 motion for sanctions for failure to cite controlling authority, because the acts creating the alleged conflict occurred under the jurisdiction of the Circuit Court of Cook County and not this court.

[*41] WHEREFORE, for the foregoing reasons, plaintiffs' Motion to Remand is GRANTED. The cause is hereby remanded to the Circuit Court of Cook County, Illinois. Defendants' Motion to Dismiss Anne Schrieffer as Party Defendant is DENIED and their Motion to Disqualify Mark Miller, David Simon and Wildman, Harrold, Allen & Dixon is MOOT. As there are no further matters pending before this Court, the case is dismissed.

ENTER:

1995 U.S. Dist. LEXIS 6540, *

David H. Coar                                    Dated: May 15, 1995

U.S. District Judge



JOHN L. DONOVAN and DONOVAN DEMOLITION, INC., Plaintiffs, vs. ABC-NACO INC., JOSEPH A. SEHER, VAUGHN W. MAKARY, JOHN W. WAITE, STEVEN M. YODER, DONALD W. DUVAL, RICHARD A. DREXLER, JEAN-PIERRE M. ERGAS, JAMES E. MARTIN, GEORGE W. PECK IV, and WILLARD H. THOMPSON, Defendants.

02 C 1951, (01 B 36484)

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2002 U.S. Dist. LEXIS 12797; Fed. Sec. L. Rep. (CCH) P91,954*

**July 12, 2002, Decided**
**July 12, 2002, Filed; July 15, 2002, Date Docketed**

**DISPOSITION:** [*1] Defendants' motion to dismiss granted and plaintiffs' complaint dismissed in its entirety.

**COUNSEL:** For JOHN L DONOVAN, DONOVAN DEMOLITION, INC., plaintiffs (02-CV-1951): George Edward Bullwinkel, Joseph Ronald Lanser, Bullwinkel Partners, Ltd., Chicago, IL.

**JUDGES:** Charles P. Kocoras, United States District Judge.

**OPINION BY:** Charles P. Kocoras

**OPINION**

*MEMORANDUM OPINION*

CHARLES P. KOCORAS, District Judge:

Before the court is Defendants' Joseph A. Seher ("Seher"), Vaughn Makary ("Makary"), Steven M. Yoder ("Yoder"), John Waite ("Waite"), Donald W. Duval ("Duval"), Richard A. Drexler ("Drexler"), Jean-Pierred M. Ergas ("Ergas"), James E. Martin ("Martin"), George W. Peck IV ("Peck"), and Willard H. Thompson ("Thompson"), (collectively herein referred to as "Defendants"), *Federal Rule of Civil Procedure Rule 12(b)(6)* motion to dismiss the complaint of Plaintiffs John L. Donovan ("Donovan") and Donovan Demolition, Inc.'s ("DDI"). For the reasons set forth below, the motion is granted.

**BACKGROUND**

The following facts are taken from the complaint and we accept them as true, as we must, for the purposes [*2] of this motion. *Bontkowski v. First Nat'l Bank of Cicero, 998 F.2d 459, 461 (7th Cir. 1993)*. Donovan is the majority shareholder of DDI. DDI, until recently, was a leader in the business of explosion surface hardening of specialty manganese steel railroad track work. ABC-NACO, Inc. ("ABC-NACO") is in the business of manufacturing and selling products to the railroad industry. ABC-NACO is a publicly traded company on the NASDAQ stock exchange. Prior to April 2000, DDI was a closely-held Illinois corporation substantially owned by Donovan. At that time, Donovan was also the inventor and sole owner of intellectual property rights in certain improvements related to DDI's business, including an invention called the "Donovan Blast Chamber" as claimed in *U.S. Patent No. 5,613,453* and reissued with broader claims as U.S. Re. 36,912, and as disclosed and claimed in numerous counterpart applications in foreign countries (the "Patent Rights"). ABC-NACO was among DDI's principal customers for railroad track work hardening services.

In the early months of 2000, ABC-NACO approached Donovan through its officer and agent, Yoder, about purchasing DDI's assets. ABC-NACO memorialized [*3] this intent in a written Letter of Intent dated March 10, 2000 and signed by Donovan and Yoder. This Letter of Intent was subsequently amended by an

EXHIBIT
tabbies®
10

2002 U.S. Dist. LEXIS 12797, *; Fed. Sec. L. Rep. (CCH) P91,954

Amended Letter of Intent dated April 26, 2000. In the Amended Letter of Intent, ABC-NACO agreed to purchase DDI's assets for $ 12 million with payments in cash and/or ABC-NACO stock valued at a strike price of $ 15.00 per share. The closing date was June 1, 2000. The Amended Letter of Intent further provided ABC-NACO with a low-cost, long-term lease of the property occupied by DDI on Donovan's farm, a ten-year supply agreement for sheet explosives from Donovan's separate company, Donovan Commercial Industries, Inc., a non-competition agreement from Donovan, and three-year employment contracts for Donovan and certain other DDI employees. Like the original Letter of Intent, the Amended Letter of Intent was signed by Yoder and Donovan.

From April 26, 2000 through June 23, 2000, further negotiations about the proposed asset sale took place between the parties telephonically, by telefax, mail, and personal meetings at DDI's offices. These negotiations culminated in an Asset Purchase Agreement dated June 23, 2000. The Asset Purchase Agreement [*4] contained the following key terms: (1) DDI would sell all of its assets to ABC-NACO in return for 500,000 shares of ABC-NACO's capital stock; (2) Donovan would give ABC-NACO a 100-year lease for DDI's business premises for a total sum of $ 1.00 per year, with ABC-NACO paying only maintenance and real estate taxes; (3) Donovan would convey his Patent Rights to ABC-NACO in return for the payment of $ 4.4 million, payable $ 1.9 million at closing, $ 1.25 million on January 1, 2001, and $ 1.25 million on January 1, 2002; (4) Donovan would execute a five-year covenant not to compete in return for the payment at closing of $ 100,000, for a total payment of $ 2 million; (5) ABC-NACO would enter five-year employment agreements with Donovan and three of his key employees; (6) ABC-NACO would grant back to Donovan a paid-up, royalty-free, fully assignable license to use the Patent Rights in all fields having to do with the destruction of explosive, chemical, or biological weapons; (7) the closing would take place on June 23, 2000.

The parties closed the transaction on the designated date. At the closing, Donovan received $ 1.9 million as the initial payment for the Patent Rights and $ 100,000 [*5] for the covenant not to compete, and a note for the remaining $ 2.5 million providing payment as agreed. Donovan also received an assignable exclusive license to use the Patent Rights for munitions destruction purposes only, and 500,000 shares of ABC-NACO common stock. ABC-NACO received title to all of DDI's assets, all the Patent Rights, a 100-year $ 1.00 per year lease for DDI's business premises, and a long-term sheets explosives supply agreement from Donovan Commercial Industries. For reasons not important here, Donovan was required by the United States Patent and Trademark Office to

execute, on September 10, 2001, a supplemental patent assignment to ABC-NACO of certain of his Patent Rights, for which he received the exclusive license.

On or about October 17, 2001, the NASDAQ stock market stopped all stock trading with ABC-NACO. Shortly thereafter, ABC-NACO filed a petition under Chapter 11 in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division; ABC-NACO is the principal debtor in Case No. 01-B-36484. Plaintiffs are unsecured creditors of ABC-NACO. Legal title for all of Donovan's inventions and patent rights relating to the Donovan Blast [*6] Chamber, for which he has not yet been fully paid, became part of ABC-NACO's bankruptcy estate. By an order dated December 11, 2001, the sale of these assets under *11 U.S.C. § 363(f)* was approved to the successful bidder, TCF Railco, Inc., for $ 75 million. The secured claims of ABC-NACO's bank lenders total about $ 176 million. Plaintiffs contend that, after all relevant bankruptcy proceedings, ABC-NACO will be unable to pay its secured creditors. Plaintiffs seek relief via the lawsuit they filed before this court.

Plaintiffs' complaint is based on allegations that Defendants, in their capacity as directors, officers, and agents of ABC-NACO, made certain affirmative misrepresentations and material omissions throughout and after the three-month long negotiations between Plaintiffs and ABC-NACO. Plaintiffs complain that these alleged affirmative representations and omissions induced them into agreeing to the transaction. The alleged affirmative misrepresentations are as follows. First, Plaintiffs allege that Makary and Seher, prior to the execution of the June 23, 2000 Agreement, represented to Donovan and others at DDI that DDI would be the "golden egg" of the [*7] Rail Systems Division, giving customers "one stop shopping" for their specialty track work, which would raise the market price of ABC-NACO's stock which was at that time in decline. Makary and Seher allegedly made these representations telephonically and in person. Makary and Seher also, at the same time and in the same manner, represented ABC-NACO would place the sum of $ 2.5 million that would be due to Donovan in return for the Patent Rights "in escrow" to assure that all remaining payments would be made when due starting January 1, 2001. Waite, also prior to execution of the June 23, 2000 Agreement, similarly represented to Donovan in one or more telephone conversations that ABC-NACO would place $ 2.5 million "in escrow" to assure that the payments for the Patent Rights would be made. After the June 23, 2000 closing, Waite represented to Donovan in at least one telephone conversation that such sum had in fact been placed in "escrow" pursuant to the oral representations of Makary, Seher, and Waite.

2002 U.S. Dist. LEXIS 12797, *; Fed. Sec. L. Rep. (CCH) P91,954

Plaintiffs further allege that during these negotiations Defendants made certain material omissions of fact. Plaintiffs allege that ABC-NACO was at that time in violation of one or more [*8] covenants in loan agreements with the consortium of banks from which it had already borrowed in excess of $ 150 million, and that it could not reasonably expect to pay Donovan his final $ 2.5 million payment on and after January 1, 2001. Plaintiffs further allege that ABC-NACO was prevented by its loan agreements with its banks from placing $ 2.5million into an escrow account as promised by Defendants. Also, should ABC-NACO actually pay Donovan the remaining $ 2.5 million due under the Asset Purchase Agreement, that ABC-NACO reasonably expected to render itself insolvent and unable to pay its debts as they accrued. Finally, that ABC-NACO's business expectations were such that the market price of its stock would likely fall to less than half of the $ 15 per share "strike" price represented as reasonable by Seher.

Plaintiff initially filed a complaint naming as Defendants all the current Defendants and ABC-NACO. Plaintiffs subsequently amended their complaint to remove ABC-NACO from the case. Plaintiffs' First Amended Complaint contains seven Counts. In Count I, Plaintiffs claim that Defendants violated section 10(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78(j)(b) [*9] and *Rule 10b-5* promulgated thereunder, *17 C.F.R. § 240.10b-5* ("Section 10(b)"). In Counts II, III, and IV Plaintiffs claim that Defendants violated sections 12-F, 12-G, and 12-I, respectively, of the Illinois Securities Law of 1953, as amended, *815 ILCS 5/12(F)*, 12(G), & 12(I) ("the Illinois Securities Act"). In Count V, Plaintiffs assert that Defendants made fraudulent transfers. Count VI alleges a claim of Illinois common law fraud. Finally, in Count VII Plaintiffs claim that Defendants conspired to commit a common law fraud in the inducement. Defendants have moved to dismiss all of the Counts in Plaintiffs' complaint.

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to *Rule 12(b)(6)* is to test the sufficiency of the complaint, not to decide the merits of the case. *Triad Assoc., Inc. v. Chicago Housing Auth., 892 F.2d 583, 586 (7th Cir. 1989)*. In ruling on a motion to dismiss, the court must first construe the complaint's allegations in the light most favorable to the plaintiff and all well-pleaded facts and allegations in the plaintiff's complaint must be taken as true. *Bontkowski v. First Nat'l Bank of Cicero, 998 F.2d 459, 461 (7th Cir. 1993)*. [*10] The allegations of a complaint should not be dismissed for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41,*

*45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*; see also *Hartford Fire Ins. Co. v. California, 509 U.S. 764, 125 L. Ed. 2d 612, 113 S. Ct. 2891 (1993)*; *Sherwin Manor Nursing Ctr., Inc. v. McAuliffe, 37 F.3d 1216, 1219 (7th Cir. 1994)*. Nonetheless, in order to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. *Lucien v. Preiner, 967 F.2d 1166, 1168 (7th Cir. 1992)*.

In reviewing a *Rule 12(b)(6)* motion to dismiss for failure to state a claim, the court is limited to the allegations contained in the pleadings themselves. Documents incorporated by reference into the pleadings and documents attached to the pleadings as exhibits are considered part of the pleadings for all purposes. *Fed. R. Civ. P. 10(c)*. In addition, "documents that a defendant attaches to a motion to dismiss are considered a [*11] part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Venture Assoc. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993)*. With these principles in mind, the court turns to the instant motion.

## DISCUSSION

We note at the outset that, after reviewing Defendants' papers, Plaintiffs have voluntarily agreed to dismiss Count V, their claim of fraudulent conveyance and Count VII, their claim of common law civil conspiracy. Accordingly, we do not address Defendants' arguments as to these Counts. We address here only Defendants' arguments in support of dismissing Counts I, II, III, IV, and VI.

We first address the arguments that apply only to Defendants Yoder, Duval, Drexler, Ergas, Martin, Peck, and Thompson. These Defendants argue that Plaintiffs' allegations as to them fail to meet the heightened pleading requirements of *Federal Rules of Civil Procedure ("Rule 9(b)")* and, therefore, they should be dismissed from the case. *Rule 9(b)* applies to Plaintiffs' securities fraud claims and common law claim of fraudulent inducement. *Ackerman v. Northwestern Mut. Life Ins. Co., 172 F.3d 467, 471 (7th Cir. 1999)*; [*12] *Sears v. Likens, 912 F.2d 889, 893 (7th Cir. 1990)*. *Rule 9(b)* mandates that, in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. *Fed. R. Civ. Pro. 9(b)*. To do so, a plaintiff must plead the "who, what, when, where, and how: the first paragraph of a newspaper story." *DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)*. In a case such as this one involving multiple defendants, "*Rule 9(b)* prohibits 'lumping together' all the defendants under a general accusation . . . the rule requires that the complaint inform each defendant of the nature of his alleged participation in the fraud and specify which defendants were involved in what activity." *Md. Staffing*

Page 4

2002 U.S. Dist. LEXIS 12797, *; Fed. Sec. L. Rep. (CCH) P91,954

*Servs., Inc. v. Manpower, Inc., 936 F. Supp. 1494, 1500 (E.D. Wis. 1996).* To survive a motion to dismiss, a plaintiff must plead "which defendants said what to whom and when . . . ." *Ackerman, 172 F.3d at 471.*

Applying these principles to Plaintiffs' complaint we find Plaintiffs' allegations as to Yoder, Duval, Drexler, Ergas, Martin, Peck, and Thompson insufficient. Plaintiff does not identify [*13] any affirmative misrepresentations made by any of these Defendants; only Defendants Seher, Makay, and Waite are individually identified as having made any statements to Plaintiffs. Indeed, there are no allegations that Duval, Drexler, Ergas, Martin, Peck, and Thompson ever came into contact with Plaintiffs. And although the complaint alleges that Yoder has dealt with Donovan, there are no allegations that Yoder made any affirmative misrepresentations in his dealings with Plaintiffs.

Nor do Plaintiffs sufficiently connect Yoder, Duval, Drexler, Ergas, Martin, Peck, or Thompson to any of the alleged omissions. Under all the causes of action Plaintiffs attempt to bring against Defendants, a defendant cannot be liable for an alleged omission unless the defendant has a duty to speak. *See, e.g., Athey Products Corp. v. Harris Bank Roselle, 89 F.3d 430, 435 (7th Cir. 1996); Wafra Leasing Corp. 1999- A-1 v. Prime Capital Corp., 192 F. Supp. 2d 852, 867-68 (N.D. Ill. 2002); Security Center, Inc. v. Am. Tel. & Tel. Co., 1995 U.S. Dist. LEXIS 6540, 1995 WL 307267,* at *8 (N.D. Ill. May 16, 1995); *DiLeo, 901 F.2d at 628; State Sec. Ins. Co. v. Frank B. Hall & Co., 258 Ill. App. 3d 588, 630 N.E.2d 940, 944, 196 Ill. Dec. 775 (Ill. App. Ct. 1994).* [*14] Specifically with regard to the Plaintiffs' federal securities claim, *Rule 10b-5* proscribes omissions that render affirmative statements misleading; thus a defendant is liable only for those omissions that make his own speech misleading or deceptive. *Tricontinental Indus., Ltd. v. Anixter, 184 F. Supp. 2d 786, 788 (N.D. Ill. 2002); Wafra,* 192 F. Supp. 2d at 867-68; *Rowe v. Maremont Corp., 650 F. Supp. 1091, 1105 (N.D. Ill. 1986),* aff'd *850 F.2d 1226 (7th Cir. 1988).* A duty to speak may also arise where the law imposes special obligations, depending on the facts of the case. *Tricontinental,* 184 F. Supp. 2d at 788 (quoting *Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1206 (11th Cir. 2001)).* State law, not federal securities law, is the source of any duty in that case. *Id.*

Here, Defendants Yoder, Duval, Drexler, Ergas, Martin, Peck and Thompson are not specifically alleged to have made any statements that would be misleading unless they disclosed the alleged omissions to Plaintiffs - they are not alleged to have made any statements at all. Additionally, Plaintiffs do not allege that [*15] these Defendants otherwise had any duty to disclose the alleged omissions under state law. Therefore, Plaintiffs' fraud claims against Defendants Yoder, Duval, Drexler,

Ergas, Martin, Peck and Thompson are insufficient. Plaintiffs' attempt to state viable claims against these Defendants by "lumping" all the Defendants together under conclusory allegations of fraud constitutes improper pleading under *Rule 9(b).*

Perhaps realizing that their allegations as to Defendants Duval, Drexler, Ergas, Martin, Peck, Yoder, and Thompson are insufficient to establish primary liability for fraud, Plaintiffs attempt to salvage their case as against these Defendants by claiming that these Defendants may be held liable under the securities laws as "controlling persons" of ABC-NACO. Plaintiffs cannot establish these Defendants' liability under § 10(b) by merely asserting that these Defendants are "control persons." *See, e.g., Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998); Great Neck Capital Appreciation Inv. P'ship v. PriceWaterhouseCoopers, L.L.P., 137 F. Supp. 2d 1114, 1120 (E.D. Wis. 2001).* Plaintiffs may be attempting to state a claim for "control [*16] person" liability under § 20(a), *15 U.S.C. § 78t(a),* for the case they cite *Lindelow et al. v. Hill et al., 2001 U.S. Dist. LEXIS 10301,* No. 00 C 3727, 2001 WL 830956 (N.D. Ill. Jul. 20, 2001), discusses this theory of liability. Plaintiffs, however, make no mention of § 20(a) in their complaint. Nor do they expressly state in their response that they are really making such a claim. If their argument and cite to *Lindelow* is their way of indicating as much, it will not do. Plaintiffs cannot amend their complaint by means of their brief in opposition to Defendants' motion to dismiss. *Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984).*

Even if they were doing as much, their allegations are inadequate. Plaintiffs do not allege any facts from which these Defendants could fairly be deduced as subject to "controlling person" liability under § 20(a) except for the fact that they were directors of ABC-NACO. The mere fact that Plaintiff alleges these Defendants are directors is not enough. *Feldman v. Motorola, 1993 U.S. Dist. LEXIS 14631, 1993 WL 497228,* at *10-11 (N.D. Ill. Oct. 14, 1993) (dismissing § 20(a) claim that was based solely on Defendants' [*17] status as director); *Craig v. First American Capital Resources, Inc., 740 F. Supp. 530, 537 (N.D. Ill. 1990)* (same); *see Harrison v. Dean Witter Reynolds, Inc., 974 F.2d 873, 881 (7th Cir. 1992)* (setting forth test for finding "control person" liability). Moreover, such a claim would also fail because, as explained below, Plaintiffs cannot establish primary liability under § 10(b) on the part of Defendants Seher, Makary, and Waite. *Krieger v. Gast, 1998 U.S. Dist. LEXIS 15422, 1998 WL 677161,* at *8 (N.D. Ill. Sept. 28, 1998). Because the allegations in Plaintiffs' complaint fail to allege a sufficient factual basis for any of Plaintiffs' claims against Defendants Yoder, Duval, Drexler,

2002 U.S. Dist. LEXIS 12797, *; Fed. Sec. L. Rep. (CCH) P91,954

Ergas, Martin, Peck or Thompson, these Defendants are dismissed from this case.

Having dismissed the other Defendants from the case, we now address whether Plaintiffs can proceed against Defendants Seher, Makary, and Waite. Defendants make a number of arguments challenging the sufficiency of Plaintiffs' claims, but we address their challenge to Plaintiffs' ability to establish justifiable reliance first, because justifiable reliance is an element in all of Plaintiffs' remaining [*18] fraud claims. *Rissman, 213 F.3d 381, 383 (7th Cir. 2000)* (stating "without reliance [plaintiff] has no claim under section 10(b) or *Rule 10b-5*"); *Foster v. Alex, 213 Ill. App. 3d 1001, 572 N.E.2d 1242, 1245, 157 Ill. Dec. 778 (Ill. App. Ct. 1991)* (instructing that Illinois Act requires plaintiff to establish element of reasonable reliance); *Trautman v. Knights of Columbus, 121 Ill. App. 3d 911, 460 N.E.2d 350, 352, 77 Ill. Dec. 294 (Ill. App. Ct. 1984)* (stating reliance upon a representation is a necessary element of common law fraud in Illinois); *One-O-One Enters., Inc. v. Caruso, 270 U.S. App. D.C. 251, 848 F.2d 1283, 1286 (D.C. Cir. 1988)* (instructing that to state a claim for fraud or securities fraud plaintiffs allegations must indicate that plaintiff's reliance on the allegedly fraudulent representations was reasonable).

Defendants argue that Plaintiffs are precluded from arguing that their reliance on Defendants' alleged misrepresentations was reasonable because the Asset Purchase Agreement contains an integration clause. That clause provides, in pertinent part:

> This Agreement...contain[s] the entire [*19] agreement and understanding between the parties hereto with respect to the subject matter of this Agreement and supersede all prior agreements and understandings relating to such subject matter. Neither party shall be liable or bound to any other party in any manner by any representations, warranties or covenants relating to such subject matter except as specifically set forth herein

Am. Compl. Exh. C § 7.06. We agree with Defendants that this clause prohibits Plaintiffs from relying on oral promises not contained in the Asset Purchase Agreement. "Silence in a final agreement containing an integration clause -- in the face of prior explicit representations -- must be deemed an abandonment or excision of those earlier representations." *One-on-One,* 848 F.2d at 1286-87. By agreeing to this term in the Asset Purchase Agreement, Plaintiffs accepted that they would not be bound by any representations not found in the Asset

Purchase Agreement. The alleged misrepresentations are not found in the Asset Purchase Agreement. Additionally, Plaintiffs agreed that such statements outside the four corners of the Asset Purchase Agreement would not form the basis of any liability [*20] on the part of Defendants. Plaintiffs' agreement not to hold Defendants liable based on any statements outside the four corners of the agreement "negates the element of reasonable reliance." *Am. Bankcard Int'l, Inc. v. Schlumberger Techs., Inc., 2001 U.S. Dist. LEXIS 19011, 2001 WL 1465760,* at *3 (N.D. Ill. Nov. 14, 2001). Because Plaintiffs cannot meet this necessary element of all their fraud claims, their claims must be dismissed. *Much v. Pac. Mut. Life Ins. Co., 266 F.3d 637, 644 (7th Cir. 2001); Rissman v. Rissman, 213 F.3d 381 (7th Cir. 2000); Am. Bankcard Int'l, Inc., 2001 U.S. Dist. LEXIS 19011, 2001 WL 1465760,* at *3; *One-on-One,* 848 F.2d at 1286-87; *Braunstein v. Benjamin Berman, Inc., 1990 U.S. Dist. LEXIS 20922, 1990 WL 192547,* at *8-10 (D.N.J. Sept. 12, 1990). Thus, we find that Plaintiffs cannot establish that they reasonable relied on the alleged misrepresentations made by Defendants Seher, Makary, and Waite.

Defendants further argue that Plaintiffs' claims, insofar as they are based on Defendants' statement that DDI would be a "golden egg" that would increase the price of ABC-NACO's stock, fail for the additional reason that this alleged statement is [*21] mere puffery and is, therefore, not actionable. We agree with Defendants. "Predictions and forecasts which are not of the type subject to objective verification are rarely actionable under § 10(b) and *Rule 10b-5.*" *Searls v. Glasser, 64 F.3d 1061, 1066 (7th Cir. 1995)* (collecting cases). "Courts consistently hold that mere puffery and glowing representations of expected boom are not enough to state claims under the [Securities Act]." *Medline Indus. Inc. Employee Profit Sharing & Retirement Trust v. Blunt, Ellis & Loewi, Inc., 1993 U.S. Dist. LEXIS 581,* No. 89 C 4851, 1993 WL 13436, at *4 (N.D. Ill. Jan 21, 1993) (statement that investment was as "good as gold" was not actionable); *see Anderson v. Abbott Labs., 140 F. Supp. 2d 894, 904 (N.D. Ill. 2001); Fewell v. Kozak, 1999 U.S. Dist. LEXIS 16532, 1999 WL 966447,* at *3 (N.D. Ill. Oct. 19, 1999); *In re Abbott Labs. Sec. Litig., 813 F. Supp. 1315, 1319 (N.D. Ill. 1992); In re Miller Indus., Inc. Sec. Litig., 12 F. Supp. 2d 1323, 1330-31 (N.D. Ga. 1998); Plevy v. Haggerty, 38 F. Supp. 2d 816, 827 (C.D. Cal. 1998).* Furthermore, such statements of opinion are not actionable [*22] under Illinois common law fraud. *See, e.g., Thacker v. Menard, Inc., 105 F.3d 382, 386 (7th Cir. 1997).* Therefore, we find that Defendants' alleged "golden egg" statement cannot be the basis of Plaintiffs' fraud claims for this additional reason.

## CONCLUSION

2002 U.S. Dist. LEXIS 12797, *; Fed. Sec. L. Rep. (CCH) P91,954

For the foregoing reasons, Defendants' motion to dismiss is granted and Plaintiffs' complaint is dismissed in its entirety.

Charles P. Kocoras

United States District Judge

Dated: *July 12, 2002*

**JUDGMENT IN A CIVIL CASE**

Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Plaintiffs' complaint is dismissed in its entirety. Plaintiffs to take nothing. All matters in controversy having been resolved, final judgment is entered in favor of the defendants and against plaintiffs.

Date: 7/12/2002